UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X     Case No.: 21-CV-10753
WEIHAI LIANQIAO INTERNATIONAL,

                                                    Plaintiff,

            - against -

A BASE IX CO. LLC, et al.,

                                                    Defendants,
------------------------------------------------------------------------X

## **DEFENDANTS' PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW**

LAZARUS & LAZARUS, P.C.
Harlan M. Lazarus, Esq.
Yvette J. Sutton, Esq.
240 Madison Avenue, 8th Floor
New York, New York 10016
(212) 889-7400
(212) 684-0314 (fax)
*Attorneys for Defendants*

## Table of Contents

TABLE OF AUTHORITIES…………………………………………………………  iii

I.   PRELIMINARY STATEMENT……………..…………..……  1

II.  PROPOSED FINDINGS OF FACTS………………………..  2

    A. A BASE IX…..……………………………………….  2

    B. A BASE IX'S RELATIONSHIP WITH MERCHANT
       FACTORS CORP. ……………………………………  5

    C. A BASE IX'S RELATIONSHIP WITH
       PLAINTIFF……………………………………………  6

    D. THE DEBIT NOTES…………………………………  10

    E. PLAINTIFF WAS INSURED & COLLECTED
       AMOUNTS DUE FROM A BASE IX FROM
       INSURERS……………..……………………………..  14

    F. A BASE IX WINDS DOWN ITS BUSINESS………..  15

    G. THE TERMINATION OF THE PARTIES
       RELATIONSHIP & COMMENCEMENT OF
       THIS ACTION………………………………………..  17

    H. PAYMENTS TO THE INDIVIDUAL
       DEFENDANTS………………………………………  18

    I. GAMMAL PROPERTY TRANSFERS……………..  19

III. PROPOSED CONCLUSIONS OF LAW……………………  20
    A. PLAINTIFF CANNOT PIERCE THE
       CORPORATE VEIL OF A BASE IX………………  20

    1. PLAINTIFF CANNOT PROVE
       "DOMINATION AND CONTROL"
       REQUIRED TO PIERCE THE CORPORATE
       VEIL…………………………………..………….  21

        a. A BASE IX MAINTAINED THE
           CORPORATE FORMALITIES
           REQUIRED OF A SMALL LIMITED

LIABILITY COMPANY……………….. 22

    b.  UNDERCAPITALIZATION…………… 23

    c.  COMMINGLING OF ASSETS……….. 25

    d.  USE OF CORPORATE FUNDS FOR
        PERSONAL USE……………………… 25

2.  DOMINATION ALONE DOES NOT
    SUFFICE: PLAINTIFF MUST ESTABLISH
    FRAUD OR WRONGDOING AS TO EACH
    TRANSACTION ATTACKED…………………… 25

3.  THE DOMINATION USED TO COMMIT
    THE ALLEGED FRAUD OR WRONG MUST
    ALSO CAUSE PLAINTIFF'S INJURY…………… 29

4.  THE INDIVIDUAL DEFENDANTS' LIABILITY
    IF VEIL PIERCING IS PERMITTED IS LIMITED
    TO SPECIFIC TRANSACTIONS ATTACKED…… 30

B.  PLAINTIFF DOES NOT HAVE STANDING TO
    ASSERT ITS DCL CLAIMS AGAINST GAMMAL
    WITH RESPECT TO HIS PERSONAL
    RESIDENTIAL PROPERTIES……………………… 31

C.  PLAINTIFF'S ACTUAL FRAUDULENT
    CONVEYANCE CLAIMS FAIL………………….. 33

    1.  PLAINTIFF'S DAMAGES FOR ACTUAL
        FRAUDULENT CONVEYANCE CLAIMS…… 36

    2.  PLAINTIFF IS NOT ENTITLED TO
        RECOVER ATTORNEY'S FEES……………… 38

D.  PLAINTIFF'S DAMAGES FOR BREACH
    OF CONTRACT…………………………………….. 38

    1.  PAINTIFF'S BREACHES & THE RESULTING
        DEBIT NOTES…………………………………. 40

    2.  PLAINTIFF IS PRECLUDED FROM
        RECOVERING AMOUNTS PAID BY
        INSURERS……………………………………… 43

E.  PLAINTIFF'S ACCOUNT STATED CLAIM
SHOULD BE DISMISSED…………………………..    46

F.  PLAINTIFF'S UNJUST ENRICHMENT
CLAIM MUST BE DISMISSED…………………….    47

G.  PLAINTIFF'S IS NOT ENTITLED TO RECOVER
UNDER UCC §2-706………………………………..    49

IV. CONCLUSION……………………………………………    51

**Table of Authorities**

**Cases**

*Abbott, Duncan & Wiener v. Ragusa*
    214 A.D.2d 412, 413, 625 N.Y.S.2d 178 (N.Y.App.Div., 1st Dep't, 1995)..    46

*Acuri v Figliolli*
    91 Misc 2d 831, 836 [NY Dist Ct 1977]…………………………………..    50

*Adore Me, Inc. v NPC Glob. Corp.*
    99 UCC Rep Serv 2d 750 [SDNY July 29, 2019]………………………….    42

*Air Atlanta Aero Eng'g Ltd. v SP Aircraft Owner I, LLC*
    637 F Supp 3d 185, 197 [SDNY 2009]…………………………………..    45,47

*Am. Federated Tit. Corp. v GFI Mgt. Services, Inc.*
    126 F Supp 3d 388, 404 [SDNY 2015]………………………………….    26,27

*Am. Med. Ass'n v United Healthcare Corp.*
    2007 WL 683974, at *10 [SDNY Mar. 5, 2007]………………………….    48

*Am. Sur. Co. of N.Y. v Conner*
    251 NY 1, 6-7 [1929]…………………………………………………..    31

*Antifun Ltd. T/A Premium Vape v Wayne Indus. LLC*
    616 F Supp 3d 291, 309 [SDNY 2022]…………………………………..    41

*Apex Oil Co. v Belcher Co. of New York, Inc.*
    855 F2d 997, 1006 [2d Cir 1988]………………………………………..    50

*Assouline Ritz LLC v Edward I. Mills & Assoc., Architects, PC*
    91 AD3d 473, 475 [1st Dept 2012]………………………………………    44

*B. Milligan Contr. Inc. v Andrew R. Mancini Assoc. Inc.*
    174 AD2d 136, 139 [3d Dept 1992]………………………………………    42

*B&R Textile Corp. v Paul Rothman Indus. Ltd.*
    101 Misc 2d 98, 100 [Civ Ct 1979]………………………………………    50

*BAII Banking Corp. v Atl. Richfield Co.*
    86 CIV. 6651 (SS), 1993 WL 403963, at *17 [SDNY Oct. 7, 1993]…….    49,50

*Brunswick Corp. v Waxman*
    599 F2d 34, 36 [2d Cir 1979]……………………………………………    28

*Burton F. Clark, Inc. v. Hillside Cos., Inc.*

121 A.D.3d 1236 (3d Dep't 2014)……………………………………..    29

*Carbon Investment Partners, LLC v Bressler*
    20 CIV. 3617 (ER), 2021 WL 3913526, at *10 [SDNY Sept. 1, 2021…..    31

*Cardell Fin. Corp. v Suchodolski Assoc., Inc.*
    2012 WL 12932049, at *20 [SDNY July 17, 2012]……………………    22,23,24

*Capmark Financial Grp. Inc. v. Goldman Sachs Credit Partners L.P.*
    491 B.R. 335, 347 (S.D.N.Y. 2013)…………………………………….    26

*Cipciao, LLC v M Chow One, LLC*
    2021 WL 1141567, at *7 [SDNY Mar. 24, 2021]…………………………    31,32

*Coastal Power Intern., Ltd. v Transcontinental Capital Corp.*
    10 F Supp 2d 345, 370 [SDNY 1998], <u>*affd,*</u> 182 F3d 163 [2d Cir 1999]….    43

*Cohen v Schroeder*
    248 F Supp 3d 511, 521 [SDNY 2017]……………………………………    23,24

*Conn. v. Physicians Health Servs. of Conn., Inc.*
    287 F.3d 110, 117 (2d Cir.2002)…………………………………….    43

*Cordius Trust v. Kummerfeld*
    153 F. App'x 761, 763 (2d Cir. 2005)………………………………….    21

*Corsello v. Verizon N.Y., Inc.*
    18 N.Y.3d 777, 790, 944 N.Y.S.2d 732, 740 (2012)……………………..    47

*D'Mel & Assoc. v. Athco, Inc.*
    105 A.D.3d 451, 453, 963 N.Y.S.2d 65 (1st Dep't 2013)…………………    36

*Deerbrook Ins. Co. v Mirvis*
    20-1385, 2021 WL 4256845, at *6 [2d Cir Sept. 20, 2021]………………    37

*Delchi Carrier SpA v Rotorex Corp.*
    71 F3d 1024, 1028 [2d Cir 1995]……………………………………    40

*DoubleLine Capital LP v Construtora Norberto Odebrecht, S.A.*
    413 F Supp 3d 187, 223 [SDNY 2019]……………………………………    31

*East Hampton Union Free School Dist. v. Sandpebble Bldrs., Inc.*
    66 A.D.3d 122, 127, 884 N.Y.S.2d 94 [2d Dep't 2009]…………………..    21

*EED Holdings v Palmer Johnson Acquisition Corp.*
    228 FRD 508, 512 [SDNY 2005]…………………………………………..    20

*EMA Fin., LLC v Chancis*
    80 F4th 395 [2d Cir 2023]……………………………………………  34

*EMA Fin., LLC v Joey New York Inc.*
    *10 [SDNY Feb. 1, 2022]…………………………………………….  34

*Fannie Mae v. Olympia Mortg. Corp.*
    2013 U.S. Dist. LEXIS 12901 (E.D.N.Y. 2013)……………………………  33

*Field Home-Holy Comforter v. Warns*
    *5 (S.D.N.Y. Dec. 13, 2014)…………………………………………….  34

*Fuji Photo Film USA, Inc. v Zalmen Reiss & Assoc., Inc.*
    31 Misc 3d 1240(A) [Sup Ct 2011]………………………………………  50

*Gartner v. Snyder*
    607 F.2d 582, 586 (2d Cir.1979)……………………………………………  20,24

*Hangzhou Silk Import and Export Corp. v P.C.B. Intern. Indus., Inc.*
    48 UCC Rep Serv 2d 1367 [SDNY Sept. 5, 2002]…………………………  42

*Hanwha Corp. v Cedar Petrochemicals, Inc.*
    760 F Supp 2d 426, 430 [SDNY 2011]………………………………………  39

*HBE Leasing Corp. v Frank*
    61 F3d 1054, 1059 n.5 [2d Cir 1995]………………………………………  33,34

*Highland CDO Opportunity Master Fund, L.P. v Citibank, N.A.*
    270 F Supp 3d 716, 730 [SDNY 2017]………………………………………..  27

*IMG Fragrance Brands, LLC v Houbigant, Inc.*
    679 F Supp 2d 395, 411 [SDNY 2009]………………………………………..  46

*In re Adler*
    467 B.R. 279, 288 (Bankr. E.D.N.Y. 2012)………………………………..  22

*In re Sharp Intern. Corp.*
    403 F3d 43, 56 [2d Cir 2005]………………………………………………  33

*In re Stage Presence, Inc.*
    592 BR 292, 304 [Bankr SDNY 2018]………………………………………..  23

*In re Storar*
    52 N.Y.2d 363, 379, 438 N.Y.S.2d 266, 420 N.E.2d 64 (1981)……………  20

*J.P.'s Shellfish, Inc. v. Best Buy Shellfish, Inc.*
    2009 NY Slip Op 30276(U), ¶¶ 5-6 (Sup. Ct., N.Y. Co., 2009)...............   23

*Key Items, Inc. v. Ultima Diamonds, Inc.*
    3729, 2010 WL 3291582, at *9 (S.D.N.Y. Aug. 17, 2010)....................   29

*Koenig v. Boulder Brands, Inc.*
    995 F.Supp.2d 274, 290 (S.D.N.Y.2014)...........................................   47

*Kozyra v Goldstein*
    146 Misc 2d 25, 26 [Sup Ct 1989]..................................................   37

*Lakah v UBS AG*
    996 F Supp 2d 250, 268 [SDNY 2014]............................................   28

*LaSalle Bank N.A. v. Nomura Asset Capital Corp.*
    47 A.D.3d 103, 107, 846 N.Y.S.2d 95 [2007]..................................   44

*Lehman Bros., Inc. v. Cox*
    10 N.Y.3d 743, 744, 853 N.Y.S.2d 530, 531, 883 N.E.2d 355, 355 (2008)..   20

*Love v Rebecca Dev., Inc.*
    36 Misc 3d 1232(A) [Sup Ct 2012]..................................................   27,29

*Mandarin Trading Ltd. v Wildenstein*
    16 NY3d 173, 182 [2011].............................................................   47

*Marine Midland Bank v. Murkoff*
    120 A.D.2d 122, 133, 508 N.Y.S.2d 17 (2d Dep't 1986).....................   37

*Mars Elecs. of N.Y., Inc. v U.S.A. Direct, Inc.*
    28 F Supp 2d 91, 99 [EDNY 1998]..................................................   26,27

*Matter of Moran v. N.Y.C. Tr. Auth.*
    45 A.D.3d 484, 484, 846 N.Y.S.2d 162, 163 (1st Dep't 2007)...............   20

*Matter of Nw. 5th & 45th Realty Corp. v. Mitchell, Maxwell & Jackson, Inc.*
    2013 WL 3929620 (N.Y.Sup.), 10.....................................................   36

*Maxwell & Jackson, Inc.*
    2013 WL 3929620 (N.Y.Sup.), 10.....................................................   36

*Mil-Spec Indus. Corp. v Expansion Indus., LLC*
    201 AD3d 651, 655 [2d Dept 2022]..................................................   41

*Morris v. N.Y. State Dep't of Taxation & Fin.*

82 N.Y.2d 135, 603 N.Y.S.2d 807, 623 N.E.2d 1157, 1160 (1993)………..    21,30

*NetJets Aviation, Inc. v. LHC Communs., LLC*
537 F.3d 168, 178 (2d Cir. 2008)………………………………………….    22

*New York Packaging II LLC v. Intco Med. Indus. Inc.*
21-cv-04388 (DG)(SIL), 2023 U.S. Dist. LEXIS 667, at *9……………...    42

*Ningbo Yang Voyage Textiles Co., Ltd. v Sault Trading*
18CV1961ARRST, 2019 WL 5399973, at *7 [EDNY Sept. 10, 2019]….    46

*Of A Feather, LLC v Allegro Credit Services, LLC*
21-1107, 2023 WL 2415607, at *1 [2d Cir Mar. 9, 2023]………………..    44

*Pae v. Chul Yoon*
41 A.D.3d 681, 682 (2d Dep't 2007)…………………………………………    23

*Perez v. One Clark Street Housing Corp.*
108 A.D.2d 844 (2d Dep't 1985)…………………………………………..    22,25

*Profi-Parkiet Sp. Zoo v Seneca Hardwoods LLC*
13 CV 4358 PKC LB, 2014 WL 2169769, at *4 [EDNY May 23, 2014]….    40,51

*Push, Inc. v. Production Advisors, Inc.*
4722, 2010 WL 1837776, at *3 (S.D.N.Y. April 15, 2010)………………..    21

*Post v Browne*
279 AD 922, 922 [2d Dept 1952], *affd*, 304 NY 610 [1952]………………    38

*Ray v Ray*
799 Fed Appx 29, 32 [2d Cir 2020]……………………………………….    33,34

*R.H. Damon & Co., Inc. v. Softkey Software Prods., Inc.*
811 F. Supp 986, 991 (S.D.N.Y.1993)…………………………………….    38

*RIJ Pharm. Corp. v Ivax Pharm., Inc.*
322 F Supp 2d 406, 416 [SDNY 2004]…………………………………..    41

*Roedel Companies, LLC v JNK Home Enterprises, LLC*
71 Misc 3d 1223(A) [Sup Ct 2021]………………………………………..    33

*Royal Host Realty, LLC v. 793 Ninth Ave. Realty, LLC*
192 F. Supp. 3d 348, 357 (S.D.N.Y. 2016)……………………………….    47

*SCM Grp., Inc. v. McKinsey & Co., Inc.*
2011 WL 1197523, at *7–8 (S.D.N.Y. March 28, 2011)…………………...    48

*Sears, Roebuck & Co. v Galloway*
　　195 AD2d 825, 827 [3d Dept 1993]…………………………………………    42

*Shantou Real Lingerie Mfg. Co., Ltd. v Native Group Intl., Ltd.*
　　14CV10246-FM, 2016 WL 4532911, at *2 [SDNY Aug. 23, 2016]………..    39

*Team Air Express, Inc. v. A. Heffco Techs., Inc.*
　　2008 U.S. Dist. LEXIS 59892, *39 (E.D.N.Y. Aug. 6, 2008)…………….    30

*TeeVee Toons, Inc. v Gerhard Schubert GmbH*
　　00 CIV. 5189 (RCC), 2006 WL 2463537, at *12 [SDNY Aug. 23, 2006]…    41

*TLC Merch. Bankers, Inc. v. Brauser*
　　*5 (S.D.N.Y. Mar. 11, 2003)……………………………………………    27

*TNS Holdings Inc. v. MKI Sec. Corp.*
　　92 N.Y.2d 335, 339 (1998)………………………………………………    20,21

*Towers Charter & Marine Corp. v. Cadillac Ins. Co.*
　　894 F.2d 516, 523 (2d Cir. 1990)………………………………………..    42

*Tycoons Worldwide Group (Thailand) Pub. Co., Ltd. v JBL Supply Inc.*
　　721 F Supp 2d 194, 205 [SDNY 2010]…………………………………..    22

*United States v McCombs*
　　30 F3d 310, 328 [2d Cir 1994]…………………………………………..    33

*U.S. Nonwovens Corp. v Pack Line Corp.*
　　48 Misc 3d 211, 215 [NY Sup 2015]……………………………………    39,40,47

*Worldcom, Inc. v Prepay USA Telecom, Corp.*
　　294 AD2d 157 (1st Dept 2002)…………………………………………    28

*Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*
　　933 F.2d 131, 139 (2d Cir. 1991)…………………………………………    21

## **Statutes and Other Cites**

NY DCL §270……………………………………………………………….    31

NY DCL § 273…………………………………………………….…………..    32, 33

NY DCL §276……………………………………………………………….    32,33,38

NY DCL §278……………………………………………………………………    38

UCC §2-101…………………………………………………………………………… 1

UCC §2-607…………………………………………………………………………. 42

UCC 2-706…………………………………………………………………….... 50, 51

UCC 2-708……………………………………………………………………… 50

UCC §2-714……………………………………………………………………… 42

UCC §2-715……………………………………………………………………… 42

28 U.S.C. § 1961(a)……………………………………………………………… 51

Defendants A Base IX Company LLC ("A Base IX" or the "Corporate Defendant"), David Apperman ("Apperman") and Albert Gammal ("Gammal")[1], submit the within proposed findings of facts and conclusions of law in connection with the August 19, 2024 trial scheduled in the above captioned action (the "Action").

## I.    **PRELIMINARY STATEMENT**

The Action, brought by Plaintiff Weihai Lianqiao International Coop Group Co., Ltd. ("Plaintiff" or "Weihai") on December 15, 2021, contains causes of action against the Defendants sounding in breach of contract, account stated, unjust enrichment, Uniform Commercial Code § UCC 2-101, Uniform Voidable Transaction Act and veil piercing claims. Amended Complaint at Doc. No. 21. Plaintiff alleges that the amount owed due to A Base IX's failure to pay for goods sold and delivered by Plaintiff to A Base IX is approximately $4,345,077.65. Plaintiff also has a claim under UCC§2-101 for $1,384,115.32 representing the difference between the invoiced price and resale price of goods manufactured for A Base IX. The amount owed is disputed by Defendants, who maintain that there were debits due A Base IX due to quality and lateness of certain goods as well as payments from insurers that offset the amount owed by A Base IX.

In addition, Plaintiff attempts to impose liability on the Individual Defendants for alleged agreements and transactions, between A Base IX and Plaintiff on a veil piercing theory of liability and alleges that there were fraudulent transfers between A Base IX and the Individual Defendants. However, Plaintiff fails to adduce by clear and convincing evidence that the

---

[1] A Base, Apperman and Gammal are collectively herein referred to as the "Defendants." Gammal and Apperman and collectively herein referred to as the "Individual Defendants."

corporate veil of A Base IX should be pierced and that the Individual Defendants conveyed any property with the intent to defraud.

For the reasons detailed below, the Action must be dismissed in its entirety against the Individual Defendants and the amount owed by A Base IX reduced to account for the debit notes, insurance proceeds and Plaintiff's failure to mitigate its damages.

## II.    PROPOSED FINDINGS OF FACTS

Defendants set forth the following proposed findings of facts, many of which are taken from the parties Stipulated Facts ("SF").

### A.  A Base IX

1.  Defendant A Base IX Company, LLC ("A Base IX") is a New York based limited liability company with two members, Defendants Apperman and Gammal (SF ¶2).

2.  A Base IX was formed in May 2015 and operated an import garment business until February 2022. A Base IX imported and sold children's and women's clothing to retailers such as Ross Stores and TJ Maxx (SF ¶30).

3.  A Base IX was formed for a legitimate business purpose and had employees, customers and vendors (Apperman Dec. ¶¶9-10).

4.  From May 2015 through March 2022, A Base IX operated from 525 Seventh Avenue, Suite 1508, New York, New York 10018 (SF ¶31).

5.  The members of A Base IX entered into the Operating Agreement of A Base IX Company LLC dated as of ___day of _____2015 (the "Operating Agreement")( The original members and their respective interests in A Base IX were as follows: Guotai USA Co. Ltd., 30%, Gammal 23 1/3%, Salamon Murciano 23 1/3%, and Apperman 23 1/3% (SF ¶32)(Apperman Declaration at **DX-1**).

6.  Pursuant to the Op Agreement, Gammal was responsible to "act as the day-to-day manager ("Day to Day Manager") of the LLC with principal responsibilities for the LLC's merchandising and sales and day to day operations, including the hiring and firing of staff, and any and all good faith decisions made in connection with merchandising, selling, designing and purchasing for the LLC (***DX-1*** Op. Agreement 3.1.(B)(iii))(Apperman Dec ¶16, ***DX-1***).

7.  Pursuant to the Op. Agreement, in consideration for Gammal's day to day management of A Base IX, Gammal was entitled to a salary of $280,000.00 payable bi-weekly together with such other and customary and usual benefits as provided to a manager in a business the same or substantially the same as the business of the LLC (***DX-1***, Op. Agreement 3.1.(B)(iii))(Apperman Dec ¶17, ***DX-1***).

8.  Pursuant to the Op. Agreement, A Base IX member GUC was to provide the LLC with working capital as needed. (DX-1).

9.  Pursuant to the Op. Agreement, distributions of cash or other assets of A Base IX to members were to be made at times as determined by the majority consent of the Members. (***DX-1***, Op. Agreement 4.6(A), Apperman Dec ¶18, ***DX-1***).

10. Pursuant to the Op. Agreement, A Base IX members were "entitled to receive from the LLC as mandatory cash distributions for each taxable year in amounts sufficient to enable each Member to discharge any federal, state and local tax liability for such taxable year (excluding penalties) arising as a result of their interest in the LLC. determined by assuming the applicability to each Member of the highest combined effective marginal federal, state and local income tax rates for any individual or corporation actually obligated to report on any tax returns income derived from the LLC." (***DX-1,*** Op. Agreement 4.6(B), Apperman Dec ¶19, ***DX-1***).

11. Apperman was the Chief Operating Officer at A Base IX (Apperman Dec ¶13) and was responsible for matters relating to the administration and financing of A Base IX including banking, accounting and bookkeeping tasks. (See also **DX-1,** Op. Agreement 3.1.(B)(iv)(Apperman Dec ¶14).

12. Gammal's title was Vice President of Sales (Apperman Dec ¶15).

13. Apperman and Gammal entered into the First Amendment to Operating Agreement of A Base IX Company LLC dated March 19, 2019 (the "Amendment") (SF ¶33).

14. According to the Amendment, Guotai USA Co. Ltd. previously sold and assigned its membership interest in A Base IX to Murciano on December 30, 2015 and, on the same day, Murciano sold and assigned a portion of his membership interest to A Base IX (SF ¶34).

15. Thus, as of December 30, 2015, A Base IX's members and their respective interests were as follows: Murciano  33 1/3%, Apperman   33 1/3%, Gammal       33 1/3% (SF ¶35).

16. In a Membership Interest Redemption Agreement dated March 19, 2019 (the "Redemption Agreement"), Murciano redeemed his interest in A Base IX (SF ¶36).

17. Following the redemption of Murciano's 33 1/3% interest pursuant to the Redemption Agreement, Apperman and Gammal each owned a 50% membership interest in A Base IX and continue to hold those interests to date (SF ¶37).

18. After the MIRA, Gammal assumed responsibility for production and design previously assumed by Murciano. Apperman assumed additional responsibilities relating to communicating with factories and vendors relating to payment (Apperman Dec ¶¶23).

19. After the MIRA, the process of paying a factory invoice was that the Individual Defendants would jointly approve of an invoice and then Apperman made the payment through A Base IX's banking system to the factory (Apperman Dec ¶25).

20. A Base IX's distributions to members were equalized at the end of the year (Apperman Dec ¶29).

21. The Individual Defendants would discuss the business matters of A Base IX in meetings at A Base IX offices at 525 7th Ave., New York, New York (Apperman Dec ¶26).

22. A Base IX's corporate records were maintained at 575 7th Avenue, New York, New York from 2015 through March 31, 2022 (Apperman Dec. ¶27).

23. At times relevant hereto A Base IX maintained the following bank accounts: TD Bank NA (account ending in 6051 and TD Bank account ending in 7304), Bank Hapoalim (account ending in 0878) (Apperman Dec. ¶28).

24. A Base IX's outside accounting firm prepared and filed A Base IX's annual tax return (Apperman Dec. ¶30).

25. A Base IX tax returns for the years 2016- 2021(DX-31, DX-32, DX-33, PX-72, PX-73, PX-74) reflects the following income:

| Year | Income |
|------|--------|
| 2016 | $1,118,000.00 |
| 2017 | $4,156,000.00 |
| 2018 | $2,135,000.00 |
| 2019 | $1,879,000.00 |
| 2020 | $1,210,000.00 |
| 2021 | -$298,000.00 |

**B.  A Base IX's Relationship with Merchant Factors Corp.**

26. On about March 22, 2018, A Base entered into a Discount Factoring Agreement (the "Factoring Agreement") with Merchant Factors Corp. ("Merchant"), whereby, amongst other things, A Base IX agreed to sell, and Merchant agreed to buy, all of A Base IX's accounts receivable (SF ¶39)(Apperman Dec. ¶33, *DX-2*).

27. Merchant advanced money to A Base IX based on the invoices from A Base IX's customers and the customers paid Merchant directly (Apperman Dec. ¶34).

28. Pursuant to the Factoring Agreement, Merchant had a lien on all of A Base IX's business assets including accounts receivable and inventory. (Apperman Dec. ¶35) Annexed to the Apperman Dec at ¶35 as *DX-26* is a true and correct copy of the UCC filings maintained on the ny.gov website.

29. Pursuant to the Factoring Agreement all advances by Merchant to A Base IX were discretionary (SF ¶40).

30. The Individual Defendants executed personal guarantees and waivers in favor of Merchant as security for any and all debts, monetary obligations and other amounts due and owning from A Base IX to Merchant pursuant to the Factoring Agreement (Apperman Dec ¶36).

### C. **A Base IX's Relationship with Plaintiff**

31. Plaintiff Weihai Lianqiao International Coop Group Co., LTD is a manufacturer and supplier of apparel located in Weihai, China (SF ¶1).

32. Jason Jiang ("Jiang") worked for Plaintiff, first as an interpreter and then as a department manager (Jiang deposition tr. pg. 11: 13- 23, Pg. 12: 14- 21)(Jiang Declaration ¶2).

33. Jiang was A Base IX's primary point of contact with Plaintiff (Jiang deposition tr. pg. 17:25- pg. 18:2, Apperman Dec. ¶41, Gammal Dec ¶20)(Jiang Declaration ¶3).

34. The Individual Defendants and an A Base IX employee named Ho Yee Loo communicated with Weihai on behalf of A Base IX (Apperman Dec ¶41). Towards the end of the parties' relationship, Apperman also communicated with Mr. Mu, Mr. Tie Sun and Mr. Sam Zhong of Weihai (Apperman Dec. ¶43).

35. Beginning in or around 2018 through October 2020, A Base IX entered into a series of written purchase orders with Plaintiff to manufacture and ship to A Base IX an array of apparel, which A Base IX would then sell to retailers. A Base IX submitted 75 Purchase Orders, which are the subject of this Action. The purchase orders in issue in this Action are dated between February 2019 through October 2020 (the "Purchase Orders")(SF ¶8).

36. Between June 2019 through May 2021, Plaintiff sent A Base IX a series of written invoices (collectively, the "Invoices") setting forth the amounts due for the goods delivered pursuant to the Purchase Orders. Plaintiff sent A Base IX 164 invoices, which are the subject of this Action (SF ¶9).

37. The Individual Defendants are not parties to the Purchase Orders and the Invoices (SF ¶13). At all times relevant to the transactions in issue in the above captioned action, Weihai contracted with, manufactured goods for, shipped goods to and invoiced A Base IX (Apperman Dec ¶40)

38. A Base IX and Weihai originally agreed that payment was to be sent net 60 from receipt of goods. Later Plaintiff accepted payment net 150- 180 from receipt of the goods (Apperman Dec. ¶¶38-39).

39. Over the course of the parties' relationship A Base IX typically paid Weihai on account payment on a weekly or bi-weekly basis (Apperman Dec.¶46-47).

7

40. Over the course of Weihai and A Base IX approximately four (4) year relationship, A Base IX paid Weihai approximately $8,000,000.00. A true and correct copy of a QuickBooks report I ran reflecting payments through 1/6/21from A Base IX to Weihai is annexed to the Apperman Dec ¶48 as *DX-8.*

41. Between June 2019 through 2021, Plaintiff delivered to A Base IX the goods identified in the Invoices (the "Delivered Goods") (SF ¶10).

42. Except as claimed by A Base IX in the Debit Notes discussed below, A Base IX accepted the Delivered Goods (SF ¶11).

43. Plaintiff delivered the Invoices to A Base IX and A Base IX received the Invoices (SF ¶12).

44. A Base IX did not pay Plaintiff in full for the Delivered Goods and A Base IX regularly maintained an open unpaid balance against the Invoices (SF ¶13). Annexed to the Apperman Dec. ¶49 as *DX-9* is a true and correct copy of a schedule reflecting the growth of the unpaid balance due Weihai from A Base IX.

45. As of July 13, 2021, there was an unpaid balance of $4,195,434.00 on the Invoices, which remains unpaid to date (the "Unpaid Balance")(SF ¶16).

46. The amounts due in connection with the Unpaid Balance commenced with a February 11, 2019 purchase order (Amended Complaint ¶10) (SF ¶17).

47. All invoicing by and between Plaintiff and A Base IX for prior periods were paid in full or are not otherwise in issue in this Action (SF ¶18).

48. The Unpaid Balance in connection with the February 11, 2019 purchase order was $2,246.40 (Amended Complaint ¶10)( SF ¶19).

49.  Although A Base IX continued to make payments to Plaintiff up to and including January 6, 2021, the unpaid balance of $2,246.40 from February 11, 2019 grew to approximately $600,912.15 by August 19, 2019 (SF ¶20).

50. In the period between February 11, 2019 and August 19, 2019 Plaintiff accepted approximately 28 additional purchase orders from A Base IX (SF ¶21).

51. The unpaid balance of approximately $600,912.15 from August 19, 2019 grew to approximately $1,980.338.94 by March 3, 2020 (SF ¶22).

52. In the period between August 19, 2019 and March 3, 2020 and irrespective of the increase in the unpaid balance, Plaintiff accepted approximately 36 additional purchase orders from A Base IX (SF ¶23).

53.  The unpaid balance of approximately $1,980.338.94 from March 3, 2020 grew to approximately $3,295,989.88 by September 11, 2020 (SF ¶24).

54. In the period between March 3, 2020 and September 11, 2020 and irrespective of the increase in the unpaid balance, Plaintiff accepted approximately 36 additional purchase orders from A Base IX (SF ¶25).

55. The unpaid balance of approximately $3,295,989.88 from September 11, 2020 increased to more than $4,000,000.00 thereafter (SF ¶26).

56. Plaintiff continued to ship A Base goods despite that A Base had an outstanding balance with Plaintiff and debt was accumulating (Tie Sun pg. 36:3- 11, pg. 41:24- pg. 42:8)

57. Apperman and Gammal were told, during conversations with Jason Jiang and Sun Tie, that Weihai was willing to accommodate and forgive some of A Base IX's open balance, because Weihai wanted to keep doing business with A Base IX and increase its business with A Base IX (Apperman Dec. ¶59). Jason Jiang and Mr. Sun advised Apperman that as long as A Base IX

kept making regular payments to Weihai in accordance with an agreed upon schedule, Weihai would not hold A Base IX to paying down the entire unpaid balance (Apperman Dec. ¶60)( *See also* Gammal Dec. ¶¶25-26).

58. In or about the end of 2020, A Base IX's relationship with Weihai took a turn. Weihai was no longer willing to ship goods without the payment of the open balance in full. Weihai threatened to stop shipments of A Base IX's goods if payment of open invoices was not sent to Weihai as quickly as possible. Annexed to the Apperman Dec ¶61 as *DX12*, *DX13*, and *DX14* are true and correct copies of email correspondence between Apperman, Weihai and Weihai's shipper concerning the unpaid balance and Weihai's failure to release goods.

59. Plaintiff continued to ship goods to A Base IX until February 2021, when it stopped shipping goods to A Base IX (SF ¶15). Weihai stopped shipping and canceled all of A Base IX's spring 2021 orders. (Apperman Dec. ¶62, *DX 13*).

60. As of July 13, 2021, and prior to deducting debits and insurance payment, A Base IX open balance with Weihai was approximately $4,195,434.00 (See Apperman Dec ¶86 and *PX-24*.(SF ¶16)

### D.  The Debit Notes

61. Between January 20, 2020 and continuing to July 13, 2021, A Base IX submitted fifteen (15) debit notes to Plaintiff for chargebacks for violations of the purchase orders, to be reduced from the Unpaid Balance (the "Debit Notes"). Such Debit Notes have not been deducted from the Unpaid Balance of $4,195,434.00 (SF ¶27).

62. Gammal discussed the reason for issuing a debit note to Weihai with Jason Jiang, before the debit note was issued in writing to Weihai (Gammal Dec ¶20).

63. Gammal recalled that Mr. Jiang always acquiesced and approved the debit notes. Mr. Jiang said to send him the debit notes. (Gammal Dec. ¶23). Mr. Jiang would constantly tell Gammal that they are "partners" or "we are together" and "don't worry." (Gammal Dec. ¶24).

64. Mr. Jiang told Gammal that if A Base IX continued making regular partial payment with Weihai against the open balance due Weihai, Weihai would continue making payment accommodations and accepting debit notes from A Base IX (Gammal Dec ¶25).

65. Jiang was eager to accommodate A Base IX, as they wanted to continue doing business with A Base IX (Gammal Dec. ¶27).

66. Ho Yee Lo, A Base IX's production manager, was responsible for creating the written Debit Notes and conveying such debit notes via email to Weihai (Apperman Dec. ¶90).

67. The reasons for the Debit Note was clearly stated on the face of the Debit Note, such as late delivery or non-conforming goods (Apperman Dec ¶91).

68. Debit Note 115 (*PX-19*) was issued by A Base IX due to Weihai failing to ship the goods by the date listed on the purchase orders and A Base IX received chargebacks from its customers due to the delay (Gammal Dec ¶31). Plaintiff admits that it agreed to pay 7.5 percent of the tax (Tie Sun Deposition Tr. Pg. 17:13- 24).

69. Debit Note 116 (*PX-9*) was issued by A Base IX on account of COVID- 19 related issues. In Gammal's conversations with Jason Jiang concerning a 15% COVID-19 related deduction he stated that understood the need for a COVID-19 related deduction and accepted it (Gammal Dec. ¶32).

70. Debit Note #118 (*PX-10*) and Debit Note #128 (*PX-18*) were issued by A Base IX due to non-merchantable moldy goods. In or about March 2020, A Base IX received a return of approximately 32,400 pointelle sweaters from Ross Stores, Inc. due to mold found on the sweaters,

hangtags and product packaging. Neither Ross Stores, Inc. nor any other customer would accept the moldy goods. Due to these mold issues the pointelle sweaters were not merchantable and had to be charged back in full to Plaintiff (Gammal Dec. ¶33). Debit Note #128 concerns additional shipping charges incurred from Ross Stores, Inc.'s return of the moldy goods to A Base IX (Gammal Dec. ¶40).

71. Debit Note #119 (*PX-11*) and Debit Note #123 (*PX-15*) were issued by A Base IX to Plaintiff due to A Base IX's warehouse received damages cartons containing A Base IX's goods from Weihai.  The damage was caused, in part, by Weihai leaving empty space in the cartons prior to shipping to A Base IX's warehouse. The warehouse needed to repack the goods in new cartons prior to shipping to customers. Debit Notes 119 and 123 were chargebacks associated with the warehouse repacking fee.(Gammal Dec. ¶¶34, 37).

72. In Debit Note 120, dated November 18, 2020, A Base IX sought a $3,048 chargeback for late delivery of goods and expedited shipping costs. Plaintiff admits that it approved Debit Note 120 (SF ¶28).

73. Debit Note 121 was issued by A Base IX due to Plaintiff's failure to conform goods to the specifications listed on the purchase order. The purchase order (DX-20) specifically required 12 pieces per master carton. However, contrary to the express terms of the purchase order, Weihai packed 24 pieces per master carton. Debit Note 121 (*PX-13*) was for repacking and labor costs associated repackaging goods due to Weihai's failure to package in accordance with the purchase order requirements (Gammal Dec. ¶35).

74. In Debit Note 122 (*PX-14*), dated December 8, 2020, A Base IX sought a $16,450 chargeback for expedited shipping charges incurred because of allegedly delayed shipping by Plaintiff. In email correspondence from October 2020, Weihai agreed to split shipping costs with

A Base IX on account of the delays (Gammal Dec. ¶36). However, Plaintiff admits that it approved Debit Note 122 to the extent of $3,250 and claims to have rejected the balance ($13,200)(SF¶29).

75. Debit Note 126 (*PX-16*) was issued by A Base IX due to Weihai requiring a shipper to hold goods at the port until Weihai's payment terms were satisfied. Weihai unilaterally requested Shandong hold the goods associated with Debit Note 126 at the delivery port, therefore incurring additional shipping charges by the carrier, which resulted in the issuance of Debit Note 126 (Gammal Dec. ¶38).

76. Debit Note 127 was for fees associated with opening and closing a line of credit that would have been used to pay Plaintiff. Such line of credit was never utilized and A Base IX incurred fees as a result of opening and closing it (Gammal Dec. ¶39, *PX-17*).

77. Debit Note 135 (*PX-21*) was issued by A Base IX to Weihai due to Weihai's failure to correctly describe goods on product packaging. Attached hereto as *DX- 27* is a true and correct copy of A Base purchase order number 1802, which described design number G1906 as a "2 PC SET-SOLD AND TIE DYE SHORT SLV TOP W/LETTUCE EDGE." However, Weihai shipped the design number G1906 with a hanger header that contained incorrect text (referring to a three pack of shorts and not a two pack of tops) on the hanger header. As a result of the incorrect hanger header, A Base IX's customer, TJ Maxx, returned all the goods to A Base IX. A Base charged back Weihai for the cost of the goods (Gammal Dec. ¶43).

78. Debit Notes 129, 130 and 136 (*PX-19, -PX-20, PX-22*) were issued by A Base IX due to Weihai's failure to ship goods to A Base IX. Due to Weihai's failure to ship the goods, A Base IX's customers orders could not be fulfilled by A Base IX and were cancelled. As a result of Weihai's failure to ship, A Base IX was entitled to receive an on-account credit on account of the

unfulfilled orders and lost profits. Gammal discussed these debit notes with Jason Jiang and understood that Jiang accepted them. (Gammal Dec. ¶¶41, 42, 44).

79. During his deposition Plaintiff's representative, Tie Sun, admitted that additional debit notes were accepted by Plaintiff but could not recall which ones were accepted (Tie Sun Deposition Tr. Pg. 20: 17- pg. 21: 14).

### E.  **Plaintiff Was Insured & Collected Amounts Due from A Base IX from Insurers.**

80. Plaintiff maintained insurance for exporters with Sinosure and PICC Property and Casualty Company Limited ("PICC") for the period in question (Tie Sun Deposition Tr. pg. 46:18- pg. 47:3)(*DX-15, DX-16* and *DX-18*).

81. Plaintiff produced documents during discovery that reflect that it assigned purchase orders numbers 1802, 1801 and 1805 to PICC (*See DX-15*). Such "Collection Trust Deed" states that Plaintiff assigned PICC such purchase orders  "for the full rights of collection" and further stated that Plaintiff "grant to PICC…the full power of exercising such rights and remedies" in exchange for the payment amount of $184,131.00.

82. During discovery, Plaintiff gave conflicts accounts with respect to what, if anything, Plaintiff recovered from Sinosure. In a sworn declaration, Mr. Tie Sun states that "Plaintiff has not submitted a claim to Sinosure related to the shipments to A Base IX Co. LLC that are the subject of this litigation" (*DX-18*).

83. However, during Mr. Tie Sun's deposition he testified that Sinosure allegedly denied the claims submitted by Plaintiff to Sinosure relating to A Base invoice (Tie Sun Deposition Tr. Pg. 47: 7-23).

84. The documents produced by Plaintiff (*DX-16*) reflect that Plaintiff did insure three A Base IX orders with Sinosure and received a minimum of $470,537.16 as the insured amount from Sinosure (*DX-16*). This is consistent with Defendants understanding that Plaintiff did maintain Sinosure coverage for orders with A Base IX.

85. Based on email correspondence and conversations between Jason Jiang and Apperman, Apperman understood that Weihai received monies from PICC and Sinosure on account of A Base IX. (Apperman ¶88, *DX 17*)

**F.  A Base IX Winds Down its Business.**

86. Between 2015 through 2019, A Base IX was a successful company, that was sufficiently funded and was profitable (Apperman Dec.¶64).

87. However, beginning in 2018, A Base IX faced financial difficulties, due to customers J&M Sales Inc. and Specialty Retailers, Inc. a/k/a Stage Stores bankruptcies (See DX-27, DX-28 and DX-29),

88. The COVID 19 Pandemic (the "Pandemic") and the increased shipping and container costs that arose during the Pandemic (Apperman Dec.¶65, *DX- 23* Base IX Financial Statements from 2019 and 2020, *DX-24* A Base IX General Ledger from December 2019 through July 2022) made matters worse.

89. Apperman stated that prior to the Pandemic, shipping containers prices were approximately $2,000.00 per container. However, during the Pandemic, shipping container prices went up to over $20,000.00 per container, which took away from A Base IX's profit on merchandise (Apperman Dec ¶68).

90. Ordinarily, A Base IX employees were paid from A Base IX's account. However, during the height of the pandemic certain employees were paid directly by Apperman (and Apperman was then reimbursed by A Base IX), as typical payment measures were not practical when A Base IX's offices were closed (Apperman Dec.¶69).

91. As a result of its financial difficulties, A Base IX's members advanced monies to A Base to stay afloat (Apperman Dec.¶70).

92. At times, Merchant did not remit payments to A Base IX right when funds were needed and even though it was requested (Apperman Dec.¶71). In some instances, the Individual Defendants would cover A Base IX's immediate cash needs and would be reimbursed by A Base IX when the Merchant advances came in to A Base IX's account (Apperman Dec.¶72 and *DX 3*).

93. On or about January 1, 2021, A Base IX entered into promissory notes with the Individual Defendants, in which A Base IX promised to pay the principal sum of $300,000.00 to Gammal and $500,000.00 to me. (Apperman Dec.¶74, *DX 5*). The loans were made for A Base IX's benefit and continued business (Apperman Dec.¶75)(See also *DX-22* a QuickBooks schedule of payments between the Individual Defendants and A Base IX from 2019- June 30, 2022).

94. On or about December 13, 2021, and in order for Merchant to continue advancing monies to A Base IX under the Factoring Agreement, the Individual Defendants provided additional cash collateral to Merchant. See Apperman Dec. ¶76, "Cash Collateral Agreements" and *DX 4*).

95. On or about February 23, 2022, A Base IX received a Small Business Administration loan in the amount of $1,000,900.00 into A Base IX's TD bank checking account (ending in 6051)(SF ¶41)(the "SBA Loan"). The SBA Loan was used to pay for A Base IX's operational expenses, employee salaries and member compensation. (Apperman Dec.¶79, *DX- 6*). A

reconciliation of disbursements from the "SBA Loan" prepared by Apperman is also contained at *DX-6*.

96. In or about February 2022, A Base IX defaulted under the Factoring Agreement, and A Base IX thereafter engaged in an effort to winddown A Base IX's business operations and inventory liquidation and maximize recovery on its assets to reduce the obligations due and owing by A Base IX to Merchant under the Factoring Agreement and related documents (Apperman Dec ¶80).

97. A Base IX maintained office space at 525 7th Ave., New York, New York from May 2015 until March 31, 2022 when, due to its financial difficulties, A Base IX left the office space (Apperman Dec ¶81).

98. As of January 31, 2023, the total outstanding obligations due and owing by A Base IX to Merchant, and as personally guaranteed by Gammal, Apperman and Susanne Apperman pursuant to the Guarantees, totaled $987.585.16 plus additional interest, costs, attorneys' fees, and all other amounts due under the Factoring Agreement and related documents. ((Apperman Dec ¶82 and *DX 7*).

99. Apperman currently maintains true and correct copies of A Base IX's corporate financial records (Apperman Dec ¶84).

**G.  The Termination of the Parties Relationship & Commencement of this Action**

100.     Plaintiff commenced this action on December 15, 2021 with the filing of a Complaint against A Base IX. The original complaint contained causes of action against A Base IX for: (1) breach of contract; (2) account stated; (3) unjust enrichment; and (4) unrecovered value from the resale of contracted-for goods. The Individual Defendants were not named in the original complaint (SF ¶3).

101.     On May 19, 2022, Plaintiff filed its letter motion to request a pre-motion conference concerning Plaintiff's intention to file a motion to amend its Complaint pursuant to Fed. R. Civ. P. 15 to add David Apperman and Albert Gammal, the two principals of defendant A Base IX, as defendants (SF ¶4).

102.     Plaintiff filed its Amended Complaint on June 1, 2022 (the "Amended Complaint"). In the Amended Complaint, Plaintiff alleges six causes of action against Defendants: (1) breach of contract; (2) account stated; (3) unjust enrichment; (4) unrecovered value from the resale of contracted-for goods; (5) avoidance of the fraudulent conveyance of property; and (6) avoidance of the fraudulent conveyance of funds (SF ¶5).

103.     On May 9, 2023, Defendants filed their answer to the Amended Complaint (the "Answer"). A Base IX's answer asserted three counterclaims: (1) breach of contract; (2) damage to A Base IX's trade reputation; and (3) breach of the implied warranty of merchantability (SF ¶7).

### H.  Payments to the Individual Defendants.

104.     At all times relevant hereto Apperman maintained a personal joint bank account with his wife, Suzanne Apperman, at JP Morgan Chase Bank NA (ending in 9357)(Apperman Dec. ¶92). Gammal maintained a personal bank account at HSBC (ending in 0880) and Citibank (ending in 6930)(Gammal Dec. ¶45).

105.     The Individual Defendants bank accounts were separate and apart from A Base IX's bank accounts, and funds were not commingled (Apperman Dec. ¶93, Gammal Dec. ¶46).

106.     To the extent that there was a transaction between the Individual Defendants and A Base IX, it was recorded in the A Base IX QuickBooks and accounted for (Apperman Dec. ¶94, Gammal Dec. ¶47).

107.    The Individual Defendants did not use corporate funds for their personal benefit (Apperman Dec. ¶95, Gammal Dec. ¶48).

108.    A Base IX funds that were conveyed to the Individual Defendants were for compensation/disbursement in accordance with the Op. Agreement or were reimbursement of expenses/repayments of loans laid out by the Individual Defendants on behalf of A Base IX. A Base IX made some distributions to the Individual Defendants, just as any corporation does if it has excess funds, but A Base IX did so only after a review and a determination of what funds could safely be distributed in light of upcoming potential cash needs (Apperman Dec. ¶96, Gammal Dec. ¶49).

109.    No loan repayments, reimbursement of expenses distributions or other payments provided to the Individual Defendants from A Base IX were paid with the intent to deceive Plaintiff. They were payments and repayments in the ordinary course of business so that A Base IX could continue to operate and did not strip A Base IX of its assets (Apperman Dec. ¶97, Gammal Dec. ¶50).

**I.  Gammal Property Transfers.**

110.    At the time of the Gammal Property Transfers, Gammal was not named as a defendant in this Action (Gammal Dec.¶52). Gammal did not have knowledge of Plaintiff's intent to add him as a defendant (Gammal Dec.¶53).

111.    Due to Gammal's mother-in-law and father becoming ill, and for estate planning purposes, Gammal and his wife decided to arrange the Gammal Property Transfers (Gammal Dec. ¶55). The Brooklyn property 1350 East 4th Street, Brooklyn, New York was originally purchased by Gammal's mother-in-law alone. Later she transferred a portion to Gammal's wife, who then transferred a portion of ownership interests to Gammal. When Gammal's mother-in-

law became ill, Gammal's portion was transferred back to his mother-in-law and my wife (Gammal Dec. ¶56).

## III.    PROPOSED CONCLUSIONS OF LAW

### A.  PLAINTIFF CANNOT PIERCE THE CORPORATE VEIL OF A BASE IX

Plaintiff seeks to pierce the corporate veil of A Base and hold the Individual Defendants liable for all causes of action, in full, despite that Plaintiff and A Base were the parties to the Purchase Orders and Invoices in issue (SF¶13).

"New York Court are reluctant to pierce the corporate veil and "allow individuals to incorporate for the very purpose of avoiding personal liability," *Gartner v. Snyder,* 607 F.2d 582, 586 (2d Cir.1979)).  Veil piercing is only permitted where Plaintiff establishes by clear and convincing evidence[2] that: "1) the owner exercised complete domination over the corporation with respect to the ***transaction*** at issue, ***and*** 2) such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *EED Holdings v Palmer Johnson Acquisition Corp.,* 228 FRD 508, 512 [SDNY 2005](emphasis added). "Those seeking to pierce a corporate veil of course bear a heavy burden of showing that the corporation was dominated as to the ***transaction attacked*** and that such domination was the instrument of fraud or otherwise

---

[2] The burden of proof for veil piercing is mostly described as a "heavy burden." *TNS Holdings, Inc., v MKI Sec. Corp.*, 92 NY2d 335, 339 (1998). Therefore, more than a preponderance of the evidence is warranted. The clear and convincing standard is appropriately applied "where the interests at stake are deemed more significant than ordinary."  New York Pattern Jury Instruction 1:64, cmt. at 85 (citing *In re Storar*, 52 N.Y.2d 363, 379, 438 N.Y.S.2d 266, 420 N.E.2d 64 (1981).
The Court of Appeals for the State of New York has used the same "heavy burden" language  in piercing the corporate veil claims as well as in applications to vacate an arbitrator's award."  See, e.g., *Lehman Bros., Inc. v. Cox*, 10 N.Y.3d 743, 744, 853 N.Y.S.2d 530, 531, 883 N.E.2d 355, 355 (2008) ("Petitioner Lehman Brothers failed to meet its heavy burden to vacate the arbitration award on respondent Cox's counterclaim.").  Courts, therefore, require clear and convincing evidence to meet such "heavy burden."  "Petitioner failed to meet his heavy burden of showing arbitrator misconduct or partiality by clear and convincing proof."  *Matter of Moran v. N.Y.C. Tr. Auth*., 45 A.D.3d 484, 484, 846 N.Y.S.2d 162, 163 (1st Dep't 2007).

resulted in wrongful or inequitable consequences . . . Evidence of domination alone does not

suffice without an additional showing that it led to inequity, fraud or malfeasance." *TNS*

*Holdings Inc. v. MKI Sec. Corp.,* 92 N.Y.2d 335, 339 (1998) (emphasis added); *Cordius Trust v.*

*Kummerfeld*, 153 F. App'x 761, 763 (2d Cir. 2005) (same, citing *Morris v. N.Y. State Dep't of*

*Taxation & Fin.,* 82 N.Y.2d 135, 603 N.Y.S.2d 807, 623 N.E.2d 1157, 1160 (1993)).

1. **Plaintiff Cannot Prove "Domination and Control" Required to Pierce the Corporate Veil.**

When determining whether an owner exercised complete domination and control, Courts

in the Second Circuit consider the following factors:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.,* issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm's length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir.

1991) Where Plaintiff alleges that an individual owner rather than a corporate entity controlled

another entity, Court's primarily focus on the following *Passalacqua* factors: "the presence of

corporate formalities; inadequate capitalization; commingling of personal and corporate funds;

and personal use of corporate funds." See, *Push, Inc. v. Production Advisors, Inc.*, No. 09 Civ.

4722, 2010 WL 1837776, at *3 (S.D.N.Y. April 15, 2010) See also *East Hampton Union Free*

*School Dist. v. Sandpebble Bldrs., Inc.*, 66 A.D.3d 122, 127, 884 N.Y.S.2d 94 [2d Dep't 2009],

*aff'd*, 16 N.Y.3d 775, 944 N.E.2d 1135, 919 N.Y.S.2d 496 [2011]  Such indicia are considered when determining whether the shareholders or other entity are "merely" using the corporation "as a conduit to conduct their personal business." *Perez v. One Clark Street Housing Corp.*, 108 A.D.2d 844 (2d Dep't 1985).

None of these factors can be demonstrated by Plaintiff.

    a.   <u>A Base IX Maintained the Corporate Formalities Required of a Small Limited Liability Company.</u>

    The standard by which corporate formalities are judged may vary with the size and type of corporation. Courts recognize that with respect to small, privately-held corporations, 'the trappings of sophisticated corporate life are rarely present,' and we must avoid an over-rigid 'preoccupation with questions of structure, financial and accounting sophistication or dividend policy or history." *Tycoons Worldwide Group (Thailand) Pub. Co., Ltd. v JBL Supply Inc.*, 721 F Supp 2d 194, 205 [SDNY 2010]. See also "[I]n the context of closely-held corporations, corporate formalities are more relaxed than in a large public corporate setting, and this should be taken into consideration as a factor in the 'domination' analysis." *In re Adler,* 467 B.R. 279, 288 (Bankr. E.D.N.Y. 2012) and *Cardell Fin. Corp. v Suchodolski Assoc., Inc.,* 2012 WL 12932049, at *20 [SDNY July 17, 2012], *report and recommendation adopted sub nom. Cardell Fin. Corp. v Suchodolksi Assoc., Inc.*, 896 F Supp 2d 320 [SDNY 2012]

    A Base IX is a limited liability company, which are granted relaxed corporate formality by state legislature. For example see *NetJets Aviation, Inc. v. LHC Communs., LLC,* 537 F.3d 168, 178 (2d Cir. 2008). A Base IX maintained its books and records at its offices and continues to maintain them (Apperman Dec. ¶27 ¶84). A Base had its own operating agreement and entered into a formal membership interest redemption agreement when its member, Salomon Murciano, redeemed his interests in A Base IX (Apperman Dec. ¶¶12,20 **DX-1**, **PX-23**). A Base

was formed for a legitimate business purpose, had its own employees, vendors and customers (Apperman Dec. ¶10). To the extent that New York courts have held that corporate formality for limited liability companies means the existence of distinction between corporate funds and the defendant's personal funds, *see Pae v. Chul Yoon*, 41 A.D.3d 681, 682 (2d Dep't 2007), A Base maintained its own bank records, financial records and has outside accountants filing A Base IX's tax returns (Apperman Decl ¶¶28,30). A Base IX lack of corporate meetings with minutes is a function of the fact that the company was comprised of the Individual Defendants that worked side by side daily. Indeed, it is difficult to fathom what corporate formalities it is that A Base IX did not observe other than formal board meetings. See also *In re Stage Presence, Inc.*, 592 BR 292, 304 [Bankr SDNY 2018], affd, 12-10525 (MEW), 2019 WL 2004030 [SDNY May 7, 2019].

A Base IX had the corporate formalities required of a small limited liability company and this factor does not weigh in favor of finding dominion and control for veil piercing purposes.

b.  Undercapitalization[3]

Generally, undercapitalization is measured "in terms of the size of the corporate undertaking, and will deem a corporation undercapitalized if it is "wholly reliant on [an individual] for the operating funds necessary for its *continuing existence*..." *J.P.'s Shellfish, Inc. v. Best Buy Shellfish, Inc.*, 2009 NY Slip Op 30276(U), ¶¶ 5-6 (Sup. Ct., N.Y. Co., 2009)(internal citation omitted).

---

[3] "(w)ere undercapitalization sufficient to pierce the corporate veil, then the veil of every insolvent subsidiary or failed start-up corporation could be pierced." *Cohen v Schroeder*, 248 F Supp 3d 511, 520 [SDNY 2017], *affd*, 724 Fed Appx 45 [2d Cir 2018] (internal citations omitted). "Instead, insolvency and undercapitalization are factors to be considered in determining whether the corporation engaged in conduct that **unjustly shields its assets**…" *Id*. (emphasis added).

However,  "[A] corporation that commences business with adequate capital and subsequently suffers insolvency is not undercapitalized as the term is used in a 'piercing the corporate veil' question.") and *Cardell Fin. Corp. v Suchodolski Assoc., Inc.,* at *22. Thus, the decline of a company due to purely economic reasons should not be viewed in the same light as one in which, for example, a shareholder "bled the corporation of its assets." *Cardell Fin. Corp. v Suchodolski Assoc., Inc.,* at *22 citing Harvey Gleb, Piercing the Corporate Veil—The Undercapitalization Factor, 59 Chi.-Kent L. Rev. 1, 15 (1982) or purposely undercapitalized to shield assets. *Cohen v Schroeder*, 248 F Supp 3d 511, 521 [SDNY 2017], affd, 724 Fed Appx 45 [2d Cir 2018]. See also *Gartner v Snyder*, 607 F2d 582, 588 [2d Cir 1979]( "Although Enterprises was thinly capitalized, especially in the later years of its operations, that alone is not a sufficient ground for disregarding the corporate form. We know of no New York authority that disregards corporate form solely because of inadequate capitalization.")

It is undisputed that between 2019 through 2022, A Base IX experienced financial difficulties (Apperman Dec. ¶65). However, A Base IX commenced business in 2015 with sufficient capital and was properly capitalized for years before outside economic factors such as COVID 19, customer bankruptcies (DX-28- DX-30), and related shipping cost increases, caused the company's decline (Apperman Dec. ¶64). A Base IX was factored and provided funding from Merchant for the purchase of receivables throughout the period A Base IX operated (See Apperman Dec ¶¶33-34 and *DX-2*). At all times, A Base IX also maintained inventory that was used to generate roughly 30% profits i.e. additional capital (PX-72, PX-73, PX-74, DX-31, Dx-32, DX-33).

Therefore, A Base IX cannot be deemed undercapitalized as the term is used for the purposes of finding dominion and control.

c.   Commingling of Assets.

Here, A Base IX's assets have not been commingled with that of the Individual

Defendants. Indeed, there is no dispute that A Base IX had its own financial records and bank

accounts (**PX29- PX43**, **DX-23- DX-24**). To the extent that there were transactions between A

Base IX and the Individual Defendants, they were recorded in A Base IX's QuickBooks (See **DX

-22**) and accounted for. Therefore, this factor does not weigh in favor of finding "domain and

control" in the alter-ego analysis.

d.   Use of Corporate Funds for Personal Use

There was no use of corporate funds for the Individual Defendants' personal use. All

corporate funds that were conveyed to the Individual Defendants were for compensation due to

the Individual Defendants in accordance with the Operating Agreement (**DX-1**) or were

reimbursement of expenses/repayments of loans laid out by the Individual Defendants on behalf

of A Base IX. (Apperman Dec. ¶97, Gammal Dec. ¶50). A Base IX made distributions to the

Individual Defendants, just as any corporation does if it has excess funds, but A Base IX did so

only after a review and a determination of what funds could safely be distributed in light of

upcoming potential cash needs (Apperman Dec. ¶96, Gammal Dec. ¶49). Credit card payments

made by A Base IX on behalf of the Individual Defendants were either reimbursed by the

Individual Defendant thereafter or were recorded as member distributions. Insofar as Plaintiff is

concerned, Defendants had no reason to anticipate that Plaintiff, after extending significant credit

for three years, would turn the spigot off. In the years prior to the breakdown to the parties'

relationship, A Base IX paid approximately $8,000,000.00 to Plaintiff, which by reason of

Plaintiff's continued extension of credit, appeared sufficient to satisfy Plaintiff's cash needs as

well as Plaintiff's intrinsic need to maximize its sales.

25

*** 

Plaintiff's anticipated showing of "domination and control" of A Base IX falls far short of what is required. Plaintiff cannot prove by clear and convincing evidence that the Individual Defendants were "merely" using A Base IX "as a conduit for [their] personal business." *Perez v. One Clark Street Housing Corp.*, 108 A.D.2d 844 (2d Dep't 1985). Therefore, Plaintiff cannot pierce the corporate veil of A Base IX.

## 2.   Domination Alone Does Not Suffice: Plaintiff Must Establish Fraud or Wrongdoing as to Each Transaction Attacked.

Even if domination and control were found, which it cannot, Plaintiff must also prove a fraud or wrongdoing as to each transaction attacked by clear and convincing evidence. In *Mars Elecs. of N.Y., Inc. v U.S.A. Direct, Inc.*, 28 F Supp 2d 91, 99 [EDNY 1998], *affd sub nom. Mars Elecs. of N.Y., Inc. v Put*, 242 F3d 366 [2d Cir 2000] the Court, addressing a claim for piercing the corporate veil, stated:

> As to the other transactions at issue, plaintiff has not offered evidence of fraud or wrongful conduct. Absent such evidence, there is an insufficient basis under New York law upon which to pierce USAD's corporate veil as to these remaining transactions. Indeed, despite the two proven instances of direct fraudulent conduct engaged in by Put, it would be inequitable to hold Put personally liable for the full amount of the default judgment against USAD on a motion for summary judgment absent conclusive evidence that Put used his domination of USAD to commit fraud with respect to each and every transaction at issue.

Therefore, each and every transaction attacked must be considered separately for the purposes of considering whether it was a fraudulent or wrongful. The standard for piercing the corporate veil is "very demanding." *Capmark Financial Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 347 (S.D.N.Y. 2013). Plaintiff has not identified specific transactions from A Base IX it deems fraudulent or wrongful, but rather lumps the transactions

between the Individual Defendant members of A Base IX with A Base IX together. That is insufficient for the demanding standard required to pierce the corporate veil.

Plaintiff claims that there were improper loan repayments, distributions and reimbursements of expenses paid to the Individual Defendants that were motivated by a desire to render A Base IX judgment proof in order to and justify piercing the corporate veil. "(p)roof of a stripping of the assets of the subsidiary by the parent, motivated by a desire to render the subsidiary judgment proof, would constitute a 'fraud or wrong' justifying piercing of the corporate veil." *Am. Federated Tit. Corp. v GFI Mgt. Services, Inc.*, 126 F Supp 3d 388, 404 [SDNY 2015], *affd.* 716 Fed Appx 23 [2d Cir 2017](internal citations omitted).

However, absent persuasive evidence of a culpable motive (as to each transfer), a transfer of assets is not sufficient to justify veil-piercing. *Am. Federated Tit. Corp. v GFI Mgt. Services, Inc.*, 126 F Supp 3d 388, 405 [SDNY 2015], affd, 716 Fed Appx 23 [2d Cir 2017](citing *TLC Merch. Bankers, Inc. v. Brauser*, No. 01–CV–3044, 2003 WL 1090280, at *5 (S.D.N.Y. Mar. 11, 2003) (Lynch, J.) "Constructive fraudulent transfers, even when made to a company's owners" do not "constitute a *per se* wrong for veil purpose-piercing purposes," unless done with culpable motive. *Highland CDO Opportunity Master Fund, L.P. v Citibank, N.A.*, 270 F Supp 3d 716, 730 [SDNY 2017]. The repayment of the loans or reimbursement of expenses is appropriate and not cause for piercing the corporate veil. *Mars Elecs. of N.Y., Inc. v U.S.A. Direct, Inc.*, 28 F. Supp. 2d 91, 99 (E.D.N.Y. 1998)("While Put treated the corporation as his personal business vehicle, he was entitled to receive a salary and reimbursements for example, and, therefore, not every withdrawal was fraudulent or wrongful.") Even where the partners transferred all remaining assets out of the judgment debtor, when it was not done with the wrongful purpose of evading the plaintiff's future claims, it does not justify piercing the corporate veil. *Love v Rebecca Dev.,*

27

*Inc.,* 36 Misc 3d 1232(A) [Sup Ct 2012]. Moreover, where a plaintiff claims millions of dollars in damages, but the commingling of corporate assets only involved several thousands of dollars, Courts have found there in no fraudulent or wrongful intent to pierce the corporate veil. *Worldcom, Inc. v Prepay USA Telecom, Corp.,* 294 AD2d 157 (1st Dept 2002).

Plaintiff failed to provide any evidence of a culpable motive as to each transfer it deems wrongful. To the extent that Plaintiff claims that every loan repayment, reimbursement and distribution paid to the Individual Defendant was wrongful, proof that A Base IX continued to make other payments**,** including payments to Plaintiff (***DX-8***), during the same time period, reflects that there was no culpable motive on the Individual Defendants' part. In fact, in 2021 A Base was on track to reduce its debt to Plaintiff, by A Base IX's payment of more dollars to Plaintiff that the amount of goods received.

Additionally, up until the end of A Base IX relationship with Plaintiff, Plaintiff was always willing to accept partial payment on the Outstanding Balance made at regular intervals. Up until the end of the parties relationship, the Individual Defendant's understood that Plaintiff was willing to forgive some of the Outstanding Balance, so long as regular payments continued to be made (Apperman Dec. ¶59, Gammal Dec. ¶25). Based on the Individual Defendants conversations with Mr. Jiang, they understood that they would never need to pay the entire Unpaid Balance. Therefore, the Individual Defendants could not have purposely been making transfers in order to evade Plaintiff, when the Individual Defendants did not think that Plaintiff expected to be paid on the entire Unpaid Balance.

Moreover, Courts in this Circuit are reluctant to find wrongdoing for veil piercing purposes when the party seeking to pierce the corporate veil knowingly contracted with a company (not an individual) and had the opportunity to investigate the finances of the company. *See Lakah v UBS*

*AG*, 996 F Supp 2d 250, 268 [SDNY 2014]. *See also Brunswick Corp. v Waxman*, 599 F2d 34, 36 [2d Cir 1979]( "Under these circumstances Brunswick obtained precisely what it bargained for, and it did not bargain for or contemplate the individual liability of the Waxmans which it now seeks to enforce.")

Here, as in *Brunswick*, Plaintiff knowingly contracted A Base IX, not the Individual Defendants. Plaintiff continued to contract with A Base IX, despite the growing debt. Even when the balance due mounted (**DX-9**), Plaintiff continued to ship goods to A Base IX. Despite the debt, Plaintiff never requested that the Individual Defendants guaranty A Base IX's obligations. Given Plaintiff's knowledge of A Base IX's failure to pay invoices in full as they became due, coupled with Plaintiff's affirmative decision to continue contracting with A Base IX despite the growing debt, Plaintiff cannot expect to recoup that which is owed by A Base IX from the Individual Defendants. Plaintiff let the Unpaid Balance accumulate with eyes wide open and should not be rewarded for its careless business decisions.

Therefore, the lack of evidence of wrongful motive on the part of the Individual Defendants, coupled with Plaintiff's knowledge of the growing "Unpaid Balance" dooms Plaintiff's veil piercing claim.

### 3. <u>The Dominion Used To Commit The Alleged Fraud Or Wrong Must Also Cause Plaintiff's Injury.</u>

Causation is also an element required to pierce the corporate veil. *Morris* requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff *which resulted in plaintiff's injury*." (emphasis added). *See also Key Items, Inc. v. Ultima Diamonds, Inc.*, No. 09 Civ. 3729, 2010 WL 3291582, at *9 (S.D.N.Y. Aug. 17, 2010).

(without a causal link between the control exerted over the corporation and the fraud or other wrong, "limited liability will prevail.")

Court's analyze the degree and timing of any misconduct when assessing whether the equities support imposition of corporate liability on a shareholder. *See e.g., Burton F. Clark, Inc. v. Hillside Cos., Inc.,* 121 A.D.3d 1236 (3d Dep't 2014). Veil piercing is designed to protect creditors who were actually caused harm by significant, deliberately timed corporate abuse. See *Love v Rebecca Dev., Inc.,* 36 Misc 3d 1232(A) [Sup Ct 2012].

Plaintiff's own arguments undermine its ability to demonstrate causation. In arguing that every penny the Individual Defendants received was wrongful (PX-44), Plaintiff did not make a cogent argument that any individual payment was wrongful, causation cannot be analyzed, and the veil piercing theory of liability dismissed. No deliberately timed corporate abuse can be found, thus the corporate veil of A Base IX should not be pierced.

### 4. The Individual Defendants' Liability if Veil Piercing is Permitted is Limited to Specific Transactions Attacked.

Even if this Court determines that piercing the corporate veil is appropriate, which it is not, liability cannot exceed the specific transactions or "asset stripping" attacked. Judge Marrero stated as such in his Decision & Order on the motion to dismiss the SAC (Doc #65 at pg. 12 "As a final note, because Weihai's injury justifying piercing Base IX's veil is the alleged diversion of funds from Base IX, the reach of veil piercing liability here is limited accordingly.") This is so because "[t]he liability stems from using the control over the corporation for a wrongful purpose." *Morris*, *Id. See also Team Air Express, Inc. v. A. Heffco Techs., Inc.,* 06CV2742(NG), 2008 WL 3165892, at *13 [EDNY Aug. 6, 2008], supplemented, 06 CV 2742 (NG), 2008 WL 4790464 [EDNY Sept. 3, 2008], and report and recommendation adopted, 06 CV 2742 NG (CLP), 2008 WL 4790460 [EDNY Oct. 28, 2008], and report and recommendation adopted, 06

CV 2742 NG (CLP), 2008 WL 4790460 [EDNY Oct. 28, 2008] ("Even if plaintiff could establish the necessary requirements to pierce the corporate veil, it is unclear on what basis these individuals could be held liable for the corporation's entire delinquency and not just for the damages caused by their own allegedly fraudulent conduct.")

The Court should not consider piercing of the corporate veil as a basis for holding the Individual Defendants liable for any claim. However, even if certain transactions are found to be wrongful for the purposes of veil piercing, Plaintiff's recovery against the Individual Defendants is limited to the wrongful transactions and not for A Base IX's entire debt.

## B. PLAINTIFF DOES NOT HAVE STANDING TO ASSERT ITS DCL CLAIMS AGAINST GAMMAL WITH RESPECT TO HIS PERSONAL RESIDENTIAL PROPERTIES [4]

Plaintiff's Amended Complaint alleges two transfers were fraudulent or constructively fraudulent and allegedly give rise to the Individual Defendants' liability in this Action. The first allegedly fraudulent transfer was a transfer of title to Defendant Gammal's residential property from Gammal and Alice Gammal, jointly, to Alice Gammal individually (Complaint ¶231)(the "Gammal Property"). The second allegedly fraudulent transfer was A Base IX's transfer of $325,500 from A Base IX's to Apperman's personal account ($205,500.00 to Apperman) and Gammal's personal account ($120,000.00 to Gammal)[5]. However, Plaintiff lacks standing to assert its DCL claims with respect to the Gammal Property.

"To bring a cause of action for fraudulent conveyance, the plaintiff must be *a creditor of the transferor* of the alleged fraudulent conveyance. See DCL §§ 270-81 A creditor is defined as "a

---

[4] The Uniform Voidable Transaction Act is applicable to the claims in this Action that took place on or after April 4, 2020. "the U.V.T.A. applies to any "transfer made or obligation incurred" on or after its effective date of April 4, 2020." *Cipciao, LLC v M Chow One, LLC,* 20-CV-5982 (JMF), 2021 WL 1141567, at *7 [SDNY Mar. 24, 2021], *judgment entered sub nom*. Cipciao, LLC v M. Chow One, LLC, 20 CIVIL 5982 (JMF) and *affd*, 21-929, 2021 WL 4852423 [2d Cir Oct. 19, 2021].

[5] Plaintiff originally maintained that $1,000,900.00 was fraudulent transferred from A Base IX to the Individual Defendants, but has since reduced the amount to $325,500.00

person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent."" *DoubleLine Capital LP v Construtora Norberto Odebrecht, S.A.*, 413 F Supp 3d 187, 223 [SDNY 2019] citing DCL §270 (defined by the U.V.T.A. as "a person that has a claim."). See *Am. Sur. Co. of N.Y. v Conner*, 251 NY 1, 6-7 [1929] "Where a conveyance made or obligation incurred is fraudulent as to a creditor whose claim has not matured he may proceed in a court of competent jurisdiction *against any person against whom he could have proceeded had his claim matured*." (emphasis added). See also *Carbon Investment Partners, LLC v Bressler* 20 CIV. 3617 (ER), 2021 WL 3913526, at *10 [SDNY Sept. 1, 2021 and *Cipciao, LLC v M Chow One, LLC,* 20-CV-5982 (JMF), 2021 WL 1141567, at *7 [SDNY Mar. 24, 2021], *judgment entered sub nom. Cipciao, LLC v M. Chow One, LLC,* 20 CIVIL 5982 (JMF), 2021 WL 1167909 [SDNY Mar. 25, 2021], and *affd*, 21-929, 2021 WL 4852423 [2d Cir Oct. 19, 2021]. The DCL only confers standing on a plaintiff if the plaintiff is a creditor of the defendant at the time of the alleged fraudulent conveyance (§273) or are the defendants "present or future creditors."

Here, unless Plaintiff can pierce the corporate veil of A Base IX (which it cannot), Plaintiff is not a creditor of Gammal. Plaintiff is only a creditor to A Base IX, and therefore lacks standing to sue Gammal individually for transfers Gammal made to others, including Alice Gammal. The allegations at Complaint ¶¶197 -199 referring to Gammal's transactions with respect to a property completely unrelated to the business of A Base IX or Plaintiff, is plainly insufficient for maintaining a claim against a non-debtor Gammal for fraudulent conveyance.

Accordingly, and because Plaintiff cannot pierce the corporate veil of A Base IX, Plaintiff lacks standing to bring its UVTA §273 claim against Gammal as to the Gammal Properties.

### C.  PLAINTIFF'S ACTUAL FRAUDULENT CONVEYANCE CLAIMS FAIL[6]

Plaintiff seeks relief for actual fraudulent conveyances allegedly made by the Defendants under DCL § 273(a)(1). DCL § 273(a)(1) provides that:

> (a)  A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>   (1) with actual intent to hinder, delay or defraud any creditor of the debtor."
> NY DEBT & CRED § 273.[7]

[T]o prove actual fraud under § 273(a)(1) (or the former §276), a creditor must show intent to defraud on the part of the transferor. *HBE Leasing Corp. v Frank,* 61 F3d 1054, 1059 n.5 [2d Cir 1995]. As opposed to DCL §§ 273(a)(2), fair consideration is not required. See *In re Sharp Intern. Corp.,* 403 F3d 43, 56 [2d Cir 2005] ("Where actual intent to defraud is proven, the conveyance will be set aside regardless of the adequacy of the consideration given.") *See also Ray v Ray,* 799 Fed Appx 29, 32 [2d Cir 2020].

The burden of proving actual intent is placed squarely on the party seeking to set aside the conveyance. *See United States v McCombs,* 30 F3d 310, 328 [2d Cir 1994]. Actual intent to defraud must also be proven by clear and convincing evidence. *See United States v. McCombs,*

---

[6] Plaintiff's Amended Complaint states that it seeks relief for fraudulent conveyances under NY DCL §273, 276, and 276-a. However, the allegations contained at counts five and six of the Amended Complaint are framed in terms of actual fraudulent conveyances only (See Doc #21 ¶231 and ¶234). The Court in its Decision and Order on Defendants' Motion to Dismiss understood Plaintiff to only be seeking relief under NY DCL Section 273(a)(1) and not (a)(2) ("This argument is not relevant because the transfer claims draw on Section 273(a)(1), not (a)(2), and (a)(1) has no such requirements.") (Doc. #65 pg. 19). The joint pretrial memorandum Section IV(A) confirms that Plaintiff only seeks to prove actual fraudulent conveyances and not constructive fraudulent conveyances. (Doc #167 pg.5). Accordingly, Defendants do not analyze the alleged fraudulent transfers under a constructive fraudulent conveyance analysis but reserve the right to do so.

[7] "The current Debtor and Creditor Law § 273 (a)(1) is based upon former Debtor and Creditor Law § 276, with the language being substantially similar." *Roedel Companies, LLC v JNK Home Enterprises, LLC,* 71 Misc 3d 1223(A) [Sup Ct 2021]

30 F.3d 310, 328 (2d. Cir 1994); *Fannie Mae v. Olympia Mortg. Corp.*, 2013 U.S. Dist. LEXIS

12901 (E.D.N.Y. 2013).

Because of the difficulty of proving actual intent to hinder, delay, or defraud creditors,

Plaintiff is allowed to rely on the factors set forth in DCL §273(b) (formerly the 'badges of

fraud') to give rise to an inference of fraudulent intent. *See In re Sharp Intern. Corp.,* 403 F3d 43

[2d Cir 2005].

> Badges of fraud may include, *inter alia*, a close relationship between the parties to the
> alleged fraudulent transaction; a questionable transfer not in the usual course of
> business; inadequacy of the consideration; the transferor's knowledge of the creditor's
> claim and the inability to pay it; and retention of control of the property by the
> transferor after the conveyance. But the presence of one or more badges of fraud does
> not necessarily compel the conclusion that a conveyance is fraudulent.

*Ray v Ray,* 799 Fed Appx 29, 32 [2d Cir 2020]. Fraudulent intent can also be inferred

from the "secrecy, haste, or unusualness of the transaction," *HBE Leasing Corp. v Frank*, 48

F.3d 623, 639 (2d Cir. 1995). However, badges of fraud are insufficient where Defendants

present presented evidence suggesting [their] actual intent was not to deceive present or future

creditors." *EMA Fin., LLC v Joey New York Inc.,* 17-CV-9706 (VSB), 2022 WL 292920, at *10

[SDNY Feb. 1, 2022], *vacated in part sub nom. EMA Fin., LLC v Chancis,* 80 F4th 395 [2d Cir

2023] citing *Field Home-Holy Comforter v. Warns*, No. 12 CV 9285(VB), 2014 WL 7398904, at

*5 (S.D.N.Y. Dec. 13, 2014).

In *Ray v Ray* the Second Circuit affirmed the Southern District's dismissal of a DCL

§276 claim where certain badges of fraud such as a close relationship between the parties existed

but were insufficient for stating a §276 claim. In *EMA Fin., LLC v Joey New York Inc.,* 17-CV-

9706 (VSB), 2022 WL 292920, at *10 [SDNY Feb. 1, 2022] the Court held that "even where the

Individual Defendants transferred money from the corporate account to their personal accounts"

34

no DCL claim arose because there was evidence that they did so "to reimburse those personal accounts after they were used for business expenses."

Here, there is no evidence to support that any alleged transfers were made with the requisite intent to defraud Plaintiff.

On February 23, 2022 A Base IX received an SBA loan for $1,000,900.00 into A Base IX's TD Bank checking account, which the Individual Defendants personally guaranteed. See *DX-6.* The loan proceeds were largely used to cover business expenses (*DX-6*). $240,000.00 were used to pay member distributions and salary. $85,500.00 was a reimbursement to Apperman for outstanding loans. See *DX-6*.

With respect to payments to the Individual Defendants that can be categorized as a "reimbursement of expenses" or "loan payable members", at times, Merchant did not remit payments to A Base IX when funds were needed (Apperman Dec.¶72). In some instances, Gammal and/or Apperman would cover A Base IX's immediate cash needs and the Individual Defendants would be reimbursed by A Base IX when the Merchant payment came in to A Base IX's account (Apperman Dec. ¶72). For instance, see true and correct copies of email correspondence between Apperman and Merchant, requesting advances attached hereto as *DX 3.* Such payments were necessary for A Base IX's continued operations (Apperman Dec. ¶75) and were not transferred with intent to deceive A Base IX's creditors (Apperman Dec. ¶97, Gammal Dec. ¶50). Additionally, with respect to "loan repayments" such payments were repayments of loans from the Individual Defendants to A Base IX that were documented on A Base IX general ledger and QuickBooks schedules. See *DX-22* and *DX-24*.  The payments to the Individual Defendants were payments and repayments in the ordinary course of business so that A Base IX

could continue to operate and did not strip A Base IX of its assets (Apperman Dec ¶97, Gammal Dec.¶50).

Member compensation provided to the Individual Defendants were compensation/disbursement in accordance with the Op. Agreement. A Base IX made some distributions to the Individual Defendants, just as any corporation does if it has excess funds, but A Base IX did so only after a review and a determination of what funds could safely be distributed in light of upcoming potential cash needs (Apperman Dec. ¶96, Gammal Dec. ¶49).

With respect to the Gammal Property Transfers, Gammal transferred such property for estate planning purposes (Gammal Dec. ¶¶55-56). Gammal was not named as a defendant in the Action at the time of the Gammal Property Transfers in February 2022 (Gammal Dec ¶52). Gammal did not know that Plaintiff intended to add Gammal as a party or considered Gammal indebted to Plaintiff, as only A Base IX was a party to the purchase orders and invoices with Plaintiff (SF ¶53). It was not until May 2022 that Plaintiff filed its pre-motion letter for leave to file an amended complaint (SF ¶4). Therefore, Gammal did not transfer the Gammal Properties with the intent to defraud Plaintiff (Gammal ¶54). Logically, there was no way Gammal, who was not a defendant at the time of the alleged transfers could defraud his unnamed creditor, here Plaintiff, by transferring ownership of a personal residential property from being jointly owned to being owned individually by Alice Gammal.

## 1.  **Plaintiff's Damages for Actual Fraudulent Conveyance Claims**

As a general rule, the remedy for a fraudulent conveyance is not an award of damages, but a judgment setting aside the conveyance or disregarding the conveyance in order to levy upon the property conveyed. *D'Mel & Assoc. v. Athco, Inc.*, 105 A.D.3d 451, 453, 963 N.Y.S.2d 65

(1st Dep't 2013)("… plaintiff's remedy is not to obtain $140,000 in damages from Michael; rather, it is to set aside the conveyance.")(*Matter of Nw. 5th & 45th Realty Corp. v. Mitchell, Maxwell & Jackson, Inc.,* 2013 WL 3929620 (N.Y.Sup.), 10) ("As a general rule, a defrauded creditor in an action to set aside a fraudulent conveyance is "limited to [setting aside the conveyance of] the property which would have been available to satisfy the judgment had there been no conveyance." (quoting *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 133, 508 N.Y.S.2d 17 (2d Dep't 1986)).

While Defendants maintain that the fraudulent transfer claims should be dismissed, Plaintiff would not automatically be entitled to a judgment equal to any money allegedly fraudulently transferred. Monetary relief would only be available to Plaintiff when the money was disposed of and unavailable. *See Marine Midland Bank v. Murkoff,* 120 A.D.2d 122 – 133.

In the case of the Gammal Property Transfer, if the alleged fraudulent conveyance was set aside, the Gammal Property would go back to being held as joint tenants by the entirety by Alice and Albert Gammal (PX-45, PX-46). No monies would be available to satisfy a judgment had the Gammal Property Transfer been set aside, because the tenancy by the entirety cannot be reached by creditors of one party to the joint tenancy. See *Deerbrook Ins. Co. v Mirvis*, 20-1385, 2021 WL 4256845, at *6 [2d Cir Sept. 20, 2021]("the District Court could not terminate Lyubov Mirvis's right of survivorship"). "[a] secured creditor ... is ... barred from using the fraudulent conveyance action as a means to expand its interests in property" and "its remedy is limited to reaching the property which would have been available had there been no conveyance." *Id.* See also *Kozyra v Goldstein,* 146 Misc 2d 25, 26 [Sup Ct 1989].

Accordingly, here there should be no monetary relief afforded to Plaintiff because Plaintiff would not be able to reach the Gammal Property if it was jointly owned in the entirety by Alice and Albert Gammal. A monetary remedy would impermissibly expand Plaintiff's reach.

If monetary relief was appropriate, which it is not, Plaintiff is not entitled to a judgment equal to the full value of the Gammal Property as at the time of the 2024 sale. Monetary damages for a fraudulent conveyance, if available, are calculated as of the time of the fraudulent transfer in issue, here 2022, and not as at the time of the 2024 sale. See *Post v Browne*, 279 AD 922, 922 [2d Dept 1952], *affd*, 304 NY 610 [1952]("the creditor …may recover the value of the property at the time the fraudulent transferee received it.").  Before the alleged fraudulent transfer, Alice and Albert Gammal owned the property jointly as tenants by the entirety (PX-45, PX-46). If the Gammal Property Transfer (PX-46) is avoided, Plaintiff may only be entitled to recover half the value of the Gammal Property as of the date of the fraudulent transfer, 2022.

However, Defendants maintain that Plaintiff cannot recover Gammal's portion of the Gammal Property, as there is no admissible evidence as to the value of the Gammal Property as of the 2022 conveyance.

## 2. Plaintiff is not Entitled to Recover Attorney's Fees

The current DCL §276 (like §276-a) lists remedies available to a creditor whose claims have matured (former Debtor & Creditor Law § 278; UFCA § 9) and to creditors whose claims have not matured (former Debtor & Creditor Law § 279; UFCA § 10). Neither §§276 or 276-a are substantive causes of action but are available remedies if Plaintiff has a substantive cause of action under the DCL. Here, because Plaintiff does not have a substantive DCL claim under §273(a)(1), the remedies provided for under §276 and 276-a are unavailable to Plaintiff.

### D. PLAINTIFF'S DAMAGES FOR BREACH OF CONTRACT

In New York the elements of a breach of contract claim are (1) the existence of a contract; (2) due performance by plaintiff; (3) breach of the contract by defendant; and (4) damages as a result of the breach. *See* R.H. Damon & Co., Inc. v. Softkey Software Prods., Inc., 811 F. Supp 986, 991 (S.D.N.Y.1993). The elements of a breach of contract claim are the same under the CISG.[8] *U.S. Nonwovens Corp. v Pack Line Corp*., 48 Misc 3d 211, 215 [NY Sup 2015].

Plaintiff claims A Base IX is liable to Plaintiff for breach of contract, for having failed to perform A Base IX duties under purchase orders entered into by Plaintiff and A Base IX. (SF ¶8). A Base IX submitted 75 Purchase Orders, which are the subject of this Action (SF ¶8). The purchase orders contain garment specifications, packaging specifications and delivery specifications (For example see DX-19, 20, 21 and 27). Between June 2019 through May 2021, Plaintiff sent A Base IX a series of written invoices (collectively, the "Invoices") setting forth the amounts due for the goods delivered pursuant to the Purchase Orders (SF ¶9). The Individual Defendants are not parties to the Purchase Orders and the Invoices (SF ¶13).

Between June 2019 through 2021, Plaintiff delivered to A Base IX the goods identified in the Invoices (SF ¶10). A Base IX did not pay Plaintiff in full for the Delivered Goods and A Base IX regularly maintained an open unpaid balance against the Invoices (SF ¶14). Plaintiff continued to ship goods to A Base IX until February 2021, when it stopped shipping goods to A

---

[8] The instant matter is governed by the CISG, *reprinted at* 15 U.S.C.A. Appendix (West Supp.1995), a self-executing agreement between the United States and other signatories, including China. "The CISG automatically applies to international sales contracts between parties from different contracting states[.] ... Where parties wish to exercise their right to derogate from the CISG, they must do so explicitly." *Shantou Real Lingerie Mfg. Co., Ltd. v Native Group Intl., Ltd.,* 14CV10246-FM, 2016 WL 4532911, at *2 [SDNY Aug. 23, 2016] However, "(B)ecause caselaw interpreting the CISG is relatively sparse, this Court is authorized to interpret it in accordance with its general principles, "with a view towards the need to promote uniformity in its application and the observance of good faith in international trade." *Hanwha Corp. v Cedar Petrochemicals, Inc.,* 760 F Supp 2d 426, 430 [SDNY 2011] (internal quotations omitted).

Base IX (SF ¶15). As of July 13, 2021, there was an unpaid balance of $4,195,434.00 on the

Invoices, which Plaintiff claims remains unpaid to date (the "Unpaid Balance") (SF ¶16). The

amount owed is disputed by Defendants, who maintain that Plaintiff's own breaches (as reflected

in the Debit Notes), payments from insurers and Plaintiff's failure to mitigate offsets the Unpaid

Balance.

    1.   <u>Plaintiff's Breaches & the Resulting Debit Notes</u>

Under the CISG, "[t]he seller must deliver goods which are of the quantity, quality and

description required by the contract,' and 'the goods do not conform with the contract unless

they ... are fit for the purposes for which goods of the same description would ordinarily be

used." *Profi-Parkiet Sp. Zoo v Seneca Hardwoods LLC*, 13 CV 4358 PKC LB, 2014 WL

2169769, at *4 [EDNY May 23, 2014], *report and recommendation adopted,* 13-CV-4358 PKC

LB, 2014 WL 2765793 [EDNY June 18, 2014]

The CISG further states that "[t]he seller is liable in accordance with the contract and this

Convention for any lack of conformity." CISG art. 36. *Delchi Carrier SpA v Rotorex Corp.,* 71

F3d 1024, 1028 [2d Cir 1995] (citing CISG). Additionally, although the CISG does not

specifically include the implied warranties of fitness and merchantability, CISG Article 35 may

properly be read to suggest them. *U.S. Nonwovens Corp. v Pack Line Corp.*, 48 Misc 3d 211, 215

[NY Sup 2015]

The CISG provides:

Damages for breach of contract by one party consist of a sum equal to the loss,
including loss of profit, suffered by the other party as a consequence of the breach.
Such damages may not exceed the loss which the party in breach foresaw or ought to
have foreseen at the time of the conclusion of the contract, in the light of the facts

40

and matters of which he then knew or ought to have known, as a possible
consequence of the breach of contract.
CISG art. 74.

In *Profi-Parkiet Sp. Zoo v Seneca Hardwoods LLC*, 13 CV 4358 PKC LB, 2014 WL

2169769, at *8 [EDNY May 23, 2014], *report and recommendation adopted*, 13-CV-4358

PKC LB, 2014 WL 2765793 [EDNY June 18, 2014] the Eastern District awarded Plaintiff

judgment against the defendant for the cost of the non-conforming goods as well as

shipment, transport, and port fees associated with the non-conforming goods under and

pursuant to CISG art. 74.

Under the CISG[9], a party may also recover lost profits due to the party being unable

to fulfill business obligations to third parties. "The standard formula to calculate lost profits

is to deduct only variable costs from sales revenue." *TeeVee Toons, Inc. v Gerhard Schubert*

*GmbH*, 00 CIV. 5189 (RCC), 2006 WL 2463537, at *12 [SDNY Aug. 23, 2006].

Here, A Base IX issued the Debit Notes (**PX-8- PX-22**) to Plaintiff within a

reasonable time after they learned of the various non-conformities and/or delays in the

delivery of certain goods.  The Debit Notes specifically stated what the non-conformities

were and the dollar amount required to be reduced from the invoice on account of the non-

conformities (**PX-8- PX-22**). Gammal discussed the Debit Notes with Mr. Jason Jiang

before the Debit Notes were issued in writing to Plaintiff (Gammal Dec. ¶20).  Even if

Plaintiff did not consent to the Debit Notes, which there is no evidence of and which

---

[9] Pursuant to UCC lost profits are also an appropriate measure of damages where a buyer expected to sell
undelivered products. *Antifun Ltd. T/A Premium Vape v Wayne Indus. LLC*, 616 F Supp 3d 291, 309 [SDNY 2022].
Lost profits that were reasonably contemplated by the parties and "are capable of measurement with reasonable
certainty" are recoverable. *Mil-Spec Indus. Corp. v Expansion Indus., LLC*, 201 AD3d 651, 655 [2d Dept 2022].
"The requirement that damages be "reasonably certain ... does not require absolute certainty. Damages resulting
from the loss of future profits are often an approximation. The law does not require that they be determined with
mathematical precision. It requires only that damages be capable of measurement based upon known reliable factors
without undue speculation." *Id.* at 655 [2d Dept 2022]. Lost profits on existing unfulfilled purchase orders are
recoverable. See *RIJ Pharm. Corp. v Ivax Pharm., Inc.,* 322 F Supp 2d 406, 416 [SDNY 2004]

Defendants maintain they did (Gammal Dec. ¶23), the CISG art 74 (as well as the UCC §2-607[10]) provides A Base IX with a method of recovery for the non-conforming and delayed goods[11] as well as the lost profits due to Plaintiff's non-delivery of goods.

Plaintiff maintains that the Debit Notes were contract modifications that were required to be in writing and relies on *New York Packaging II LLC v. Intco Med. Indus. Inc.*, No. 21-cv-04388 (DG)(SIL), 2023 U.S. Dist. LEXIS 667, at *9 (E.D.N.Y. Jan. 3, 2023) for the proposition that alleged oral modifications of contracts for the sale of goods are invalid. However, *New York Packaging II LLC* is a non-reported Eastern District decision that concerned whether an oral modification of an arbitration clause in a contract is valid. The case has nothing to do with non-conforming and late goods, which are clearly governed by CISG art 74 (as well as the UCC §2-607). The Debit Notes were not contract modifications but A Base IX's form of recovery for non-conforming or late goods. Plaintiff's assertion that the Debit Notes were contract modifications is pure nonsense; taking Plaintiff argument to its logical conclusion, no purchaser of goods could ever prevail on a breach claim because, according to Plaintiff, the assertion of the claim would have to subject of a writing signed by buyer and seller.

---

[10] Even if applying the UCC, the Court may account for the Debit Notes due to Plaintiff's delivery of late and/or non-confirming goods.). See *Sears, Roebuck & Co. v Galloway*, 195 AD2d 825, 827 [3d Dept 1993]("acceptance does not in and of itself impair any other remedy provided by UCC article 2 for nonconformity (UCC 2–607[2] ). Thus, "acceptance leaves unimpaired the buyer's right to be made whole, and that right can be exercised by the buyer not only by way of cross-claim for damages, but also by way of recoupment in diminution or extinction of the [purchase] price" (UCC §2–607, official comment 6)." See *also B. Milligan Contr. Inc. v Andrew R. Mancini Assoc. Inc.,* 174 AD2d 136, 139 [3d Dept 1992] relying on UCC §2-714 or §2- 715 and *Hangzhou Silk Import and Export Corp. v P.C.B. Intern. Indus*., Inc., 48 UCC Rep Serv 2d 1367 [SDNY Sept. 5, 2002]("While acceptance normally obligates the buyer to pay the contract price for the goods, it does not prevent the buyer from interposing a counterclaim for breach of the underlying contract due to the nonconformity.")

[11] "New York law requires that contract provisions specifying dates for performance be strictly enforced in a contract action at law." *Adore Me, Inc. v NPC Glob. Corp.,* 99 UCC Rep Serv 2d 750 [SDNY July 29, 2019*] citing Towers Charter & Marine Corp. v. Cadillac Ins. Co.,* 894 F.2d 516, 523 (2d Cir. 1990)

Accordingly, the amount due Plaintiff from A Base IX must be reduced by the total amount set forth in the Debit Notes, approximately $2,215,000.00 (**PX-24**).

2.  <u>Plaintiff is Precluded From Recovering Amounts Paid By Insurers</u>

Defendants maintain that Plaintiff recovered certain amounts from insurers in connection with the Unpaid Balance. Plaintiff is prohibited from recouping such amounts from A Base IX.

Plaintiff produced documents during discovery that reflect that it assigned purchase orders numbers 1802, 1801 and 1805 to PICC (*See DX-15*). Such "Collection Trust Deed" states that Plaintiff assigned PICC such purchase orders "for the full rights of collection" and further stated that Plaintiff "grant to PICC…the full power of exercising such rights and remedies" in exchange for the amount of $184,131.00. "[A] valid and binding assignment of a claim (or a portion thereof confers standing on the assignee *See Conn. v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 117 (2d Cir.2002). Therefore, Plaintiff does not have standing to seek relief from Defendants in connection with purchase order numbers 1802, 1801 and 1805 for the amount of $184,131.00.

During discovery, Plaintiff gave conflicts accounts with respect to what, if anything, Plaintiff recovered from Sinosure. In a sworn declaration, Mr. Tie Sun states that "Plaintiff has not submitted a claim to Sinosure related to the shipments to A Base IX Co. LLC that are the subject of this litigation" (**DX-18**). during Mr. Tie Sun's deposition he testified that Sinosure allegedly denied the claims submitted by Plaintiff to Sinosure relating to A Base invoice (Tie Sun Deposition Tr. Pg. 47: 7-23).

However, the documents produced by Plaintiff (*DX-16*) reflect that Plaintiff did insure three A Base IX orders with Sinosure in the insured amount of $470,537.16 (*DX-16*). This is consistent with Defendants understanding that Plaintiff did maintain Sinosure coverage for orders with A Base IX. Plaintiff should be precluded from recovering such amounts again.

### 3. Failure to Mitigate Damages

A plaintiff in a contract case is required to take reasonable actions to minimize its damages. *Coastal Power Intern., Ltd. v Transcontinental Capital Corp.*, 10 F Supp 2d 345, 370 [SDNY 1998], *affd*, 182 F3d 163 [2d Cir 1999].[12] Failure to mitigate damages is an affirmative defense to a breach of contract claim which requires the defendant to establish that the plaintiff unreasonably failed to mitigate damages, and that reasonable efforts would have reduced the damages. *Id*. If proven, Plaintiff's right of recovery is subject to reduction. *LaSalle Bank N.A. v. Nomura Asset Capital Corp.*, 47 A.D.3d 103, 107, 846 N.Y.S.2d 95 [2007]. For example see *Assouline Ritz LLC v Edward I. Mills & Assoc., Architects, PC*, 91 AD3d 473, 475 [1st Dept 2012]("Plaintiffs opted to risk additional funds on the possibility that the enterprise would ultimately be profitable rather than to treat their previous investment as damages to be mitigated by selling the property as soon as reasonably possible."). See also *Of A Feather, LLC v Allegro Credit Services, LLC*, 21-1107, 2023 WL 2415607, at *1 [2d Cir Mar. 9, 2023]( " closing on the Loan Commitment would have been an unreasonable risk after the Feather Parties' nonpayment.")

Here, the amounts due in connection with the Unpaid Balance commenced with a February 11, 2019 purchase order (Amended Complaint ¶10). The Unpaid Balance in connection with the February 11, 2019 purchase order was $2,246.40 (Amended Complaint ¶10)

---

[12] The CISG also provides a remedy due to a parties failure to mitigate damages. See CISG Art. 77

(SF ¶19). Although A Base IX continued to make payments to Plaintiff up to and including January 6, 2021, the unpaid balance of $2,246.40 from February 11, 2019 grew to approximately $600,912.15 by August 19, 2019 (SF ¶20). In the period between February 11, 2019 and August 19, 2019, and despite the growing unpaid balance, Plaintiff accepted approximately 28 additional purchase orders from A Base IX (SF ¶21). The unpaid balance of approximately $600,912.15 from August 19, 2019 grew to approximately $1,980.338.94 by March 3, 2020 (SF ¶22). In the period between August 19, 2019 and March 3, 2020, and despite the growing unpaid balance, Plaintiff accepted approximately 36 additional purchase orders from A Base IX (SF ¶23). The unpaid balance of approximately $1,980.338.94 from March 3, 2020 grew to approximately $3,295,989.88 by September 11, 2020 (SF ¶24). In the period between March 3, 2020 and September 11, 2020, and despite the growing unpaid balance, Plaintiff accepted approximately 36 additional purchase orders from A Base IX (SF ¶25). The unpaid balance of approximately $3,295,989.88 from September 11, 2020 increased to more than $4,000,000.00 thereafter (SF ¶26).

Despite the growing unpaid balance, Plaintiff opted to risk and continued opting to risk taking additional purchase order on the possibility that, Plaintiff would be profitable from its transactions with A Base IX. At a point in time between February 11, 2019 and prior to January 2021, Plaintiff could have chosen to stop future transactions with A Base IX on account of the prior non-payments. Plaintiff could have elected to stop further debt from mounting. Despite the debt, Plaintiff never requested that the Individual Defendants guaranty A Base IX's obligations. Plaintiff elected to continue issuing credit to A Base IX and ran the risk of further non-payment; a choice Plaintiff made with eyes wide open, and one Plaintiff should bear a burden for.

Accordingly, this Court should find that Plaintiff unreasonably failed to mitigate its damages. Plaintiff's reasonable efforts, such as stopping future transactions with A Base IX prior to January 2021 or requiring up-front payment for goods, would have reduced Plaintiff's damages. Plaintiff's right of recovery is subject to reduction on account of Plaintiff's failure to mitigate in an equitable amount to be determined by the Court.

### E.  PLAINTIFF'S ACCOUNT STATED CLAIM FAILS

"Under New York law, an account stated refers to a promise by a debtor to pay a stated sum of money which the parties had agreed upon as the amount due." _Air Atlanta Aero Eng'g Ltd. v SP Aircraft Owner I, LLC_, 637 F Supp 2d 185, 197 [SDNY 2009] (quotation omitted). For an account stated claim, the plaintiff must allege that (1) an account was presented, (2) the account was accepted as correct, and (3) the debtor promised to pay the amount stated." _Id_. at 198 [SDNY 2009].

"An account stated is an account, balanced and rendered, with an assent to the balance either express or implied. There can be no account stated where no account was presented or where any dispute about the account is shown to have existed." _IMG Fragrance Brands, LLC v Houbigant, Inc.,_ 679 F Supp 2d 395, 411 [SDNY 2009] citing _Abbott, Duncan & Wiener v. Ragusa,_ 214 A.D.2d 412, 413, 625 N.Y.S.2d 178 (N.Y.App.Div., 1st Dep't, 1995)

Further, no account stated claim can be found against a defendant who is not a debtor." _Id._ at 197 [SDNY 2009]. Moreover an account stated claim is preempted by the CISG. _Ningbo Yang Voyage Textiles Co., Ltd. v Sault Trading,_ 18CV1961ARRST, 2019 WL 5399973, at *7 [EDNY Sept. 10, 2019], report and recommendation adopted, 118CV1961ARRST, 2019 WL 5394568

[EDNY Oct. 22, 2019]. Where a plaintiff seeks recovery for the same damages under different legal theories, only a single recovery is allowed. *Id*.

As to the first element it is undisputed that Plaintiff sent invoices to A Base IX (SF¶12). However, A Base IX did not always accept the account as correct.  Here, the account stated claim fails because the A Base disputed portions of the Unpaid Balance and did not agree to pay the full account stated as presented by Plaintiff to A Base IX. Defendants maintained that the Unpaid Balance was subject to deductions and offsets on account of non-conforming and delayed goods (SF ¶11)(See also *PX8- PX22* the Debit Notes). A Base IX's Debit Notes were sent to Plaintiff in the normal course of business (SF ¶27) and set forth the amounts to be reduced from the Unpaid Balance (SF ¶27).

As such, and because A Base IX disputed and continues to dispute the amount due to Plaintiff, this claim should be dismissed as against all Defendants. Further, the claim must be dismissed as to the Individual Defendants because they were not debtors of Plaintiff." *Air Atlanta Aero Eng'g Ltd. v SP Aircraft Owner I, LLC,* at 197 [SDNY 2009] and it is preempted by the CISG.

### F.   PLAINTIFF'S UNJUST ENRICHMENT CLAIM MUST BE DISMISSED

In prevail on a claim for unjust enrichment a plaintiff must show "that (1) the other party was enriched, (2) at that party's expense, and (3) that 'it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered" *Mandarin Trading Ltd. v Wildenstein*, 16 NY3d 173, 182 [2011]. However, "If the plaintiff is simply restating a contract or tort claim, then unjust enrichment is not available." *Royal Host Realty, LLC v. 793 Ninth Ave. Realty, LLC,* 192 F. Supp. 3d 348, 357 (S.D.N.Y. 2016). *See also Koenig v. Boulder Brands,*

*Inc.,* 995 F.Supp.2d 274, 290 (S.D.N.Y.2014) ("… an unjust enrichment claim cannot survive where it simply duplicates, or replaces, a conventional contract or tort claim."). "[U]njust enrichment is not a catchall cause of action to be used when others fail.. An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Corsello v. Verizon N.Y., Inc.,* 18 N.Y.3d 777, 790 (2012) and *U.S. Nonwovens Corp. v Pack Line Corp.,* 48 Misc 3d 211, 216 [NY Sup 2015]("…because an express contract exists between Plaintiff and Nuspark, the CISG preempts Plaintiff's claim for unjust enrichment.")

This is true even were not all defendants were parties to the contract. Claims for unjust enrichment may be precluded by the existence of a contract governing the subject matter of the dispute even if one of the parties to the lawsuit is not a party to the contract." *Am. Med. Ass'n v United Healthcare Corp.,* 00 CIV. 2800 (LMM), 2007 WL 683974, at *10 [SDNY Mar. 5, 2007]. *See also* *SCM Grp., Inc. v. McKinsey & Co., Inc.,* No. 10 Civ. 2414, 2011 WL 1197523, at *7–8 (S.D.N.Y. March 28, 2011)("where an express and valid contract exists concerning the rights at issue, quasi-contract claims such as unjust enrichment are precluded even when asserted against non-signatories to the contract.").

Here, there are no facts that would justify a separate cause of action for unjust enrichment. Plaintiff attempts to frame the unjust enrichment claim as Defendants alleged failure to "fully compensate Plaintiff for the service" of shipping and manufacturing goods (for A Base) (Complaint ¶223). However, the damages sought are the same sum of $4,345,077.65 allegedly due for under the contract claim (compare Complaint ¶213 and Complaint ¶224). The unjust enrichment cause of action simply restates Plaintiff's previous cause of action for breach of contract.

Plaintiff's claims for unjust enrichment should be dismissed against all Defendants as the claim is duplicative of Plaintiff's breach of contract claim.

### G.  **PLAINTIFF'S IS NOT ENTITLED TO RECOVER UNDER UCC §2-706**

Plaintiff asserts a cause of action to recover the difference in the purchase price on inventory originally manufactured for A Base IX that was resold by Plaintiff to third parties under UCC Article 2-706.  Plaintiff contends that it was forced to resell goods manufactured for A Base IX, that were not delivered to A Base IX. Plaintiff allegedly resold the goods for $1,960,869.87 and seeks $1,495,766.98, which is the difference in the price that Plaintiff could have received from A Base IX and the sale price. (PX-1 ¶¶ 184-193, 226-229).

As an initial matter the UCC does not govern the contracts for the purchase and sale of goods subject of this Action, the CISG does.

CISG Article 79(1) provides:

 A party is not liable for a failure to perform any of his obligations if he proves that the failure was due to an impediment beyond his control and that he could not reasonably be expected to have taken the impediment into account at the time of the conclusion of the contract or to have avoided or overcome it or its consequences.

Under the CISG, A Base IX would not be liable for failing to purchase and sell the goods resold by Plaintiff. A Base IX notified Plaintiff that it could not pay for the goods subject of the orders resold by Plaintiff due to harsh economic circumstances brought about by the COVID-19 Pandemic (**DX-12- DX-14**). In lieu of performance, A Base IX provided Plaintiff authorization and release to resell the goods with A Base IX's valuable trademarks on it (**PX-7**).

"Section 2–706 of the Uniform Commercial Code provides for a seller's right to recover the difference between the contract price and the resale price (plus incidental damages) of goods reasonably identified to the broken contract. The resale must be made in good faith and must be commercially reasonable with respect to method, manner, time, place and terms, and must be preceded by reasonable notification to the defaulting buyer of the intent to resell." *BAII Banking Corp. v Atl. Richfield Co*., 86 CIV. 6651 (SS), 1993 WL 403963, at *17 [SDNY Oct. 7, 1993], *affd sub nom. Baii Banking Corp. v Atl. Richfield*, 28 F3d 103 [2d Cir 1994]. The Second Circuit has held that a sale is not commercially reasonable in time if it occurs six weeks after a breach and where the market was volatile. See *BAII Banking Corp. v Atl. Richfield Co*., 86 CIV. 6651 (SS), 1993 WL 403963, at *18 [SDNY Oct. 7, 1993], *affd sub nom. Baii Banking Corp. v Atl. Richfield,* 28 F3d 103 [2d Cir 1994].

A plaintiff must also provide the defendant notice of the sale. <u>*Fuji Photo Film USA, Inc. v Zalmen Reiss & Assoc., Inc.,*</u> 31 Misc 3d 1240(A) [Sup Ct 2011], <u>judgment entered,</u> [N.Y. Sup Ct 2011](Where the plaintiff failed to give notice to defendant "pursuant to UCC § 2–706(3) so as to afford it the opportunity to participate in the private sale or perhaps determine to pay plaintiff's invoice so as to avoid the greater loss to be sustained under the terms of plaintiff's proposed private sale," the Court dismissed the claim.

Where a Plaintiff's resold returned merchandise at significantly below market value[13], to a single vendor, New York Courts have deemed the resale not commercially reasonable manner.

---

[13] "The seller has the burden of proof with respect to market price or market value." *B&R Textile Corp. v Paul Rothman Indus. Ltd.,* 101 Misc 2d 98, 100 [Civ Ct 1979], *affd sub nom. B & R Textile Corp. v Paul Rothman Indus., Ltd.,* 27 UCC Rep Serv 996 [App Term Dec. 7, 1979]. Where the seller failed to produce any evidence which shows what the market price was, the provisions of section 2-708 of the Uniform Commercial Code are not available. <u>*Acuri v Figliolli,*</u> 91 Misc 2d 831, 836 [NY Dist Ct 1977]

See *Fuji Photo Film USA, Inc. v Zalmen Reiss & Assoc., Inc.,* 31 Misc 3d 1240(A) [Sup Ct 2011], judgment entered, [N.Y. Sup Ct 2011]. The Second Circuit in *Apex Oil Co. v Belcher Co. of New York, Inc.,* 855 F2d 997, 1006 [2d Cir 1988] rejected the use for measuring damages of a resale that occurred six weeks after a breach.

Here, Plaintiff allegedly sold the goods at to a single purchaser (who upon information and belief is not in the garment industry) on November 11, 2021 (PX-7) almost a full year after A Base IX ordered the goods and six months after the goods were to be delivered to A Base IX. Plaintiff does not have any admissible evidence as to Plaintiff marketing the goods or the market value of the goods. The record here reflects that the Defendants authorized the Plaintiff to resell the goods, but there is no record of Plaintiff providing Defendants notice of the resale or sale price. Thus, the resale was not commercially reasonable, and Plaintiff should not be entitled to recoup under §2-706.

Moreover, because the Individual Defendants were not parties to the contracts in issue (SF ¶13), the UCC or CISG remedies cannot be pursued against the Individual Defendants.

Accordingly, Plaintiff's claim under UCC 2-706 should be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss all causes of action against the Individual Defendants in their entirety. Defendants respectfully

request that the amount due Plaintiff from A Base IX be reduced on account of the Debit Notes,

insurance payments received by Plaintiff and Plaintiff's failure to mitigate damages.[14]

Dated: November 13, 2024
      New York, New York

                         LAZARUS & LAZARUS, P.C.

                      By:__/s/ Harlan Lazarus _____
                           Harlan M. Lazarus, Esq.
                           Yvette J. Sutton, Esq.
                           240 Madison Avenue, 8th. Flr.
                           New York, New York, 10016
                           212-889-7400 [Telephone]
                           212-684-0314 [Facsimile]
                           hlazarus@lazarusandlazarus.com
                           ysutton@lazarusandlazarus.com

---

[14] To the extent there is a recovery due Plaintiff from A Base IX, Courts in the Second Circuit look to the post judgment rate set by 28 U.S.C. § 1961(a) to calculate the prejudgment interest under the CISG. See *Profi-Parkiet Sp. Zoo v. Seneca Hardwoods LLC*, 2014 WL 2169769, at *10 (E.D.N.Y. May 23, 2014) (awarding prejudgment interest "using the average rate of return on one-year Treasury bills, compounded annually").