UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WEIHAI LIANQIAO INTERNATIONAL COOP GROUP CO., LTD., *Plaintiff*, v. A BASE IX COMPANY LLC, DAVID A. APPERMAN, and ALBERT GAMMAL, *Defendants*. | 21 Civ. 10753 (DEH) **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

DALE E. HO, United States District Judge:

This case arises from a dispute over approximately $4.2 million in unpaid invoices for apparel shipped from China to the United States between 2019 and 2021.  The manufacturer and supplier of the apparel, Weihai Lianqiao International Cooperation Group Co., Ltd. ("LIC" or "Plaintiff"), seeks to recover the unpaid balance from the importer, A Base IX Company LLC ("A Base IX" or "A Base"), and to pierce the corporate veil as to the LLC's members, David A. Apperman and Albert Gammal (together, the "Individual Defendants," and collectively with A Base IX, "Defendants"), and to void certain allegedly fraudulent transfers.

In 2023, the Honorable Victor Marrero, to whom this case was originally assigned, denied Defendants' motion to dismiss Plaintiff's amended complaint.  Following reassignment to the undersigned, the Court held a three-day bench trial with live testimony by witnesses from both parties.  For the reasons that follow, the Court concludes that the full record supports the conclusions that Plaintiff is entitled to damages from A Base IX for breach of contract; the Individual Defendants are liable under a veil-piercing theory; and Plaintiff is further entitled to judgment against the Individual Defendants for fraudulent conveyance.  Accordingly, the Court will enter judgment in favor of Plaintiff.

## FINDINGS OF FACT

Pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure,[1] the Court makes the following findings of fact based on the testimony and exhibits at trial.[2]

### I.    The Contractual Relationship

Plaintiff LIC is a manufacturer and supplier of apparel located in Weihai, China.  (Joint Pretrial Order, App. B ("Stipulated Facts") ¶ 1, ECF No. 123).  At the relevant times, Sun Tie ("Sun") was LIC's General Manager and Jason Jiang ("Jiang") was a Department Manager.  (Sun Decl. ¶ 1; Jiang Decl. ¶ 1).  Defendant A Base IX is a New York-based limited liability company with two members, David Apperman ("Apperman") and Albert Gammal ("Gammal").  (Stipulated Facts ¶ 2).

From around February 2019 through October 2020, A Base entered into a series of written purchase orders (the "Purchase Orders") with LIC, under which LIC would manufacture and deliver an array of apparel for A Base to sell to retailers.  A Base submitted 75 Purchase Orders during this period.  (*Id.* ¶ 8).  From June 2019 through May 2021, LIC sent A Base a series of written invoices (collectively, the "Invoices") setting forth the amounts due for the goods it had

---

[1] All references to Rules are to the Federal Rules of Civil Procedure.  In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

[2] Citations to the transcript of the November 2024 trial are referenced as "Trial Tr." throughout this Opinion.  Citations to the November 9, 2022 deposition transcript of David Apperman are referenced as "Apperman Tr." and citations to the March 3, 2023 continued deposition transcript of David Apperman are referenced as "Apperman Cont. Tr." Citations to the August 15, 2024 deposition transcript of Susanne Apperman are referenced as "S. Apperman Tr." Citations to the November 15, 2022 deposition transcript of Albert Gammal are referenced as "Gammal Tr." and citations to the August 14, 2024 deposition transcript of Alice Gammal are referenced as "Alice Gammal Tr."  The declarations of David Apperman, Albert Gammal, Sun Tie, and Jason Jiang were admitted at trial as PX-77 ("Apperman Decl."), PX-78 (Gammal Decl."), PX-79 ("Sun Decl."), and PX-80 ("Jiang Decl.").  To the extent that the Court cites in this Opinion to any evidence to which a party objected, the objection is overruled.  The Court need not and does not resolve any remaining objections.

delivered pursuant to the Purchase Orders.  (*Id.* ¶ 9).  The Purchase Orders and Invoices contain the material terms of the parties' agreements and are enforceable written contracts between LIC and A Base.  (*Id.* ¶¶ 8-16).  From June 2019 through early 2021, LIC delivered to A Base the goods identified in the Invoices (the "Delivered Goods").  (*Id.* ¶ 10).  Except as claimed by A Base in the Debit Notes discussed below, A Base accepted the Delivered Goods.  (*Id.* ¶ 11).  LIC delivered the Invoices, and A Base received them.  (*Id.* ¶ 12).

### A.    The Unpaid Balance

A Base did not pay LIC in full for the Delivered Goods.  (*Id.* ¶ 14).  From August 2019 through July 2021, A Base carried a large unpaid balance with LIC, and LIC regularly requested payments to reduce that balance.  (Sun Decl. ¶ 13; PX-58 through PX-64).  As of July 13, 2021, the unpaid balance on the Invoices had reached $4,195,434 (the "Unpaid Balance").  Stipulated Facts ¶ 16.  That balance remains unpaid to date.  (Sun Decl. ¶ 16; Trial. Tr. 113:4-6).

On January 18, 2021, and July 13, 2021, A Base proposed payment schedules to pay down the balance owed to LIC.  (PX-57; PX-24).  A Base did not complete the payments in accordance with those proposed schedules.  (Trial Tr. 114:5-7).  Indeed, A Base made no payments at all to Plaintiff after July 2021.  (*Id.* at 113:7-10).  Beginning in 2021, as A Base continued to carry a large unpaid balance, LIC began requiring A Base to pre-pay for its orders.  (Sun Decl. ¶ 14).  On several occasions, LIC canceled A Base's orders because A Base was not making timely payments.  (*Id.*).

Defendants contend that their failure to pay LIC was due to the COVID-19 pandemic and the supply chain crisis, but their unpaid balance had already increased to $1.98 million by March 3, 2020 (Stipulated Facts ¶¶ 22-23)—before either COVID or the supply chain crisis.  On cross-examination, Apperman admitted that the balance owed to Plaintiff as of March 3, 2020 had nothing to do with COVID-19 or the supply chain crisis.  (Trial Tr. 108:1-6).  A Base was also

profitable in 2020, reporting $17.2 million in gross sales and $1.13 million in business income (PX-73; Trial Tr. 110:11-17). Despite the robust sales and overall profit, however, the unpaid balance owed to LIC increased to $3,295,989.88 by September 2020 (Stipulated Facts ¶ 24; Trial Tr. 112:5-8) and to $4.2 million by January 18, 2021 (PX-57; Trial Tr. 114:19-21).

While A Base was carrying a large unpaid balance with LIC, it continued to earn revenue from LIC's goods. A Base's $19 million in sales in 2019 and its $17.2 million in sales in 2020 included sales of LIC's goods. (Trial Tr. 108:17-22, 110:11-19; *see also* PX-72, PX-73). In other words, A Base received revenue from LIC's goods for which A Base did not pay. (Trial Tr. 269:20-25). And Apperman and Gammal continued to pay themselves from those revenues— indeed, they paid themselves significantly more in 2020 than they did in 2019. As discussed in greater detail below, Gammal received $659,600 in total compensation in 2020,[3] a significant increase over his compensation in 2019, and Apperman received $657,449 in total compensation in 2020, a significant increase over his compensation in 2019. (DX-22).

**B.    The Debit Notes**

In January 2021, when A Base IX's unpaid balance had increased to nearly $4.2 million (PX-57; Trial Tr. 114:19-21), Plaintiff canceled orders from A Base due to its failure to timely pay. (Sun Decl. ¶ 14, Trial Tr. 274:5-10). A Base subsequently submitted fifteen debit notes to LIC (the "Debit Notes") seeking chargebacks for purported violations of the terms of the Purchase Orders. (Sun Decl. ¶ 9; Jiang Decl. ¶¶ 5-6). The Debit Notes are in the record at PX-8 through

---

[3] According to DX-22, Gammal also borrowed $76,250 from A Base IX in 2020, which was never paid back. This aligns with Defendants' 2019 and 2020 financial statements (DX-23), which show that there was $202,568 owed by Gammal and Apperman to A Base IX for advances in 2019 and $618,967 owed by Gammal and Apperman to A Base IX for advances in 2020. There is no evidence in the record showing that those sums were paid back to A Base IX.

PX-22.  Each one contains a cover page that includes a date, a description of the chargeback, and an amount.  Some of them also include attachments in support of the chargebacks.

At trial, Gammal testified that the Debit Notes dated in 2020 were not submitted right away; rather, Defendants "waited on them" for "quite some time."  (Trial Tr. 273:4-25).  Defendants began submitting the Debit Notes in January 2021, after the relationship with LIC had suffered a major breakdown.  (*Id.* at 273:18-25, 265:13-16).  At that point, Defendants decided that they "needed to do something to protect [themselves].  So [they] issued [the Debit Notes] then."  (*Id.* at 273:19-21).  Thus, although many of the Debit Notes relate to transactions between the parties in 2020, they were not submitted to LIC until January 2021 or later.  (*Id.* at 273:4-25, 90:2-5, 90:12-18).  Nevertheless, Defendants discussed at least some of their concerns with LIC before issuing the formal Debit Notes.  (*Id.* at 263:4-6).

LIC admits that it approved two of the Debit Notes (in full or in part) to the tune of $6,298, bringing the unpaid balance down to $4,189,136.  (Stipulated Facts ¶¶ 28-29).  Other than those two, LIC never approved any of the other Debit Notes.  (Trial Tr. 27:7-9, 68:20-69:24).  Based on his conversations with Jiang before issuing the Debit Notes, Gammal understood Jiang to be sympathetic to A Base's concerns.  (*Id.* at 264:2-10, 265:1; *see* Gammal Decl. ¶¶ 31-38).  But Jiang did not have the authority to approve the Debit Notes on behalf of LIC.  (Trial Tr. 27:2-9).

Defendants did not raise the Debit Notes during their initial negotiations with LIC regarding the unpaid balance.  For example, on January 18, 2021, Defendants submitted a written proposed payment plan to Plaintiff.  (PX-57; Trial Tr. 114:8-18).  In that plan, Defendants acknowledged that the unpaid balance owed to Plaintiff was $4,293,718.  (PX-57; Trial Tr. 114:9-21).  Defendants did not seek to reduce that unpaid balance by reference to the Debit Notes dated before January 18, 2021, which together totaled more than $1.2 million. (PX-57; Trial Tr. 114:22-115:4; PX-24).  Six months later, in their proposed payment plan in July 2021, Plaintiffs included

more than $2.2 million in deductions based on the Debit Notes. (PX-24). Defendants' failure to even reference the Debit Notes in their initial negotiations over the unpaid balance undermines the credibility of their claimed deductions.

               1.    <u>Debit Note 115</u>

In Debit Note 115, dated January 20, 2020 and submitted in January 2021, A Base sought a $250,000 chargeback for goods it claimed Plaintiff untimely shipped. (PX-8 at 1[4]). A Base contended that it was forced to give a markdown on these goods for its buyer, Ross Stores. (*Id.* at 2).

The record reflects that Gammal emailed various LIC employees on January 16, 2020, expressing his displeasure with the shipping delays and stating that he was forced to give markdowns to his buyers. (*Id.*). According to Apperman's handwritten notes dated January 20, 2020, Gammal spoke to Jiang about the delays and requested a $250,000 deduction. (*Id.* at 5). Apperman's notes stated that Jiang told Gammal that he "understands and is with us but needs to get this ok'd by his boss/manager." (*Id.*). Apperman testified at trial that Plaintiff never signed a document approving Debit Note 115. (Trial Tr. 119:14-16).

The record does not include any documents showing the alleged $250,000 markdown demanded by Ross. (*Id.* 120:12-16). But the record does include an email conversation between LIC and A Base about the status of the delayed Ross orders in March 2020. (PX-8 at 2). On March 5, Jiang proposed shipping some of the delayed order by air and the balance by sea. (*Id.* at 13). A Base employee Ho Yee Loo ("Loo") responded by instructing LIC to send the entire shipment by air. (*Id.* at 12). Jiang agreed to ship the order by air by the end of the month. (*Id.* at 8-11). On March 13, however, Loo replied that A Base had convinced its buyer to accept later

---

[4] Unless otherwise indicated (for example, by citation to a Bates number), citations to specific pages in the parties' exhibits are based on the PDF pagination.

delivery and have the order shipped by sea, but that A Base would need to give the buyer a 15%

discount.  (*Id.* at 8).  Gammal then followed up to say that LIC had "the choice to either air these

goods at factory cost or ship by sea with 15% discount."  (*Id.* at 7).  Jiang responded that 15% was

more than LIC could accept and asked A Base to reconsider.  (*Id.* at 6-7).  It is not clear from the

email exchange what ultimately ended up happening.  Defendants did not examine any witnesses

about this exchange at trial, nor did they cite it in their post-trial proposed findings of fact.

       2.    <u>Debit Note 116</u>

In Debit Note 116, dated March 31, 2020 and submitted in January 2021, A Base sought a

$657,097 chargeback for a 15% discount on its unpaid balance of $4,380,644.38.  (PX-9).  In this

Debit Note, Defendants did not contend that LIC provided nonconforming or untimely goods.  (*Id.*;

Trial Tr. 121:24-122:17).  Rather, Defendants requested a 15% deduction on the unpaid balance

"on account of COVID-19 related issues."  (Gammal Decl. ¶ 32).

LIC never approved the claimed deduction in Debit Note 116.  (Sun Decl. ¶ 12; Jiang Decl.

¶ 8).  Although Gammal testified that he spoke with Jiang about a 15% COVID-related deduction

and "understood that he accepted it," Apperman testified at trial that LIC never approved of Debit

Note 116 or the 15% discount in writing.  (Gammal Decl. ¶ 32; Trial Tr. 121:18-23).  There is no

documentary evidence showing that LIC approved Debit Note 116.  (Trial Tr. 122:20-21).

       3.    <u>Debit Note 118</u>

In Debit Note 118, dated March 16, 2020 and submitted in or after January 2021,[5] A Base

sought a $313,927 chargeback for allegedly moldy goods delivered by LIC.  (PX-10).  A Base

stated that it had received a return of approximately 32,400 pointelle sweaters from Ross Stores

due to mold.  (*Id.*).  A Base sought a full refund from LIC.  (Gammal Decl. ¶ 33).

---

[5] The documentation attached to Debit Note 118 includes copies of emails dated February
11, 2021, suggesting that A Base may not have submitted Debit Note 118 until after that date.

Documentation attached to Debit Note 118 shows that Ross Stores contacted A Base in March 2020 to complain about moldy garments and to return the affected orders. (PX-10). At some point between March and December 2020 (the email is not dated), Apperman wrote to Jiang, explaining that Ross had returned a number of orders and stating that A Base would send samples of the moldy garments to LIC. (*Id.*). Apperman advised Jiang that the total deduction from Ross was expected to be around $250,000, which A Base would be withholding from LIC. (*Id.*). On December 31, 2020, Jiang emailed Albert and David about a number of pending issues, including the Ross deduction. Jiang stated, "we did not see the problem of quality and moldy as you mentioned, and we have replied to you by emails before, we do not accept this deduction." (*Id.*). Jiang said he would arrange for an LIC representative to visit the warehouse where the returned goods were stored to do an inspection. (*Id.*).

LIC never approved Debit Note 118. (Sun Decl. ¶ 12; Jiang Decl. ¶ 8; Apperman Tr. 114-15; Trial Tr. 123:14-19).

### 4. Debit Note 119

In Debit Note 119, dated October 12, 2020 and submitted in or after January 2021, A Base sought an $840 chargeback for allegedly damaged cartons. (PX-11). A Base claimed that it incurred material and labor costs in connection with replacing the allegedly damaged cartons.

The attachments to Debit Note 119 include emails from an external address—presumably a buyer—to A Base stating that the factory was leaving too much space in the cartons and attaching photos of damaged cartons. (PX-11). Apperman instructed Loo to draw up a debit note for $5 per carton and send it to him; Loo complied. (*Id.*). It is not clear from the record when A Base submitted Debit Note 119 to LIC. There are no documents in evidence demonstrating that A Base actually incurred any material or labor costs for the allegedly damaged cartons. (Trial Tr. 124:22-24).

### 5. Debit Note 120

In Debit Note 120, dated November 18, 2020, A Base sought a $3,048 chargeback for late delivery of goods and shipping by sea instead of air.  (PX-12).  Sun approved Debit Note 120. (Sun Decl. ¶ 11; Jiang Decl. ¶ 7).

### 6. Debit Note 121

In Debit Note 121, dated November 23, 2020 and submitted in January 2021 or later, A Base sought a $312 chargeback due to improper packaging.  A Base claimed that Plaintiff incorrectly packed twenty-four items in a carton instead of twelve items in a master carton.  (PX-13).  A Base sought chargebacks for material and labor costs in connection with replacing the cartons.  (*Id.*).

There are no documents in evidence demonstrating that A Base actually incurred any material or labor costs for the allegedly incorrect cartons.  (Trial Tr. 126:2-5).

### 7. Debit Note 122

In Debit Note 122, dated December 8, 2020 and submitted in January 2021 or later, A Base sought a $16,450 chargeback for ocean freight shipping charges incurred because of allegedly delayed shipping by LIC.  (PX-14).

Attached to Debit Note 122 is an email exchange between Loo and Jiang discussing how A Base and LIC would split the shipping costs.  (*Id.*).  It is unclear whether these emails, which are dated October 2020, relate to the same shipments as those referenced on the face of the Debit Note.  (*Id.*).  Nevertheless, in that exchange, Jiang offered to split the cost of a shipping container with A Base.  Loo agreed, stating that a container would cost about $6,500 and that A Base would share it with LIC and issue a debit note for $3,250.  (*Id.*).  There is no documentation to back up the $16,450 claimed by A Base, and LIC never signed a document approving payment of $16,450

in shipping costs. (Trial Tr. 126:20-22, 127:2-5). Sun accepted Debit Note 122 to the extent of $3,250 and did not accept the remaining balance. (Sun Decl. ¶ 11; Jiang Decl. ¶ 7).

### 8. Debit Note 123

In Debit Note 123, dated December 10, 2020, A Base sought a $4,870 chargeback for 974 allegedly damaged cartons. (PX-15). A Base claimed that it incurred material and labor costs in connection with replacing the cartons.

Documentation attached to Debit Note 123 demonstrates that Loo emailed Jiang on December 11, 2020, with a debit note seeking chargebacks for $5 per carton. (*Id.*). Jiang wrote back that he "thought the damage was because of transportation or loading," because when cartons were damaged before making it on board LIC's forwarder would inform them immediately. (*Id.*). Jiang expressed skepticism that all 974 cartons were damaged and asked Loo to double check. (*Id.*). There is no follow-up correspondence in the record. There are no documents in evidence demonstrating that A Base actually incurred any material or labor costs for the allegedly damaged cartons. (Trial Tr. 127:17-25).

### 9. Debit Note 126

In Debit Note 126, dated February 15, 2021, A Base IX sought a $10,000 chargeback for inbound charges related to alleged "intentional delays in shipments" caused by LIC. (PX-16). According to Gammal, in January and February 2021, LIC required A Base to use a logistics company, Shandong Hengzhuo International Logistics Co., Ltd., ("Shandong"), that LIC had a preexisting relationship with. (Gammal Decl. ¶ 38). Gammal testified that Shangdong "would hold goods at the overseas delivery port until [LIC]'s payment terms were satisfied." (*Id.*). After LIC asked Shangdong to hold the deliveries associated with Debit Note 126, according to Gammal, A Base incurred additional shipping charges. (*Id.*).

The attachments to Debit Note 126 include email correspondence between Shangdong and A Base in which Apperman expressed concern about the high freight charges. The Shangdong representative explained that the charges were "due to the late booking." (PX-16). Apperman subsequently emailed Jiang to complain that Shangdong had "raised the prices on your advi[c]e," stated, "I know you would not do that," and asked Jiang to speak with Shangdong. (*Id.*). Jiang wrote back that he would talk with them. (*Id.*). It is not clear from this email exchange whether the increased freight cost was indeed due to LIC's intervention, and there are no other documents in evidence substantiating the $10,000 chargeback. Apperman testified at trial that Plaintiff never signed a document approving Debit Note 126. (Trial Tr. 128:5-7).

10.    Debit Note 127

In Debit Note 127, dated February 15, 2021, A Base sought a $10,000 chargeback for fees and charges relating to a line of credit obtained for goods that Plaintiff allegedly did not ship. (PX-17).

Attached to Debit Note 127 is a spreadsheet that appears to show that A Base incurred $6,300 in fees on a line of credit in connection with LIC. There is otherwise no documentation to substantiate the $10,000 chargeback sought in Debit Note 127. (Trial Tr. 128:16-19).

11.    Debit Note 128

In Debit Note 128, dated February 15, 2021, A Base sought a $1,500 chargeback for freight and warehouse costs allegedly incurred in connection with the same moldy goods referenced in Debit Note 118. (PX-18).

Based on the attachments to Debit Note 128, it appears that A Base may have repackaged the same units previously returned by Ross Stores and shipped them to a different buyer at Ross nearly a year later. (*Id.* at 8). There is no documentation to substantiate the $1,500 chargeback claimed by A Base. (Trial Tr. 129:1-6).

11

12.    Debit Note 135

In Debit Note 135, dated May 20, 2021, A Base sought a $41,616 chargeback for incorrect hanger headers on garments shipped by LIC. Although A Base had ordered two-packs of short-sleeve tops (DX-27), the hanger headers on the garments shipped by LIC labeled them as three-packs of dolphin shorts. (PX-21 at 4-6).

The documentation attached to Debit Note 135 shows that A Base's buyer, TJ Maxx, asked to return the goods due to the incorrect hanger headers. (*Id.*). Apperman testified at trial that A Base's warehouse had to replace each hanger and repack every box, but he could not point to any documentation of the material and labor costs incurred. (Trial Tr. 161:17-25). It is not clear if the chargeback was for the sale price of the returned goods, as Debit Note 135 suggests ("9792 SETS X $4.25 selling price"), or for the material and labor costs to repackage the order, as Apperman testified at trial. (PX-21; Trial Tr. 161:17-20). Email correspondence attached to Debit Note 135 includes a reference to a $5,355 debit (PX-21 at 3), but this figure is not contextualized, nor does it match the $41,616 sum sought by A Base.

13.    Debit Notes 129, 130, and 136

In Debit Notes 129, 130, and 136, A Base sought chargebacks of $282,000, $600,000, and $24,055.20, respectively, for alleged lost profits on orders LIC cancelled due to A Base's unpaid balance. (PX-19; PX-20; PX-22). Debit Notes 129 and 130 are dated February 15, 2021, and Debit Note 136 is dated July 13, 2021. At the time LIC cancelled A Base's orders, the unpaid balance was at least $4.2 million, and Sun had begun requiring pre-payment before shipment. (PX-57; Sun Decl. ¶ 14).

Debit Notes 129, 130, and 135 seek only alleged lost profits; they do not seek any out-of-pocket expenses incurred by A Base. The chargebacks were calculated based upon a 30% profit margin. (Trial Tr. 130:18-20). However, Defendants have offered contradictory evidence

regarding A Base's profitability in 2020 and 2021. Apperman testified in his declaration that COVID-19 and the supply chain crisis "took away all our profit on merchandise." (Apperman Decl. ¶ 68; *see also* Trial Tr. 98:13-20). Defendants submitted no evidence demonstrating that A Base in fact lost any profits relating to the orders referenced in these three debit notes—there is no evidence, for example, that A Base had buyers already committed or lined up for these orders, or that those buyers would have paid 30% more than the cost to A Base of purchasing the goods. Although Defendants attach spreadsheets to Debit Notes 129, 130, and 135 detailing the cancelled orders, they fail to provide any evidence of lost profits. (PX-19; PX-20; PX-22; *see* Trial Tr. 160:15-18).

### 14.    Total Debit Note Chargebacks

In sum, Plaintiff agreed to deduct $6,298 for Debit Notes 120 and 122 from the unpaid balance of $4,195,434, leaving a net unpaid balance of $4,189,136. As explained in the Conclusions of Law, the Court concludes, based on the preponderance of the evidence, that the remainder of the debit notes cannot be enforced as contract modifications and cannot form the basis to sustain Defendants' counterclaims.

### C.    The Resold Goods

In February and May 2021, LIC and A Base entered into a series of purchase orders that do not figure in the Unpaid Balance. (Sun Decl. ¶¶ 17-18; *see* PX-57; PX-5; PX-6). A Base and LIC agreed that goods from the February 2021 and May 2021 purchase orders would be stored until A Base IX paid the outstanding balance then owed to LIC. (Sun Decl. ¶¶ 16, 18).

For three of the February 2021 purchase orders, LIC assigned its right to collection against A Base to PICC Property and Casualty Company Limited ("PICC") in the amount of $184,131 plus interest. (DX-5; DX-15).

On June 24, 2021, A Base signed a "Release and Authorization to sell all A Base IX trademarked goods—Glitz/Moral Fiber/Ready to go" (the "Release"). (PX-56). Specifically, A Base authorized LIC "to sell off all remaining finished goods related to all A Base IX purchase orders after we take possession of the following from LIC," followed by a list of styles adding up to 42,300 items. (Sun Decl. ¶ 19; PX-56). The June 24 Release further stated that "[t]his release and permission will cover goods currently in China and LIC's LA warehouse that bears the following labels: Glitz, Moral Fiber and Ready2Go" and that "[t]his sale release will be effective on 07/01/2021 towards all customers in China, Europe, the USA, and Worldwide." (PX-56).

The following day, on June 25, 2021, Defendants picked up 27,072 of the items of clothing referenced in the Release, for a total purchase price of $66,844.80. (Sun Decl. ¶ 21). As requested by LIC, A Base prepaid that amount and the corresponding duty via wire transfer. (*Id.*). Defendants do not appear to have paid for or picked up the remaining 15,228 items referenced in the Release.[6]

At that point, there were goods with a total contract price[7] of $369,237.03 remaining in the two warehouses in California, and goods with a total contract price of $1,591,632.84 in LIC's warehouses in China (the "Unsold Inventory"). (Sun Decl. ¶ 22). Thus, as of June 25, 2021, Plaintiff had possession of $1,960,869.87 worth of Unsold Inventory. (*Id.* ¶ 23). Defendants did

---

[6] The testimony at trial was somewhat contradictory in this regard. When asked on cross-examination whether LIC ever gave A Base "possession to all of those styles in those quantities" referenced in the Release, Sun responded, "No." (Trial Tr. 50:17-21). But Jiang, when asked on cross-examination whether A Base took possession of "all of those goods listed" in the Release, answered, "Yes." (Trial Tr. 84:24-25, 85:1-10). The Court cannot conclude based on this conflicting testimony that all the styles listed in the Release were picked up. Rather, the Court finds that the preponderance of the evidence supports the conclusion that only 27,072 items were picked up and paid for by A Base. (Sun Decl. ¶ 21).

[7] In his declaration, Mr. Sun refers to the "value" of the goods in the 2021 Purchase Orders. The Court assumes he is referring to the contract price.

not contest these figures at trial or in their post-trial briefing.  *See generally* Defs.' PFOF ¶¶ 129-136; Defs.' PCOL ¶¶ 170-180.

On or about November 8, 2021, LIC sold the Unsold Inventory in private sales to third-party buyers in the United States and China for a total of $465,102.89.  (*Id.* ¶¶ 23-24; PX-7).  When asked on cross-examination what he did to ensure a commercially reasonable sale at a market rate, Sun appeared confused, explaining that "[t]hat was the transaction between customers" and "[e]verybody was equal."  (Trial. Tr. 53:2-5).  Jiang, when asked about the resale on cross-examination, testified that he did not know the specific details.  (*Id.* at 87:22-24).  Defendants did not offer any evidence suggesting that these private sales did not occur or that the sale prices were not commercially reasonable.

Thus, it is undisputed that, after reselling the Unsold Inventory, Plaintiff received $1,495,766.98 less than it would have under its contracts with A Base.  (Sun Decl. ¶ 25).

## II.    Facts Relevant to Plaintiff's Veil-Piercing Claim

### A.    Background

A Base IX was formed in May 2015 and operated as a garment business until February or March 2022.  (Stipulated Facts ¶¶ 31-32).  A Base imported and sold children's and women's clothing to retailers such as Ross Stores and TJ Maxx.  (*Id.* ¶ 30).  A Base operated from 525 Seventh Avenue, New York, New York 10018.  (*Id.* ¶ 31).  Apperman and Gammal operated A Base from 2015 through February 2022.  (*Id.* ¶ 38).

The original members of A Base IX entered into the Operating Agreement of A Base IX Company LLC (the "Operating Agreement") in 2015.  (PX-23 at 3).  The original members and their respective interests in A Base were as follows: Guotai USA Co. Ltd. (30%); Apperman (23 1/3%); Gammal (23 1/3%); Salomon Murciano (23 1/3%).  (*Id.* at 4).

Guotai USA Co. Ltd. sold and assigned its membership interest in A Base IX to Murciano on December 30, 2015.  (*Id.* at 24).  On the same day, Murciano sold and assigned a portion of his interest to A Base IX.  (*Id.*).  Thus, as of December 30, 2015, A Base IX's members and their respective interests were as follows: Murciano (33 1/3%); Apperman (33 1/3%); Gammal (33 1/3%).  (*Id.* at 43).

In a Membership Interest Redemption Agreement dated March 19, 2019 (the "Redemption Agreement"), Murciano redeemed his interest in A Base IX and in a related company, CSCO, LLC.  (*Id.*).  Following the redemption of Murciano's 33 1/3% interest pursuant to the Redemption Agreement, Apperman and Gammal each owned a 50% membership interest in A Base IX and continue to hold those interests to date.  Apperman and Gammal entered into the First Amendment to the Operating Agreement of A Base IX Company, LLC on March 19, 2019.  (*Id.* at 24).

During the time they operated A Base IX, Apperman and Gammal did not hold formal corporate meetings and did not maintain a board of directors.  (Apperman Tr. 37:22-38:7; Gammal Tr. 40:19-41:2; Trial Tr. 165:16-19).  A Base IX did not maintain any meeting minutes.  (Trial Tr. 165:20-22).

Apperman and Gammal were solely responsible for approving A Base IX expenses. (Apperman Tr. 213:19-214:4).  Apperman and Gammal were authorized to make bank transactions on behalf of A Base IX.  (*Id*. at 170:13-16).  Apperman and Gammal both had the authority to approve petty cash.  (*Id.* at 57:13-17).  From 2019 through 2022, Gammal and Apperman would approve any invoices and then Apperman would make payment through A Base IX's banking system to the factories.  (*Id*. at 56:3-19).  Apperman oversaw the finances of A Base IX from 2019 through 2022.  (*Id.* at 56:3-9).

While they operated A Base IX, Apperman and Gammal operated another apparel company, CSCO, LLC, ("CSCO") out of the same space.  (Trial Tr. 94:7-11).  As of March 19,

16

2019, CSCO's members and their respective membership interests were identical to those of A Base IX: Murciano (33 1/3%); Apperman (33 1/3%); Gammal (33 1/3%).  (PX-23 at 41).  Following the redemption of Murciano's 33 1/3% interest pursuant to the Redemption Agreement, Apperman and Gammal each owned a 50% membership interest in CSCO.  (*Id.*).

CSCO is related to a business known as Cherry Stix Limited ("Cherry Stix").  (Gammal Tr. 16:2-18:24).  Cherry Stix was a garment importer owned by Charles Gammal and Steven Gammal, Defendant Albert Gammal's uncles.  (*Id.*).  Apperman was employed at Cherry Stix for over 30 years, beginning in the mid-1980's.  (Apperman Tr. 13:21-23).

Extra Touch Co., Limited ("Extra Touch") was another related garment importer owned by Charles Gammal and Steven Gammal.  (Gammal Tr. 16:2-18:24).  Extra Touch and Cherry Stix were part of the same company.  Cherry Stix sold plus-sized clothing, and Extra Touch sold junior's and children's clothing.  (*Id.*).  Gammal worked at Extra Touch from 1990 to 2002.  (*Id.* at 13:2-7).

### B.    Mingling of Corporate and Personal Funds

Between August 2019 and July 2022, Apperman and Gammal maintained little separation between A Base IX's corporate funds, expenses, and liabilities and their respective personal funds, expenses, and liabilities.  For example, at the height of COVID, Apperman paid A Base IX's employees directly from his personal account.  (Apperman Tr. 196:3-197:23, 198:15-200:8).  On at least one occasion, Susanne Apperman, David Apperman's wife, personally guaranteed A Base IX's corporate debt, despite not being an employee or member of A Base IX.  (PX-54; PX-67; S. Apperman Tr. 8:11-13).  A Base IX also provided a guaranty for a $150,000 personal loan made to Gammal, which Gammal used to pay his portion of A Base IX's debt owed to Merchant Factors.  (PX-51; Trial Tr. 192:18-193:2).  Gammal signed the guaranty on behalf of A Base IX on December 14, 2021.  (PX-51 at 23).  His signature, name, and title ("VP") appear below the words

"A BASE IX COMPANY LLC" on the signature page.  (*Id.*).  Nevertheless, when asked during cross-examination about his signature, Gammal was evasive and refused to answer whether he signed the guaranty on behalf of A Base.[8]  (*Id.* at 280:16-281:8).

As discussed in more detail below, Apperman and/or Gammal used A Base IX funds to pay their personal credit card bills, used A Base IX's corporate credit card to pay for personal expenses, and used A Base IX funds to cover personal deficits and low balances.

        1.      <u>Use of A Base IX Funds to Pay Personal Credit Card Bills</u>

Both Apperman and Gammal frequently used A Base's funds to make payments on their personal credit cards.  From November 2019 through December 2021, Apperman used A Base IX's bank account to make monthly payments toward his personal credit card accounts, for a total

---

[8] Q:     Could you go to the signature please.  On page 13 of PX 51, the guarantee, it appears that A Base IX company LLC signed this; right?

A:     I signed it.

Q:     On behalf of A Base?

A:     I was personally liable for the loan.

Q:     But A Base IX was the guarantor on this loan?

A:     I was personally liable for the loan.

Q:     Are you disputing that A Base was?

A:     I'm not sure.  I'm not certain.

Q:     But you signed here on behalf of A Base, did you not?

A:     The loan was made to me.

Q:     Can you answer the question.  Did you sign here on behalf of A Base?

A:     I signed the document.

Q:     And so is it your recollection that One Step insisted that A Base guarantee this loan to you?

A:     I don't recall.

(Trial Tr. 280:16-281:8).

of approximately $117,000 in payments.  (PX-30; PX-32; PX-39; PX-40, PX-41, PX-42).[9]  At
trial, Apperman testified that any personal expenses paid for by A Base would have been identified
by the bookkeeper and charged as a shareholder distribution.  (Trial Tr. 185:19-186:10).  However,
Defendants submitted no evidence of any reconciliation or repayment of the $117,000 paid by A
Base IX to Apperman's personal credit card accounts.  Similarly, Gammal used A Base IX's funds
to pay his personal credit card accounts each month between May 2020 and December 2021,
totaling more than $500 in payments over that period.  (PX-32; PX-37; PX-38).[10]  There is no
evidence demonstrating that these payments were ultimately repaid by Gammal or otherwise
reconciled.

### 2.    Use of A Base IX's Credit Card for Personal Expenses

Apperman, Gammal, and Alice Gammal also used A Base IX's corporate credit card
accounts for their own personal expenses.  From July 2019 through 2021, Apperman used A Base
IX's Business Gold American Express card for thousands of dollars in personal expenses,
including family vacations, furniture, and restaurants.  For example, on November 4, 2019,

---

[9] The Court obtained this number by examining outgoing payments from A Base's TD
Bank account to "AMEX" that match incoming payments to Apperman's personal American
Express cards in both amount (to the penny) and date (within two business days).  For example,
Apperman's personal American Express credit card statement shows an online payment of $3,000
on November 1, 2019 (PX-41 at 35); meanwhile, A Base's TD Bank account statement shows a
debit of $3,000 on November 4, 2019 with the description "AMEX EPAYMENT" (PX-30 at 10).
Similarly, Apperman's personal card statement shows an online payment of $3,000 on November
3, 2019 (PX-40 at 31); A Base's bank statement shows a debit of $3,000 on November 5, 2019
with the description "AMEX EPAYMENT" (PX-30 at 10).  Adding up all such corresponding
payments, the Court finds that Apperman made a total of approximately $117,000 in payments
from A Base's bank accounts to his personal credit cards.  This may be a slightly conservative
estimate, as there is at least one payment of $5,500 to Apperman's personal American Express
card that matches a $5,500 transfer from A Base's TD Bank account to Apperman's personal Chase
account just days earlier.  (PX-30 at 39; PX-40 at 91; PX-39 at 36).

[10] For Gammal's credit card statements, the Court followed the same methodology as
discussed above with Apperman's credit card statements.  *See supra* at 19 n.9.

Apperman charged $2,610 at a furniture store in Long Island. (PX-34 at Bates AMEX001086). That same day, he charged $662.16 to book a spa hotel in Israel. (*Id.*). He later charged $345 for express passport services, $550 for airline fees, and $545.85 for a travel agency in Jerusalem in connection with that trip. (*Id.* at Bates AMEX001087, 1099). On August 27, 2020, Apperman charged $296.58 for flights to Cancun for himself and his wife Susanne. (*Id.* at Bates AMEX001170). On July 24, 2019, he charged $334.43 at a restaurant near his Long Island home, and in August 2019 he charged at least $444.41 for restaurants and cafes. (*Id.* at Bates AMEX001058, 1066-67). He also charged $294.99 for men's luxury clothing from London on September 9, 2019 and $334.07 for liquor on December 18, 2019. (*Id.* at Bates AMEX001074, 1108). Defendants have pointed to no evidence that these charges were ever repaid or otherwise reconciled by Apperman.

During that same period, Albert Gammal also repeatedly used A Base IX's Business Gold American Express card for personal expenses. For example, between July 29, 2019 and December 4, 2019, Gammal charged over $10,000 for tuition and tuition loan payments at CUNY Baruch and CUNY Brooklyn. (*Id.* at Bates AMEX001056-57, 1066, 1086, 1097-99). When asked about these charges on cross-examination, Gammal initially testified that his children "might have" attended CUNY Baruch and CUNY Brooklyn. (Trial Tr. 277: 1-10). He then admitted that he "believe[d] they did" attend those schools, that he had to pay tuition, and that the tuition was a personal, not business, expense. (*Id*. at 277:5-15). Defendants have presented no evidence that the tuition payments were ever repaid by Gammal.

From September 1-3, 2019, Gammal used A Base IX's credit card to charge $9,485.72 for his extended family's airfare to and from Israel. (PX-34 at Bates AMEX001065-66). Gammal later used A Base IX's credit card for lodging at the Intercontinental and Dan Hotels and for restaurants and transportation in Israel. (*Id.* at Bates AMEX001124). During cross-examination,

Gammal was evasive about these charges. When asked if he recalled taking a trip to Israel with his family, he responded, "[i]t's possible." (Trial Tr. 278:15-21). He admitted, however, that these were not business expenses. (*Id*. at 278:22-23). Defendants have presented no evidence that Gammal ever reimbursed A Base IX for the family trip to Israel.

Other charges by Gammal to A Base IX's Business Gold American Express credit card account include:

- August 5, 2019: $751.78 for the Fashion Institute of Technology ("FIT"). (PX-34 at Bates AMEX001057). On December 1 and 2, 2019, Gammal charged another $1,357.83 for FIT. (*Id.* at Bates AMEX001098).

- August 2019: at least $732.32 for restaurants in New Jersey or Brooklyn. (*Id.* at Bates AMEX001057-65);

- August 2, 2019: $481.17 for a spa treatment. (*Id.* at Bates AMEX001057);

- August 6, 2019: $933 for the Sephardic Community Center in Brooklyn. (*Id.* at Bates AMEX001057-58);

- 2019: parking tickets (*id.* at Bates AMEX001105), gas (*id.*), E-ZPass tolls (*id.* at Bates AMEX001099), meal delivery services (*id.* at Bates AMEX001067), groceries (*id.* at Bates AMEX001106), and charities (*id.* at Bates AMEX001098);

- March 27, 2020 and March 31, 2020: a total of $668.98 for groceries. (*Id.* at Bates AMEX001135). On April 3, 2020, Gammal charged another $471.54 for groceries. (*Id.* at Bates AMEX001136);

- December 27, 2020: $868.65 for flights to Aruba for Gammal and two family members. (*Id.* at Bates AMEX001197-98);

- 2020: gas (*id.* at Bates AMEX001115), EZpass tolls (*id.*), parking tickets (*id.* at Bates AMEX001123), charity donations (*id.*; *id.* at Bates AMEX001136), Dunkin Donuts (*id.* at Bates AMEX001125), Ubers (*id.* at Bates AMEX1192);

- January 28, 2021: $399.23 for groceries, and $86.72 for groceries again the next day. (*Id.* at Bates AMEX001204);

- February 28, 2021: $307.39 for groceries from supermarkets located in close proximity to the Gammals' Brooklyn home at 1350 East 4th Street. (*Id.* at Bates AMEX001210);

- June 30 and July 1, 2021: $246.88 for groceries and $244.44 at a steakhouse. *(Id.* at Bates AMEX001238);

- July 23, 2021 and July 29, 2021: $571.41 for liquor. (*Id.* at Bates AMEX001244). There are multiple other charges for liquor store purchases;

- 2021: for Ubers (*id.* at Bates AMEX001237); subway fares (*id.* at Bates AMEX001210); Amazon purchases (*id.* at Bates AMEX001231); restaurants (*id.* Bates AMEX001238); $192.60 at the DSN Community Center (*id.* at Bates AMEX001244; Trial Tr. 275:17-22, 332:3-5); and $765.77 at Sarah's Tent, a restaurant (*id.* at Bates AMEX001238, 1244-45).[11]

During cross-examination, Gammal testified that "[w]hatever personal charges were there, were reconciled by the bookkeeper and taken off the membership distribution." (Trial Tr. 277:13-15). But when asked if there was proof of that reconciliation, he was unable to point to any documentation in the record. (*Id.* at 277:16-19).

Defendants have not identified any documents in the record showing the reconciliation of Apperman or Gammal's personal charges. Nor did they offer any testimony from the bookkeeper or address this issue with either Apperman or Gammal during their redirect examination. Thus, while the record shows extensive transactions in which Apperman and Gammal used A Base IX's Business Gold American Express credit card for personal use, there is no evidence that they ever reimbursed A Base IX to cover these charges.

Alice Gammal, Albert Gammal's wife (who was neither an employee nor officer of A Base IX), also had her own corporate card. In early 2022, as Apperman and Gammal were winding down the business, Alice Gammal used A Base IX's American Express Business Gold credit card for multiple personal purchases, including for the monthly membership fees at Deal Sephardic Network (DSN) Community Center, a New Jersey beach club where the Gammals were members.

---

[11]    Throughout this period, Gammal also charged several thousand dollars for clothing from retailers such as Zara, Lululemon, Lord & Taylor, Banana Republic, Saks Fifth Avenue, J. Crew, and Theory. (*Id.* at Bates AMEX001064-65, 1097, 1245, 1185, 1192). On cross-examination, Gammal testified that certain clothing purchases were for "samples." Trial Tr. 279:8-16. Gammal's credibility on the stand was often lacking. But it is not wholly implausible that some of these purchases were business-related expenses given that Gammal operated in the women's clothing industry, and in an abundance of caution, the Court does not consider the clothing purchases in its discussion of Gammal's personal purchases using A Base IX's credit card.

(PX-76; Trial Tr. 275:17-24, 276:7-9, 331:4-22, 332:3-5).  On cross-examination, Albert Gammal initially was evasive about the DSN Community Center charges, testifying that he "believe[d]" that he had been to the DSN Community Center but that he was "not sure" if the Gammals were members there.  (Trial Tr. 275:21-24).  Gammal eventually admitted that he had been to the DSN Community Center and that the fees paid there were not business-related.  (*Id*. at 276:7-12).

At trial, both Apperman and Albert Gammal claimed they did not know Alice Gammal had an A Base IX corporate credit card.  (*Id*. at 187:10-20, 275:4-16).  Gammal said he was "sure" he received the credit card statement, but claimed he did not see the reference to Alice Gammal's card in the statement.  (*Id*. at 278:3-9).  Alice Gammal also testified that she did not recall that she had an A Base IX corporate credit card.  (*Id*. at 330:7-23).  The Court finds it difficult to believe that Alice Gammal obtained a corporate credit card without the knowledge of either Apperman or Albert Gammal, who were the sole members of the LLC at the relevant time.  (*Id*. at 187:10-12, 275:4-7, 330:7-8, 330:20-23).  Their testimony that they were not aware of Alice Gammal's corporate credit card is not credible.

### 3.    Use of A Base IX Funds to Cover Personal Deficits and Low Balances

On at least three occasions, Gammal used A Base IX's assets to cover deficits or low balances in his personal account.  On October 11, 2019, Gammal wired $100,000 from A Base IX's TD Bank Account Number XX7304 to his personal Citibank Account Number XX6930 when the latter had a $65.13 balance.  (PX-30 at Bates TD00005; PX-36 at Bates ABASEIX003227).  The transaction was not labeled as a loan repayment, draw, or distribution in the TD Bank records.  (PX-31 at 7).  On February 12, 2021, Gammal wired $120,000 from A Base IX's TD Bank Account Number XX7304 to his personal HSBC Account Number XX0880 when the latter had a balance of -$271.05.  (PX-30 at Bates TD00079; PX-35 at Bates ABASEIX004485).  The transaction was not labeled as a loan repayment, draw, or distribution in the TD Bank records.  (PX-31 at 325).

On July 14, 2021, Gammal wired $15,000 from A Base IX's TD Bank Account Number XX7304 to his personal HSBC Account Number XX0880, when the latter had a balance of -$432.77. (PX-30 at Bates TD00099; PX-35 at Bates ABASEIX004458). The transaction was not labeled as a loan repayment, draw, or distribution in the TD Bank records. (PX-31 at 388).

### C. Undercapitalization

From August 1, 2019 through June 2022, A Base IX was consistently undercapitalized. For example, Apperman and Gammal allowed deficits in A Base IX's bank accounts on at least four occasions:

- On September 30, 2019, A Base IX's BHI Account Number XX0878 had a balance of -$11,857.89. (PX-29 at Bates BHI2022D000608);

- On July 31, 2020, A Base IX's TD Bank Account Number XX6051 had a balance of -$8,320.20. (PX-32 at Bates TD00654);

- On January 29, 2021, A Base IX's TD Bank Account Number XX6051 had a balance of -$9,223.04. (*Id.* at Bates TD00690); and

- On January 31, 2022, A Base IX's TD Bank Account Number XX6051 had a balance of -$11,225.35. (*Id.* at Bates TD00760)

During these same four months when A Base IX incurred deficits in its corporate bank accounts, A Base IX's American Express corporate credit card maintained significant balances. On September 6, 2019, the corporate card had a balance of $19,697.83 (PX-34 at Bates AMEX001061); that balance had grown to $22,044.34 by October 8, 2019 (*id.* at Bates AMEX001071). On July 8, 2020, it had a balance of $20,062.33 (*id.* at Bates AMEX001151), which was reduced only slightly to $18,091.33 by August 7, 2020 (*id.* at Bates AMEX001157). And on January 8, 2021, it had a balance of $13,780.55 (*id.* at Bates AMEX001195), which was reduced to $12,678.20 by February 5, 2021 (*id.* at Bates AMEX001201). In early 2022, new charges continued to outpace payments and credits, and Alice Gammal was using the card for personal expenses. (PX-76 at 1, 4, 7).

On redirect, Apperman testified that there might have been "dozens or hundreds" of additional overdrafts in A Base IX's bank accounts. (Trial Tr. 242:23-243:3). Additionally, Apperman admitted that A Base IX repeatedly did not have enough funds to cover its short-term expenses, including twenty such instances in 2019, a year in which Apperman claimed A Base IX was profitable. (*Id.* at 181:1-21; Apperman Decl. ¶ 64). At the same time, A Base IX's corporate American Express credit card was being used frequently for personal expenses and maintaining a significant balance. (*See generally* PX-34).

Beginning in March 2018, A Base IX relied on factor financing from Merchant Factors Corp. ("Merchant") to cover its operation expenses. (DX-2; Trial Tr. 171:4-21, 172:7-9, 18-20). Merchant required Apperman and Gammal to remit cash or collateral to cover any possible shortfalls in the factoring agreement. (Apperman Tr. 208:18-209:21). In November 2019, after notifying A Base IX of a default under the Discount Factoring Agreement for making distributions in excess of 70% of net profits in 2018, Merchant began requiring A Base IX to maintain a tangible net worth of at least $400,000 by the end of 2019 and $1,000,000 by the end of each year thereafter. (DX-2 at 24-25). In August 2020, Merchant notified A Base IX of a default for failing to meet the $400,000 tangible net worth requirement. (*Id.* at 27).

A Base IX's independently audited financial statements show that Apperman and Gammal had $613,633 in negative equity in A Base IX at the beginning of 2019. (DX-23 at 7). That year, Apperman and Gammal made $945,291 in distributions from A Base IX to themselves, but they still owed the company $202,568 in outstanding loans and/or advances. (*Id.* at 7, 12). In 2020, Apperman and Gammal distributed $1,108,250 to themselves while taking substantial loans or advances from A Base IX, increasing the amounts they owed to $618,967. (*Id.*). The independent auditor stated in the financial statements that Apperman and Gammal "d[id] not intend to repay within the next twelve months." (*Id.* at 12).

25

A Base IX, its members, and/or its affiliates have been the subject of multiple lawsuits for nonpayment of contracts since 2019. On July 29, 2019, Zhejiang Zhui Horizon Clothing Industrial Co., Ltd. ("ZZHC") commenced an action in Supreme Court, New York County against one of the other apparel companies operated by Apperman and Gammal, CSCO, LLC d/b/a Cherry Stix/Extra Touch. (PX-25). ZZHC, a Chinese clothing design and manufacturing company, contended that CSCO failed to pay $473,417 for goods ZZHC shipped from August through December 2016. (*Id.* at 5). By stipulation, CSCO agreed to entry of judgment in the amount of $473,417 plus interest, costs, and disbursements. (*Id.* at 29). On November 8, 2023, a total judgment of $768,322.52 was entered against CSCO. (*Id.* at 35). To the Court's knowledge, no satisfaction of judgment has been filed.

On September 9, 2019, Prosper Elite Limited and Grand Step (H.K.) Ltd. d/b/a Grand Apparel Designs ("GSL") commenced an action in Supreme Court, New York County against various defendants, including CSCO, A Base IX, and Apperman. (PX-26). GSL, a manufacturer and exporter of consumer goods located in Hong Kong, contended that CSCO failed to pay $286,505.26 for goods shipped by GSL, and that A Base IX failed to pay $160,529.60 for goods shipped by GSL. (*Id.* at 71, 73). CSCO and A Base IX were represented by the same law firm in the GSL action. (*Id.* at 76). Apperman testified at trial that he was stricken from the lawsuit. (Trial Tr. 211:12-212:1).

On October 18, 2021, 525 Delaware, LLC ("525 Delaware") commenced an action in Supreme Court, New York County against CSCO, Apperman, and Gammal (the "Landlord Action"). 525 Delaware is the owner of 525 Seventh Avenue, the building in which A Base IX and CSCO both maintained their offices. (PX-27). 525 Delaware contends that, as of October 31, 2021, CSCO had failed to pay $120,045.28 in rent. CSCO is the lessee under the lease with 525 Delaware, and Apperman and Gammal personally guaranteed the obligations under that lease. (*Id.*

at 3-4). By decision and order dated May 23, 2022, the court (Hon. Sabrina Kraus) granted 525 Delaware's motion for partial summary judgment. On June 6, 2022, judgment was entered against CSCO, Apperman, and Gammal in the total amount of $99,615.72. (*Id.* at 30). The judgment was satisfied in full as of October 16, 2024.

On August 5, 2022, S.J. Stile Associates, LTD ("S.J. Stile") commenced an action in Supreme Court, Nassau County against A Base IX and Apperman. A Base IX had appointed S.J. Stile as its agent and attorney in all Customs districts, and Apperman had personally guaranteed payment by A Base IX under the agreement with S.J. Stile. (PX-28). S.J. Stile contended that A Base IX and Apperman failed to pay $200,663.05 for invoices related to S.J. Stile's receipt of merchandise deliverable to A Base IX. (*Id.* at 8).

### D.    Asset Stripping

In its pre-trial Proposed Findings of Fact, Plaintiff calculated the payments Apperman and Gammal took from A Base IX from 2019 to 2022 based upon an analysis of the bank records produced by Defendants in discovery and the bank records Plaintiff obtained by subpoena. (*See* ECF No. 168 ¶¶ 119-187). At trial, Defendants did not refute this calculation.

The below summary of the payments to Apperman and Gammal is based on the schedule of distributions prepared by Defendants (DX-22), Defendants' independently audited financial statements (DX-23), and A Base IX's tax returns for 2019, 2020, and 2021 (PX-72 through PX-74). The amounts are rounded to the nearest dollar.

1.    2019

In 2019, Gammal and Apperman received the following payments from A Base IX:

**Gammal**

| | |
|---|---|
| Member Draws: | $230,000 |
| Tax Distributions: | $220,000 |
| Total Compensation: | **$450,000** |

| Loans: | -$32,000 (Gammal borrowed $32,000 from A Base) |
|---|---|

**Apperman**

| Member Draws: | $231,500 |
|---|---|
| Tax Distributions: | $225,000 |
| Total Compensation: | **$456,500** |
| Loans: | $15,000 (Apperman loaned $15,000 more than he received) |

(DX-22 at 2, 5).

Thus, Apperman and Gammal received a total of at least $906,500 in distributions in 2019.[12]  According to the distribution schedule, they collectively received $17,000 in net loans and/or advances from A Base in 2019 (Gammal received $32,000 and Apperman loaned $15,000 more than he received).  A Base IX's audited financial statement shows that by the end of 2019, Gammal and Apperman collectively owed A Base IX $202,568 in loans and/or advances.  (DX-23 at 12).

The distributions listed above do not take into account the use of A Base IX's credit card account by Apperman, Gammal, and Alice Gammal for personal expenses, including travel, restaurants, college tuition, and community center memberships.  Nor do they take into account the A Base IX funds used by Apperman and Gammal to make payments on their personal credit cards.  While Apperman and Gammal testified that such expenses would have been "reconciled by the bookkeeper and taken off the membership distribution" (Trial. Tr. 277:13-15), Defendants failed to offer any evidence that the expenses were ever reconciled.[13]

---

[12] This figure is slightly less than the amounts disclosed on A Base IX's 2019 financial statement ($945,291) (DX-23 at 7) and the amount Defendants reported on A Base IX's 2019 tax return ($1.13 million) (PX-72 at 4).

[13] Although Defendants failed to offer any evidence to corroborate their claim that their liberal use of A Base IX's corporate credit card was "reconciled," it is at least plausible that the $202,568 due from Apperman and Gammal in 2019 and the $618,967 due from them in 2020 (DX-23) includes some of these personal expenses.  Defendants did not attempt to explain at trial how these substantial "due from members" amounts were calculated.  In any event, even if those

2.    2020

Despite the onset of COVID-19 and the downturn in A Base IX's business, Defendants'
distribution schedule shows that Gammal and Apperman took substantially more in distributions
in 2020 than they had in 2019.  In 2020, Gammal received $659,600 in total compensation, a 47%
increase over his 2019 compensation, and Apperman received $657,449, a 44% increase over
2019:

**Gammal**

| | |
|---|---|
| Member Draws: | $333,600 |
| Tax Distributions: | $326,000 |
| Total Compensation: | **$659,600** |
| Loans: | -$76,250 (Gammal borrowed $76,250 from A Base) |

**Apperman**

| | |
|---|---|
| Member Draws: | $302,949 |
| Tax Distributions: | $354,500 |
| Total Compensation: | **$657,449** |
| Loans: | -$1,300 (Apperman borrowed $1,300 more than he lent) |

(DX-22 at 3, 7).[14]

Although Defendants' distribution schedule shows that Gammal and Apperman received a
total of $77,550 in loans or advances from A Base IX in 2020, the financial statement shows that
they collectively owed A Base IX $618,967 by the end of 2020—an increase of $416,399 over the
previous year.  (DX-23 at 12).  Gammal and Apperman therefore appear to have actually received

---

amounts properly included the personal charges on A Base IX's credit card and the payments made
by A Base IX to their personal credit card accounts, there is no evidence that they were ever paid
back.

[14] The $1,317,049 in total distributions shown in Defendants' distribution schedule (*id.*) is
more than the $1,108,250 they disclosed to the auditor for the financial statement (DX-23 at 7)
and on A Base IX's 2020 tax return (PX-73 at 4).

$416,399 in loans or advances in 2020.[15]  There is no record that they ever repaid the $618,967 they owed at the end of 2020.  According to the independent auditor, Apperman and Gammal did "not intend to repay" within the next twelve months.  (*Id.*).

Using the total distributions shown in the 2020 financial statement and 2020 tax return ($1,108,250), which is less than the amount shown on Defendants' distribution schedule, Gammal and Apperman received a total of $1,524,649 ($1,108,250 in distributions plus $416,399 in loans or advances) in 2020.  (DX-23 at 7-8).  That is an approximately 33% increase over the $1,147,859 ($945,291 in distributions plus $202,568[16] in loans or advances) shown on the 2019 financial statement.  (DX-23 at 7-8).  There is no evidence that these figures take into account the use of A Base IX's credit card for personal expenses or the use of A Base IX funds to pay off personal credit cards.

In sum, in 2020, when A Base IX's business had already begin to suffer due to COVID-19, Gammal and Apperman took a much higher percentage of A Base IX's assets for themselves than they did during the previous year.

At the same time, Defendants continued to order goods from Plaintiff and sell those goods, which funded the sizeable distributions taken by Gammal and Apperman.  A Base IX's unpaid balance with Plaintiff increased from approximately $1,980,338.94 on March 3, 2020 to approximately $3,295,989.88 by September 11, 2020.  (Stipulated Facts ¶ 24).

---

[15] The $416,399 is the increase of the "due from members" amount from 2019 ($202,568) to 2020 ($618,967) as shown in the financial statements.  (*Id.*).

[16] The $202,568 figure represents the amount "due from members" by the end of 2019 and may include loans and/or advances taken prior to 2019.  (DX-23 at 5).  Replacing the $202,568 figure with the more conservative figure of $17,000 in loans and/or advances taken in 2019 from Defendants' distribution schedule (DX-22 at 2, 5), the increase in total distributions and loans from 2019 to 2020 was 58%.

Defendants stopped paying Plaintiff in 2021, and by July, the unpaid balance had increased to $4,195,434.  (*Id.* ¶ 16).

3.  2021

Although Defendants reported a $301,538 loss on A Base IX's 2021 tax return (PX-74 at 1), Gammal and Apperman continued to distribute sizeable amounts to themselves.  According to Defendants' distribution schedule, Apperman and Gammal each received $601,000 in total compensation in 2021:

**Gammal**

| | |
|---|---|
| Member Draws: | $268,000 |
| Tax Distributions: | $333,000 |
| Total Compensation: | **$601,000** |
| Loans: | -$15,000 (Gammal borrowed $15,000 from A Base) |

**Apperman**

| | |
|---|---|
| Member Draws: | $257,100 |
| Tax Distributions: | $344,000 |
| Total Compensation: | **$601,100** |
| Loans: | -$4,500 (Apperman borrowed $4,500 more than he lent) |

(DX-22 at 3, 9).

Gammal's total distributions in 2021 ($601,000) remained significantly higher than they had been in 2019 ($450,000), a year in which Defendants claim A Base IX was "sufficiently funded and was profitable."  (Apperman Decl. ¶ 64).  Apperman's total distributions in 2021 ($601,100) were also significantly higher than they had been in 2019 ($456,500).[17]  Again, these figures do not take into account the use of A Base IX's credit card for personal expenses or the use of A Base

---

[17] The $1,202,100 in total distributions in 2021 as shown in Defendants' distribution schedule (DX-22 at 3, 9) is substantially more than the $79,610 they reported as distributions in A Base IX's 2021 tax return (PX-74 at 5).

IX funds to pay off personal credit cards.  Gammal and Apperman were able to take such high distributions in 2021 in part because Defendants continued to sell Plaintiff's goods.

### E.    The Promissory Notes

Apperman and Gammal argued that certain payments made from A Base IX to them were loan repayments in accordance with promissory notes given by the company to each of them in January 2021.  (DX-5).  The Court concludes that these promissory notes were fabricated.

In a promissory note dated January 1, 2021 and signed by Apperman on behalf of the company, A Base IX promised to pay Gammal $300,000 for loans he had made to the company.  (*Id.* at 1).  Gammal testified that he wrote a $300,000 check to A Base IX in 2019.  (Trial Tr. 281:16-24).  However, there is no documentary evidence of a $300,000 check from Gammal to A Base IX.  The $300,000 payment is not shown on Defendants' distribution schedule, which details transactions beginning on January 11, 2019.  (DX-22).  Apperman claimed on cross-examination that Gammal's loan is not shown on Defendants' distribution schedule because it was deposited before January 11, 2019.  But Defendants could have corroborated this claim by offering a copy of the $300,000 check or a bank statement showing the transfer.  They have not done so.  Nor did either Apperman or Gammal address this issue during their respective redirect testimony.

Gammal's alleged $300,000 loan is also contradicted by A Base IX's independently audited financial statements.  (DX-23).  In neither 2019 nor 2020 did the independent auditor disclose any loans owed by A Base IX to Gammal or Apperman.  The list of A Base IX's assets on the balance sheet includes $202,568 "due from members" in 2019 and $618,957 "due from members" in 2020 (*id.* at 12), but there is nothing listed as "due to members" under liabilities (*id.* at 5).  Apperman claimed that Gammal's loan is shown on the financial statements as "loans

payable to members" (Trial Tr. 194:8-14), but there are no loans payable to members shown in the 2019 and 2020 financial statements.  (DX-23).

Apperman's purported $500,000 promissory note suffers from the same evidentiary infirmities—it is not listed in the financial statements, which only depict obligations owed *by* Apperman and Gammal *to* A Base IX (and no obligations running from A Base IX to them). Moreover, Apperman's testimony that whenever he loaned money to A Base IX, it was "temporary" and "was reimbursed in a few days" (Trial Tr. 180:7-10, 181:10), contradicts Defendants' assertion that he was owed $500,000 as of January 1, 2021.

The Court finds it suspicious that these promissory notes supposedly referenced loans made in 2019 but were dated January 2021—the same month Plaintiff began to cancel Defendants' orders, the relationship broke down, and Defendants decided they "needed to do something to protect" themselves.  (Trial Tr. 264:13-16, 265:13-16, 273:17-25).  In light of the evidence presented at trial, the Court concludes that the $300,000 promissory note to Gammal and the $500,000 promissory note to Apperman were fabricated.

## III.    Procedural History and Post-Filing Developments

### A.    The Complaint

Plaintiff commenced this action against A Base IX on December 15, 2021.  (ECF No. 1). Plaintiff's original complaint brought claims for breach of contract, account stated, unjust enrichment, and unrecovered value from the resale of contracted-for goods.  (*Id.*).  Plaintiff initially sued only A Base IX.  (*Id.*).  On January 24, 2022, A Base IX answered and asserted counterclaims for breach of contract, damage to trade reputation, and breach of the implied warranty of merchantability.  (ECF No. 10).

### B.    The SBA Loan Transfers

On February 23, 2022, A Base IX received a loan from the United States Small Business Administration ("SBA") for $1,000,900.  (DX-6).  Apperman and Gammal were both personal guarantors on the SBA loan.  (Gammal Tr. 168:3-15).

The same day the loan proceeds were received, Apperman and Gammal made the following payments from A Base IX's TD Bank Account Number XX7304:

- $100,000 to Apperman        (OBI: "2021 taxes");
- $85,500 to Apperman         (OBI: "re pay loans from 1 3 22 to 2 4 22");
- $100,000 to Gammal          (OBI: "2021 taxes");
- $20,000 to Apperman         (OBI: "2022 members distributions"); and
- $20,000 to Gammal           (OBI: "2022 shareholders distribution").
- **TOTAL:** $325,500

(PX-31).  When asked about these payments at trial, Apperman acknowledged that he made the payments on the same day the $1,000,900 from the SBA loan landed in A Base IX's account.  (Trial Tr. 208:5-21).  But he explained that the payments were largely "for taxes" and "to repay [] loans" Apperman had made to A Base IX.  (*Id.* at 207:21-23).  The information fields for each wire transfer state that the $100,000 each paid to Apperman and Gammal were for "2021 taxes," and the $85,500 paid to Apperman was to repay loans from January 3, 2022 to February 4, 2022.  (PX-31).  Defendants do not point to any documentation of the loans from Apperman, but the Court has reviewed the relevant bank statements contained in Plaintiff's exhibits and concludes that Apperman made nine loans totaling $83,250 to A Base IX between January 3 and February 4, 2022.  (PX-39 at 128-132).

Regardless of the purpose of the transfers, the SBA loan agreement expressly prohibited distribution of A Base IX's assets to any "owner" or "partner" without SBA's prior written consent.  (DX-6 at Bates4033).  Apperman did not obtain SBA's prior written consent before making $325,500 in payments from the loan proceeds to himself and Gammal.  (Trial Tr. 208:22-24).

When asked about this at trial, Apperman testified that he "didn't see that limitation" in the loan agreement.  (*Id.* at 209:1).

At the time Apperman distributed $325,500 to himself and Gammal in February 2022, A Base IX's revenues were rapidly decreasing.  (*Id.* at 213:19-21).  In February 2022, A Base IX defaulted under the discount factoring agreement with Merchant, which eliminated a source of cash.  (*Id.* at 213:10-25; Apperman Decl. ¶ 80).  By February 2022, Apperman and Gammal were winding down A Base IX's business.  (*Id.* at 214:9-13; Apperman Decl. ¶ 80).  Apperman acknowledged that, under the terms of SBA's loan agreement with A Base IX, the loan proceeds could have been used to pay down the balance owed to Plaintiff.  (Trial Tr. 207:2-8).  Ultimately, however, Defendants did not use any of the SBA loan proceeds to pay Plaintiff.  (*Id.* at 209:6-9).

### C.    The 2022 Gammal Property Transfers

On February 3, 2022—a month and a half after Plaintiff filed this action and a few weeks before Apperman withdrew the $325,500 from the SBA loan proceeds—Gammal transferred his one-half interest in a property on Grant Avenue in Deal, New Jersey (the "Vacation Home") to his wife, Alice Gammal.  (PX-46).  Alice Gammal did not give him any money or anything else of value in exchange for the transfer.  (Trial Tr. 335:24-336:6).  Gammal and Alice Gammal purchased the Vacation Home on October 16, 2017 for $1,250,000.  (PX-45).  Eleven days before Gammal transferred his interest to his wife, the couple cashed out at least some of their equity with a $1.82 million mortgage on the property.  (PX-71; Trial Tr. 336:9-19).  Alice Gammal did not participate in the process of obtaining the mortgage.  (Trial Tr. 336:20-22).  Albert Gammal testified that an appraisal of the Vacation Home was likely prepared in connection with this mortgage, but no documents were produced by Defendants with respect to the mortgage or appraisal.  (*Id.* at 290:15-22).

The Gammals used the Vacation Home as a second home near the beach. (*Id.* at 335:2-5). Albert Gammal testified that after the 2022 transfer, his use of and access to the Vacation Home did not change in any respect. (*Id.* at 293:6-19, 302:1-11). He still used the Vacation Home in the summer, on holidays, and during COVID. (*Id.*). He did not need Ms. Gammal's permission to go to the Vacation Home. (*Id.* at 293:6-19).

On the same day he transferred his interest in the Vacation Home, Gammal transferred his interest in a property on East 4th Street in Brooklyn, New York (the "Brooklyn Property") to Alice Gammal and her mother, Sarah Sultan. (PX-49). Alice Gammal testified at trial that neither she nor her mother gave anything of value to Albert Gammal in exchange for transferring his interest in the Brooklyn home. (Trial Tr. 334:12-21). She explained that it was Albert Gammal's idea to transfer his interest in the two properties. (*Id.* at 336:24-337:1).

Albert Gammal testified at trial that he transferred his interest in the Vacation Home and the Brooklyn property for estate planning purposes. (*Id.* at 291:2-4). But he acknowledged that there were no documents, such as a trust document or a will, outlining the purported estate plan. (*Id.* at 292:2-11, 293:4-5). He elaborated that when his father and mother-in-law became sick, he started to think about his own future and "didn't want to have to go through what they were going through with medical bills and all that." (*Id.* at 292:14-25). His understanding was that "you can't own a home and have Medicaid coverage." (*Id.* at 292:22-23). Alice Gammal testified that she never saw any estate planning documents related to the transfer of either the Vacation Home or the Brooklyn Property. (*Id.* at 337:5-13).

The Court does not find Gammal's "estate planning" story to be credible. His demeanor at trial, the lack of any documents related to the purported estate plan, and the circumstances surrounding the transfers all undercut his explanation. The transfers occurred just months after this action was commenced; Gammal did not disclose them to Plaintiff or its counsel. At the time,

Gammal was a defendant in at least one other non-payment lawsuit (PX-27), and A Base IX was a defendant in at least three non-payment lawsuits, including this action. (PX-26; PX-28). The only logical conclusion is that Gammal was seeking to hide assets in anticipation of being named in this lawsuit.

### D.    The Amended Complaint

On June 1, 2022, Plaintiff filed an Amended Complaint naming Apperman and Gammal as additional defendants under a veil-piercing theory of liability. (ECF No. 21). Plaintiff also added new causes of action in connection with the transfer of the Vacation Home and the SBA loan funds. (*Id.*). In all, the Amended Complaint alleges six causes of action against Defendants: (1) breach of contract; (2) account stated; (3) unjust enrichment; (4) unrecovered value from the resale of contracted-for goods; (5) avoidance of the fraudulent conveyance of property; and (6) avoidance of the fraudulent conveyance of funds. (ECF No. 21; PX-1 ¶¶ 205-39).

On September 13, 2022, Defendants filed a Motion to Dismiss the Amended Complaint for failure to state a claim under Rule 12(b)(6). (ECF No. 37). The Court (Hon. Victor Marrero) denied the motion by Opinion and Order dated April 18, 2023. (ECF No. 65). On May 9, 2023, Defendants filed their Answer to the Amended Complaint, asserting three counterclaims: (1) breach of contract; (2) damage to A Base IX's trade reputation; and (3) breach of the implied warranty of merchantability. (Stipulated Facts ¶ 7; PX-3 at 50-52 ¶¶ 10-22).

### E.    The 2024 Gammal Property Transfer

As the initial trial date in this action approached, on April 2, 2024, Alice Gammal sold the Vacation Home. (PX-47). She testified at trial that she was not involved in negotiating the terms of the 2024 sale; rather, Albert Gammal negotiated the terms. (Trial Tr. 339:5-8). The Vacation Home was listed by a real estate broker for $4.9 million, which did not include the price for any personal property in the Vacation Home. (*Id.* at 339:9-18). The eventual purchase and sale

agreement showed the price at only $2.9 million, but Alice Gammal ultimately received a total of at least $4.3 million from the sale of the property. (*Id.* at 295:23-24; PX-47). Specifically, the purchaser of the Vacation Home paid $2.9 million under the purchase agreement, an additional $900,000 designated for the purported undocumented sale of unenumerated personal property, and $500,000 in cash for no specified additional consideration, for a total of $4,300,000. (PX-50; PX-51; Alice Gammal Tr. 44:20-45:21, 62:12-22, 68:03-69:12, 71:04-72:08, 77:03-13; Trial Tr. 339:25-340:3, 341:1-342:6).

Alice Gammal admitted that there was no written inventory created for the $900,000 that was purportedly for the sale of personal property in the home. (Trial Tr. 340:4-8). Albert Gammal claimed that the $900,000 was verbally agreed to while he and the buyer conducted a "walkthrough," (*Id.* at 296:21-25), but that they did not reduce the $900,000 to a written inventory list. (*Id.* at 297:6-7). Albert Gammal claimed at trial that all property inside and outside the house was sold, but the Gammals paid Michael's Moving and Storage for relocation of personal property from the Vacation home. (*Id.* at 297:2-3, 340:19-25; PX-69).

Neither Alice Gammal nor Albert Gammal could explain why the purchaser paid $500,000 in cash to them. Alice Gammal admitted that an additional $500,000 was paid at closing but could not articulate what the $500,000 was for. (Trial Tr. 341:22-342:6). Albert Gammal admitted that he attended the closing for the sale of the Vacation Home in lieu of Alice Gammal, negotiated the $500,000 cash payment, and received the $500,000 cash payment, (*Id.* at 298:12-14; Alice Gammal Tr. 63:16-18, 65:23-68:2), but he could not articulate what the $500,000 was for. (Trial Tr. 298:18-299:6). Rather, Gammal testified only that the additional $500,000 cash payment was "advantageous" to him. (Trial Tr. 300:6-7, 301:9-12). There was no written agreement for the $500,000 payment. (*Id.* at 298:15-17). Gammal testified that he did not give the purchaser anything in exchange for the $500,000. (*Id.* at 299:7-9, 300:11-17, 301:15-16).

Defendants did not disclose sale of the Vacation Home to Plaintiff; rather, Plaintiff uncovered the sale on its own in June 2024.  (ECF No. 103).  A portion of the net proceeds from the sale of the Vacation Home was used to pay personal debts owed solely by Albert Gammal.  (Trial Tr. 305:1-3).  None of the net proceeds from the sale of the Vacation Home were used to pay any of the debt owed to Plaintiff.  (*Id.* at 305:4-6).

## F.    The Bench Trial

This Court held a bench trial on November 18, 19, and 20, 2024, at which Sun Tie, Jason Jiang, David Apperman, Albert Gammal, and Alice Gammal testified.  The parties also stipulated to the admission into evidence of sworn declarations by Jiang, Sun, Apperman, and Gammal.  (Trial Tr. 9:11-13; PX-77, PX-78, PX-79, PX-80).  The parties stipulated to the admission into evidence of 105 exhibits listed in the Joint Pretrial Order.  (Trial Tr. 140:15-18; ECF No. 167 App. D).  Four exhibits remained in dispute at the start of trial: PX-44, PX-65, PX-66, and PX-75.  (Trial Tr. 140:15-18).  The Court admitted PX-75 and reserved on PX-44, PX-65, and PX-66.  (*Id.* at 20:21-22, 326:6-7, 373:25-374:2).  After trial, the parties each submitted proposed findings of fact and conclusions of law for the Court's consideration.  (ECF Nos. 176-179).

## CONCLUSIONS OF LAW

### I.   Breach of Contract

#### A.    Choice of Law

The Court first addresses a choice-of-law dispute raised by the parties in their post-trial submissions.  Judge Marrero previously determined that this case is governed by New York law.  *See Weihai Lianqiao Int'l Coop. Grp. Co. v. A Base IX Co. LLC*, No. 21 Civ. 10753, 2023 WL 2989068, at *2 n.4 (S.D.N.Y. Apr. 18, 2023) ("The applicable law in this case is not addressed in the Amended Complaint.  However, the parties apply New York law in their briefing, no party has suggested that any other state's law should apply, and Defendants are alleged to all have New York

citizenship. Accordingly, the Court applies New York law."). Defendants now urge the Court instead to apply the United Nations Convention on Contracts for the International Sale of Goods (CISG). Defs.' PCOL at 31 n.19. But the decision to apply New York law is the law of the case. *See Kashef v. BNP Paribas SA*, No. 16 Civ. 3228, 2024 WL 1676355, at *1 (S.D.N.Y. Apr. 18, 2024) (adopting prior judge's ruling regarding governing law as law of the case). The Court declines to reconsider Judge Marrero's decision on the applicable law.

In any event, even if Judge Marrero had not previously applied New York law, the Court would do so now. "The selection of the governing law . . . is not an ace of spades to be held in counsel's hand until discovery has closed and then sprung on an unsuspecting adversary." *Rienzi & Sons, Inc. v. N. Puglisi & F. Industria Paste Alimentari S.P.A.*, No. 08 Civ. 2540, 2013 WL 2154157, at *7 (E.D.N.Y. May 16, 2013), *aff'd*, *Rienzi & Sons, Inc. v. Puglisi*, 638 F. App'x 87 (2d Cir. 2016). Defendants did not mention the CISG in their January 2022 Answer (ECF No. 10), their September 2022 Motion to Dismiss (ECF No. 38), their May 2023 Answer to the Amended Complaint (ECF No. 67), or their January 2024 letter seeking leave to file a motion for summary judgment (ECF No. 92). It was not until the eve of trial—two-and-a-half years into this litigation— that Defendants first raised the CISG. *See* ECF No. 126. Indeed, Defendants repeatedly invoked New York law and the New York UCC in their pretrial filings. *See, e.g.*, Mem. Supp. Mot. Dismiss at 13, ECF No. 38 (stating that "[w]here a contract in dispute is for the sale of goods, provisions relating to buyer's remedies are controlled by the [New York] Uniform Commercial Code"); Ans. ¶ 225, ECF No. 10 (arguing that "Plaintiff's claims are barred by the UCC, contractual, and/or common law defense based upon Plaintiff's failure to satisfactorily perform the services for which Plaintiff seeks payments"); Ans. to Am. Compl. ¶ 249, ECF No. 67 (same); Initial Pretrial Order § IV, ECF No. 123 (same). Defendants' prior assertion of an affirmative defense based on the

UCC is inconsistent with their eleventh-hour argument that the CISG, not the UCC, governs this case.

Defendants, by their conduct throughout this litigation, have consented to the application of New York law and waived reliance on the CISG. *See Rienzi*, 638 F. App'x at 90 (holding that district court did not err in finding that plaintiff had consented to the application of New York law before "untimely" invocation of the CISG); *Anhui Joyful Mfg. & Trading Co. v. M.I.S.S. Sportswear, Inc.*, No. 23 Civ. 8070, 2025 WL 887317, at *5 (S.D.N.Y. Mar. 21, 2025) (holding that defendant "consented to the application of New York law and waived application of the CISG" when it "waited until the summary judgment stage to invoke the CISG" and had relied on New York law in its affirmative defenses); *Ho Myung Moolsan, Co. v. Manitou Min. Water, Inc.*, No. 07 Civ. 07483, 2010 WL 4892646, at *2 (S.D.N.Y. Dec. 2, 2010) (explaining that plaintiff who "relied exclusively on New York law, and not the CISG, until after the close of discovery" had "by its actions . . . consented to the application of the N.Y.U.C.C. and it was far too late to withdraw that consent without undue prejudice to defendant"), *aff'd*, 501 F. App'x 85 (2d Cir. 2012). It would be particularly prejudicial to Plaintiff to reverse course on the governing law now, when Defendants failed to raise this issue for more than a year after Judge Marrero's application of New York law in deciding the Motion to Dismiss. Accordingly, the Court will continue to apply New York law.

### B.    Legal Principles

Because this case involves a contract for the sale of goods in excess of $500, the New York UCC governs the breach of contract claim. *See* N.Y. U.C.C. § 2-105(1) (stating that "'goods' means all things (including specially manufactured items) which are movable at the time of identification to the contract for sale"); *see also Acco, Ltd. v. Rich Kids Jean Corp.*, No. 15 Civ. 7425, 2017 WL 4350576, at *5 (S.D.N.Y. May 3, 2017) (stating, in a breach of contract claim

involving a Chinese garment manufacturer and United States importer, that "[s]ince the contract is for the sale of goods, Article 2 of the New York Uniform Commercial Code governs").

To prevail on a breach of contract claim, a plaintiff must prove: "(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).

First, to show the existence of a binding contract, "there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999) (citation omitted).  Generally, under New York law, "[a]n invoice between merchants containing the names and addresses of the buyer and seller, the date, the payment terms, the price of the goods, a description of the goods, the amount of the goods and the total price of the sale constitutes a writing in confirmation of a contract for the sale of goods satisfying the statute of frauds, provided that no written notice of objection is given as to the contents of the invoice within 10 days of receipt." *Demand Elec. Inc. v. Innovative Tech. Holdings, LLC*, 665 F. Supp. 3d 498, 505 (S.D.N.Y. 2023) (quoting *M. Slavin & Sons Ltd. v. Glatt Gourmet Cuisine, Inc.*, 877 N.Y.S.2d 857, 859 (App. Div. 2009)).

Second, a party seeking to recover for breach of contract "must first show it substantially performed under that contract." *Optima Media Grp. Ltd. v. Bloomberg L.P.*, No. 17 Civ. 01898, 2021 WL 1941878, at *8 (S.D.N.Y. May 14, 2021).  "Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007).

42

Third, the defendant's breach must be material. "Under New York Law, for a breach of contract to be material, it must go to the root of the agreement between the parties" such that it "defeats the object of the parties in making the contract." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997). "Material breach and substantial performance are two sides of the same coin." *Fund v. Titon Builders, Inc.*, No. 13 Civ. 7620, 2016 WL 3685086, at *5 (S.D.N.Y. July 5, 2016).

Fourth, a plaintiff must prove that it suffered damages as a result of the defendant's breach. The general yardstick for damages in a breach-of-contract claim is "the amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract." *Indu Craft, Inc., v. Bank of Baroda*, 47 F.3d 490, 495 (2d Cir.1995). To be recoverable, "damages must be not merely speculative, possible and imaginary, but they must be reasonably certain, and such only as actually follow or may follow from the breach of the contract." *Najjar Indus., Inc. v. City of New York*, 451 N.Y.S.2d 410, 414 (App. Div. 1982) (quoting *Wakeman v. The Wheeler & Wilson Mfr. Co.*, 4 N.E. 264, 266 (N.Y. 1886)). Nevertheless, "if a plaintiff has shown it more likely than not that it has suffered damages, the amount of damages need only be proved with reasonable certainty." *Indu Craft*, 47 F.3d at 496. Thus, "when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach." *Id.* (quoting *Wakeman*, 4 N.E. at 266).

Finally, it is well established that a harmed plaintiff must take reasonable actions to mitigate its damages. *Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985); *Coastal Power Int'l, Ltd. v. Transcon. Cap. Corp.*, 10 F. Supp. 2d 345, 370 (S.D.N.Y. 1998), *aff'd*, 182 F.3d 163 (2d Cir. 1999). The defendant bears the burden of introducing evidence to prove that

plaintiffs could have mitigated their damages but failed to do so. *Air Et Chaleur*, 757 F.2d at 494; *Coastal Power*, 10 F. Supp. 2d at 370.

Plaintiff brings two breach-of-contract claims: one relating to goods that Defendants accepted but did not pay for, and one relating to goods that Defendants did not accept and which Plaintiff subsequently resold (at a lower price than had been agreed to by Defendants). The Court will discuss each in turn.

## C.    Discussion: Unpaid Balance on Accepted Goods

In its principal breach-of-contract claim, Plaintiff seeks to recover the Unpaid Balance on the Delivered Goods. Defendants concede the first four elements of Plaintiff's contract claim and contest only the amount of damages. *See* Trial Tr. 364:9-19; Def.'s Post-Trial Proposed Conclusions of Law ("Def.'s PCOL") ¶¶ 127-31, ECF No. 177. That is, Defendants have abandoned any argument that Plaintiff failed to substantially perform its side of the bargain, thereby materially breaching the contract and excusing Defendants' own performance. *Compare* Ans. to Am. Compl. ¶ 249 (raising affirmative defense that "Plaintiff's claims are barred by the UCC . . . based upon Plaintiff's failure to satisfactorily perform"), *and id.* at 50 ¶ 11 (asserting counterclaim that Plaintiff's delivery of non-conforming goods and cancellation of orders "constitute a complete breach and material repudiation of the parties' agreements"), *with* Defs.' PCOL ¶ 131 (arguing only that "[t]he amount owed is disputed by Defendants"), *and* Tr. 364:17-18 ("The only defense to the contract claim is a deduction, an offset of some sort keyed to the debit memos. Otherwise, A Base IX owes the money.").

The Court agrees that, based upon the Stipulated Facts, Plaintiff has demonstrated each of the elements of its breach-of-contract claim. Specifically, the parties have stipulated that: (1) from February 2019 through October 2020, A Base entered into written Purchase Orders with LIC for apparel manufactured and shipped by Plaintiff to A Base; (2) Between June 2019 through May

2021, LIC sent A Base a series of written invoices setting forth the amounts due for the goods delivered pursuant to the Purchase Orders; (3) between June 2019 through 2021, Plaintiff delivered to A Base the goods identified in the Invoices; (4) except as claimed by A Base in the Debit Notes, as discussed below, A Base accepted the delivered goods; and (5) A Base failed to pay $4,195,434 on the Invoices, which remains unpaid to date.  Stipulated Facts ¶¶ 8-16.  Accordingly, the only remaining question is whether Plaintiff's damages should be offset due to the Debit Notes, the insurance payments, or its failure to mitigate damages.  *See* Defs.' PCOL ¶ 131.

### 1.    The Debit Notes

The parties dispute whether the Debit Notes should be treated as proposed contract modifications or as a form of recovery for late or non-conforming goods.  Plaintiff argues that "[t]he Debit Notes are proposed modifications of the parties' written contracts," Plaintiff's Proposed Conclusions of Law ("Pl.'s PCOL") at ¶ 20, ECF No. 179, and because Plaintiff never agreed to them in writing, they are unenforceable under New York law.  Defendants counter that the Debit Notes were "A Base IX's form of recovery for non-conforming or late goods."  Defs.' PCOL ¶ 140.  Defendants are referring, presumably, to their third counterclaim, which states: "Plaintiff breached the implied warranty of merchantability in that Plaintiff's goods and garments, subject of the Debit Notes, *inter alia*: (a) were not fit for the ordinary purposes for which such goods are used; (b) did not conform to the promises or affirmations of fact made to Defendant; or (c) were delivered late; or (d) simply, not delivered."  Ans. to Am. Compl. ¶ 20.

First, Plaintiff is correct that the Debit Notes cannot be enforced as contract modifications under New York law.  Under New York law, any proposed modifications to the contract of sale are not binding unless accepted in writing.  *See* N.Y. U.C.C. § 2-209(3) (providing that any modification of a contract for the sale of goods for more than $500 must be in writing and signed by the party to be charged); *S & S Textiles Int'l v. Steve Weave, Inc.*, No. 00 Civ. 8391, 2002 WL

1837999, at *6 (S.D.N.Y. Aug. 12, 2002).  Aside from the two Debit Notes to which Plaintiff agreed in whole or in part (Stipulated Facts ¶¶ 28-29), there is no evidence in the record demonstrating that Plaintiff approved the remaining Debit Notes in writing.  Accordingly, because all of the Debit Notes other than those two were not accepted in writing, they cannot be enforced as contract modifications.

Second, while the Debit Notes are relevant to Defendants' counterclaims for non-conforming or late goods, the Court concludes that Defendants have not prevailed on those counterclaims.  Defendants devote much of their analysis of the Debit Notes to the CISG, but they also cite UCC § 2-607, which describes a buyer's remedies when goods have already been accepted.[18]  *See* Defs.' PCOL ¶ 138.  Section 2-607 clarifies that a buyer's acceptance of delivered goods does not preclude a potential counterclaim for damages.  *See* N.Y. U.C.C. § 2-607(2); *United States for Use & Benefit Saunders Concrete Co. v. Tri-State Design Const. Co.*, 899 F. Supp. 916, 922-23 (N.D.N.Y. 1995).  Accordingly, the Court has considered the evidence regarding the Debit Notes in connection with Defendants' counterclaims to reduce the Unpaid Balance.

Defendants' counterclaims are subject to the general contract principles outlined above, *see supra* Conclusions of Law Part I.D, as well as the specific provisions for a buyer's remedy under UCC § 2-607.  First, the buyer "must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."  N.Y. U.C.C. § 2-607(3)(a); *see id.* § 1-205 ("Whether a time for taking an action required by this act is reasonable depends on the nature, purpose, and circumstances of the action.").  "The notification which saves the buyer's rights under [§ 2-607] need only be such as informs the seller that the

---

[18] Although Defendant stipulated that "[e]xcept as claimed by A Base IX in the Debit Notes discussed below, A Base IX accepted the Delivered Goods," they do not argue that A Base IX rejected the goods at issue in the Debit Notes.  Rather, the evidence shows—and Defendants' reliance on U.C.C. § 2-607 confirms—that Defendants accepted the Delivered Goods.

transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation." *Id.* § 2-607 cmt. 4. Second, "[t]he burden is on the buyer to establish any breach with respect to the goods accepted." *Id.* § 2-607(4). "However, this rule becomes one purely of procedure when the tender accepted was non-conforming and the buyer has given the seller notice of breach under subsection (3)." *Id.* cmt. 6. Third, if the first two requirements are satisfied, a buyer "may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." *Id.* § 2-714(1). "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." *Id.* § 2-714(2).

In sum, to establish their entitlement to recover for non-conforming goods, Defendants must (1) show that they notified Plaintiff of the breach within a reasonable time; (2) prove that Plaintiff breached the express or implied warranties in the contract; and (3) provide a reasonable measure of damages. N. Y. U.C.C. §§ 2-607, 2-714. The Court will next review the evidence to determine whether Defendants have proven a counterclaim for each Debit Note. Before doing so, however, the Court makes some general observations about the record.

Defendants' efforts to prove their counterclaims at trial were haphazard, and their post-trial briefing offers little help. For example, the testimony at trial was unclear as to when Defendants first notified Plaintiff of the concerns referenced in each of the Debit Notes. The Debit Notes dated from 2020 were not formally submitted until after the relationship between LIC and A Base had broken down in January 2021. (Trial Tr. 273:13-16; 265:13-16). As for the Debit Notes dated after January 2021, it is unclear whether they were submitted immediately or whether Defendants also waited on those.

47

Because § 2-607(3)(a) requires only that the buyer notify the seller of breach within a reasonable time, Defendants can establish reasonable notice by pointing to informal communications—such as a phone call, email, or text message—flagging their concerns before the submission of the formal Debit Note. But such evidence is not available across the board. At trial, Gammal testified that he "would have a daily discussion with Mr. Jiang" and "would explain to him the issues and the problems that [they] were having," Tr. 264:2-4, but that could mean either that he raised every problem on the day it arose or that he spoke with Jiang daily about problems that had arisen in the past. Gammal's testimony is too vague to establish when LIC was first notified of the concerns articulated in each of the Debit Notes. Some of the Debit Notes attach documentation of Defendants' communications with Plaintiff that give some clues as to when Plaintiff was notified. Although Defendants did not present testimony on these attachments at trial, the Court may look to them for proof of notice. Accordingly, for the 2020 Debit Notes, the Court will treat Plaintiff as having been notified the earlier of (1) January 2021 or (2) the date of documented communication in the attachments to the Debit Note. For the 2021 Debit Notes, the Court will treat Plaintiff as having been notified on or around the date listed on the Debit Note.

Additionally, Defendants did not attempt to prove either breach or damages at trial. Defendants did not elicit testimony from either Apperman or Gammal about the substance of the complaints in the Debit Notes or the damages incurred—either on direct examination or, after Plaintiff challenged the lack of documentation on cross, on redirect. Nor have Defendants in any meaningful way pointed the Court to documentary evidence of breach or damages in their post-trial briefing. Nevertheless, where the Court finds evidence of non-conformity on the face of the documents submitted by the parties, it will consider that evidence in deciding whether Defendants have established breach under § 2-607(4). Moreover, cognizant that "there can rarely be good reason for refusing . . . any damages whatever" where "it is certain that damages have been caused

by a breach of contract, and the only uncertainty is as to their amount," *Indu Craft*, 47 F.3d at 496, the Court will not reject Defendants' counterclaims out of hand for their failure to prove damages with specificity. But the fact that Defendants submitted the Debit Notes only in an effort to protect themselves once the relationship broke down—and did not include them in their January 2021 proposed payment plan—significantly undermines the trustworthiness of the claims on the face of the Debit Notes. Accordingly, the Court will consider evidence of breach and damages in the documents attached to the Debit Notes, but it will not take at face value the claims in the Debit Notes themselves.

The Court now turns to the documentary evidence to determine whether Defendants have proven a counterclaim under UCC § 2-607 for each Debit Note.

          a.     *Debit Note 115*

In Debit Note 115, A Base sought a $250,000 chargeback for goods that it alleges were shipped late, forcing it to give a markdown on the late goods to its buyer, Ross Stores.

Various e-mail communications attached to Debit Note 115 show that LIC did, indeed, deliver certain shipments late. (*See, e.g.*, PX-8 at 8.) And A Base provided reasonable notice of this alleged breach, satisfying § 2-607(3)(a): Although a year elapsed between the date of the Debit Note and its submission in January 2021 (Trial Tr. 273:19-21, 274:5-10), documentation attached to the Debit Note shows that Gammal e-mailed Jiang and others at LIC on January 16, 2020, stating that the delays were a "serious problem for us." (PX-8 at 4).

But the documentary evidence does not make clear that A Base was entitled to its claimed damages of $250,000 for that late delivery. It does not include, for example, proof of a $250,000 deduction from Ross. *See* Tr. 120:8-24. Nor did Defendants attempt to prove these damages at trial or justify them in its post-trial briefing. Because the Court has no basis on which to make a

reasonable determination as to damages, Defendants have failed to prove their counterclaim in connection with Debit Note 115.

### b.    *Debit Note 116*

In Debit Note 116, A Base sought a $657,097 chargeback for a 15% discount on its open balance.  (PX-9).  Although Gammal and Jiang had discussed the possibility of a 15% deduction on the open balance related to COVID-19, LIC never agreed to such a discount in writing.  (Trial Tr. 121:14-23).  Debit Note 116 does not relate to late or damaged goods.  (*Id.* at 122:2-5).  Because Defendants have not shown the existence or breach of an agreement for a 15% discount, Defendants have not made out a viable counterclaim related to Debit Note 116.

### c.    *Debit Note 118*

In Debit Note 118, A Base IX sought a $313,927 chargeback for allegedly moldy goods delivered by LIC.  (PX-10).  A Base contended that it received a return of approximately 32,400 pointelle sweaters from Ross Stores due to mold.  (Gammal Decl. ¶ 33).

Any counterclaim related to Debit Note 118 fails for lack of establishing adequate notice. Debit Note 118 is dated March 20, 2020 and was submitted to LIC in January 2021.  (Trial Tr. 273:19-21, 274:5-10).  The documentation attached to Debit Note 118 shows that A Base's buyer complained of mold in March 2020.  (PX-10 at 21).  At some point in the next nine months, A Base alerted LIC: an email from Jiang, dated December 31, 2020, refers to A Base's mold complaints and states that LIC disagrees with them.  (*Id.* at 3).  But the record does not indicate when in that nine-month period Defendants *first* communicated the issue to LIC.  The attachments to Debit Note 118 include an email from Apperman to Jiang explaining the issue with the moldy garments, but it is undated.  (*Id.* at 13).  Thus, while Defendants were aware of the mold issue as of March, there is no evidence indicating that they notified LIC of it prior to December.  The record therefore cannot sustain a finding of reasonable notice.  *See, e.g.*, *Mt. Vernon Mills, Inc., v. Murphy*

*Textile Mills*, 539 N.Y.S.2d 334 (App. Div. 1989) (holding seven month delay unreasonable as a matter of law under § 2-607(3)(a)). Because the Court cannot determine whether A Base notified LIC of the mold issue within a reasonable time, as required by § 2-607(3)(a), Defendants have failed to prove their counterclaim as to Debit Note 118.

#### d.    *Debit Note 119*

In Debit Note 119, A Base sought an $840 chargeback for allegedly damaged cartons. (PX-11). A Base contended that it incurred material and labor costs to replace the damaged cartons.

Any counterclaim related to Debit Note 118 fails for lack of establishing adequate notice and for failure to establish damages.

With respect to notice, Debit Note 119 is dated October 12, 2020 and was submitted in or after January 2021. The record does not reveal when Defendants first notified LIC of the damage to the cartons. Moreover, although A Base's buyers sent an email attaching photos of damaged cartons and laying the blame with the factory, it is unclear if the damage was indeed LIC's responsibility. (PX-11 at 2-3, 6-8).

In any event, assuming A Base notified LIC of the damage within a reasonable time and the damage was LIC's responsibility, Defendants have failed to provide any means of computing damages. There is no evidence of the material or labor costs allegedly incurred by A Base to replace the damaged cartons. (Trial Tr. 124:22-24). Because the Court has no reasonable means of assessing damages, Defendants have failed to prove their counterclaim as to Debit Note 119.

#### e.    *Debit Note 121*

In Debit Note 121, A Base sought a $312 chargeback for items that were packaged in the incorrect carton size. (PX-13.) A Base claimed that it incurred material and labor costs in replacing the cartons. (*Id.*). There are no attachments to Debit Note 121, and no documents in evidence demonstrating that A Base IX actually incurred any material or labor costs for the

allegedly incorrect cartons. (Trial Tr. 126:2-5). Even if Defendants can satisfy the notice and breach requirements, they have failed to provide any method of computing damages and have therefore failed to prove their counterclaim as to Debit Note 121.

### f.  *Debit Note 122*

In Debit Note 122, A Base sought a $16,450 chargeback for ocean freight shipping charges incurred because of allegedly delayed shipping by LIC. (PX-14). Sun accepted Debit Note 122 to the extent of $3,250 and did not accept the remaining balance. (Sun Decl. ¶ 11; Jiang Decl. ¶ 7). Any counterclaim related to the remaining balance on Debit Note 122 fails due to the lack of evidence to establish damages.

Debit Note 122 is dated December 8, 2020, but the attached email exchange appears to relate to a late shipment in October 2020. (PX-14). In that exchange, Loo and Jiang agreed that A Base and LIC would split the cost of a $6,500 shipping container, each contributing $3,250. There is no documentation to substantiate the remaining $13,200 ($16,450 minus the $3,250 LIC agreed to pay). (Trial Tr. 126:20-22, 127:2-5). Plaintiff has already agreed to deduct $3,250, and Defendants have failed to provide any evidentiary basis for the Court to award the remainder of the damages claimed in Debit Note 122.

### g.  *Debit Note 123*

In Debit Note 123, dated December 10, 2020, A Base sought a $4,870 chargeback for material and labor costs incurred in replacing 974 allegedly damaged cartons. (PX-15). Documentation attached to Debit Note 123 demonstrates that Loo emailed Jason on December 11, 2020, seeking chargebacks for $5 per carton. (*Id.*). The email exchange reflects a disagreement about the extent of the damages and who bore responsibility. (*Id.*). There is no evidence that LIC was responsible for the damaged cartons or that A Base actually incurred any costs in replacing

the damaged cartons.  (Trial Tr. 127:17-25).  Accordingly, the Court does not have sufficient basis to award damages on Defendants' counterclaim for Debit Note 123.

> h.    *Debit Note 126*

In Debit Note 126, A Base IX sought a $10,000 chargeback related to alleged "intentional delays in shipments" caused by LIC that resulted in increased freight charges.  (PX-16).  It is not clear from the email exchange attached to Debit Note 126 whether the increased freight cost was indeed attributable to LIC, and there are no documents in evidence substantiating the $10,000 chargeback.  Defendants have not proven a counterclaim as to Debit Note 126.

> i.    *Debit Note 127*

In Debit Note 127, A Base sought a $10,000 chargeback for fees and charges relating to a line of credit obtained for goods that Plaintiff allegedly did not ship.  (PX-17).  There is no documentation to substantiate the $10,000 chargeback sought in Debit Note 127.  (Trial Tr. 128:16-19).  A spreadsheet submitted by Defendants (PX-17) appears to show that A Base incurred $6,300 in fees on a line of credit in connection with LIC, but does not demonstrate why A Base would have a claim against LIC for $10,000 (or $6,300, for that matter).  Defendants have therefore not proven a counterclaim as to Debit Note 127.

> j.    *Debit Note 128*

In Debit Note 128, A Base sought a $1,500 chargeback for freight and warehouse costs allegedly incurred in connection with the same moldy goods referenced in Debit Note 118.  (PX-18).  It is unclear whether LIC bears responsibility for this moldy shipment—if anything, the record suggests that A Base may have repackaged the same moldy units previously returned by their buyer and shipped them to a different buyer nearly a year later.  (*Id.* at 8).  There is also no documentation to substantiate the $1,500 in damages claimed by A Base.  Accordingly, Defendants have failed to prove a counterclaim as to Debit Note 128.

k.    *Debit Note 135*

In Debit Note 135, A Base sought a $41,616 chargeback in connection with a shipment from LIC that included the wrong hanger headers on the garments. (PX-21). A comparison of the purchase order (DX-27) and the documentation attached to the Debit Note (PX-21) confirms that the garments A Base had ordered—two-packs of short-sleeve tops—were improperly labeled as three-packs of dolphin shorts. This evidence is sufficient to establish breach.

But Defendants have provided conflicting statements regarding the damages they seek. Debit Note 135 indicates that the $41,616 chargeback was for 9792 sets at a "$4.25 selling price," but Apperman testified at trial that it was for material and labor costs incurred in repackaging the order. (PX-21; Trial Tr. 161:17-20). Either way, Defendants have not provided the Court with any reasonable means to calculate damages. Assuming the chargeback was for damages based on the sale price of the goods, the measure of damages would be "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted." N.Y. U.C.C. § 2-714(2). Here, there is no evidence that the value of the goods as delivered was $0, entitling Defendants to recover the full selling price of $4.25 per item. Rather, if—as Apperman suggested—the goods were ultimately repackaged and resold, it would be reasonable for Defendants to recover the difference between the sale price originally agreed to with their buyer and the sale price they ultimately received, plus incidental costs. *Id.* §§ 2-714(2)-(3). But there is nothing in the record demonstrating the costs A Base incurred in swapping out the hangers. (Trial Tr. 161:23-25). Accordingly, Defendants have failed to provide a reasonable means of assessing damages on their counterclaim in connection with Debit Note 135.

l.    *Debit Notes 129, 130, and 136*

In Debit Notes 129, 130, and 136, A Base sought chargebacks of $282,000, $600,000, and $24,055.20, respectively, for alleged lost profits on orders LIC cancelled due to A Base's unpaid

balance.  (PX-19; PX-20; PX-22).  These counterclaims—unlike those discussed above—are not governed by UCC § 2-607(a) because they concern goods that were never delivered and therefore never accepted.

Defendants cannot prevail on their counterclaims for breach of contract on the cancelled orders because Plaintiff was wholly justified in cancelling them.  "It is a basic tenet of contract law that nontender of payment constitutes material breach, which operates to discharge performance by the nonbreaching party." *Imtrac Indus., Inc. v. Glassexport Co.*, No. 90 Civ. 6058, 1996 WL 39294, at *6 (S.D.N.Y. Feb. 1, 1996).  Under the UCC, where the buyer "fails to make a payment due on or before delivery," the seller may "cancel" the order.  N.Y. U.C.C. § 2-703(f).  Here, there is no dispute that, at the time Plaintiff cancelled the orders, A Base had failed to make multiple payments that were due.  (Sun Tie Decl. ¶ 14).  Accordingly, Plaintiff properly cancelled the orders that are the subject of Debit Notes 129, 130, and 136, and A Base IX is not entitled to any offset.

Indeed, Defendants' counsel acknowledged during summation that Plaintiff was entitled to cancel orders due to the excessive unpaid balance: "I can't say they did the wrong thing by cutting off the spigot, it is a lot of money that they were out and they were entitled to stop funding if they wished to stop funding.  But, Your Honor, the question is, why did it take them so long?"  (Trial Tr. 362:5-10).  Defendants have even argued that Plaintiff's failure to cut off the spigot earlier amounts to a failure to mitigate their damages.  Defs.' PCOL ¶ 156.  Defendants cannot plausibly argue that they are entitled to lost profits on the cancelled orders while also faulting Plaintiff for failing to cut them off earlier.

Even if Plaintiff's cancellation of the orders due to the excessive unpaid balance had not been justified, Defendants have not offered any documentation to support their claim to alleged lost profits.  Defendants calculated their lost profits based upon a 30% profit margin, but they

submitted no evidence that they indeed lost profits on the cancelled orders or that those profits would have been 30%.

Defendants have failed to prove a counterclaim as to Debit Notes 129, 130, and 136.

*　　　*　　　*

In sum, Plaintiff agreed to deduct $6,298 for Debit Notes 120 and 122 from the unpaid balance of $4,195,434. Defendants have not proven their counterclaims for any of the remaining Debit Notes, leaving Defendants liable for $4,189,136 on the contract claim, subject to the following discussion.

### 2.    The Insurance Assignment

Defendants argue that Plaintiff lacks standing to sue on certain purchase orders because it assigned its right of collection for $184,131 on these purchase orders to PICC. Defs.' PCOL ¶¶ 145-46. This argument fails because the Second Circuit has made clear that a pre-suit assignment of interest does not affect Article III standing. *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 380 (2d Cir. 2021). "[T]here is a distinction between having standing to pursue a claim and being a real party in interest with respect to that claim, only the latter of which is implicated by an assignment." *Id.* As the Sixth Circuit has explained, in a passage quoted with approval in *Fund Liquidation Holdings*, "one who sells his interest in a cause of action is not deprived of Article III standing, but he is susceptible to a real-party-in-interest challenge, at least if the challenge is timely raised." *Cranpark, Inc. v. Rogers Grp., Inc.*, 821 F.3d 723, 730 (6th Cir. 2016). Here, no real-party-in-interest challenge has been raised by Defendants, and the challenge is therefore waived. *Cf.* 6A *Wright & Miller's Federal Practice & Procedure* § 1542 (3d ed. 1998) (noting that real-party-in-interest challenges, unlike standing challenges, can be waived).

In any event, the purchase orders in question are actually from February 2021, and are not part of the Unpaid Balance. (Sun Tie Decl. ¶ 15; PX-5; DX-15). To the extent the assignment to

56

PICC is relevant, it can be relevant only to Plaintiff's recovery under its fourth cause of action for the resale of goods ordered in February 2021. But even if any recovery for the resold goods should rightfully belong to PICC under their agreement with LIC, "that is a matter of contract between the policyholder and the insurer." *Ocean Ships, Inc. v. Stiles*, 315 F.3d 111, 117 (2d Cir. 2002).

Defendants are not entitled to any deductions due to the assignment of rights to PICC.

### 3.   Mitigation of Damages

Finally, Defendants seek to reduce the balance owed to Plaintiff by raising the affirmative defense of failure to mitigate damages. Specifically, Defendants argue that "[a]t a point in time between February 11, 2019 and prior to January 2021, Plaintiff could have chosen to stop future transactions with A Base IX on account of the prior non-payments." Defs.' PCOL ¶ 156. In Defendants' view, "reasonable efforts, such as stopping future transactions with A Base IX prior to January 2021, requiring up-front payment for goods, requiring personal guaranties, would have reduced Plaintiff's damages." *Id.* ¶ 157. This argument is frivolous. Defendants cite no authority for the proposition that a party to a contract may escape liability by claiming its counterparty should have known it would breach and could have mitigated damages by not contracting with it in the first place. Defendants have not met their burden to show that Plaintiff failed to mitigate damages.

### 4.   Total Damages

In sum, the unpaid balance admitted by Defendants, $4,195,434, is reduced only by $6,298, the amount of chargebacks to which Plaintiff agreed in Debit Notes 120 and 122, resulting in total damages of $4,189,136.

Plaintiff is entitled to pre-judgment interest on that amount through the date of judgment. A pre-judgment interest award is governed by New York law. *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 147 (2d Cir. 2008) ("Under New York choice of law principles, the allowance of

prejudgment interest is controlled by the law of [the state] whose law determined liability on the main claim."). In New York, interest at nine percent "is generally mandatory" on damages awarded for breach of contract. *Rhodes v. Davis*, 628 F. App'x, 787, 792 (2d Cir. 2015).

Because the parties have stipulated to the Unpaid Balance as of July 13, 2021, the Court will compute the interest from that "reasonabl[y] intermediate date." N.Y. C.P.L.R. § 5001(b) (Consol. 2024). Applying the 9% rate to $4,189,136 results in annual interest of $377,022.24. Dividing that sum by 365 days results in a per diem of $1,032.93. Multiplying the $1,032.93 per diem by 1469, the number of days between July 13, 2021 and July 21, 2025, results in $1,517,374.17 in interest due as of July 21, 2025.

The total amount of damages to Plaintiff on its breach of contract claim as of July 21, 2025, therefore, is $5,706,510.17.[19]

### D.    Discussion: Resale of Rejected Goods

In its fourth cause of action, Plaintiff contends that it was forced to resell the Unsold Inventory from the 2021 Purchase Orders because A Base IX could not take possession of the goods. Plaintiff seeks to recover $1,495,766.98, the difference between the resale price of $465,102.89 and the contract price of $1,960,869.87. FAC ¶¶ 184-193, 226-229.

Under the UCC, a seller's remedies for a buyer's wrongful rejection of goods include withholding delivery, cancelling, and reselling the goods. N.Y. U.C.C. § 2-703. When the seller resells the goods in good faith and in a commercially reasonable manner, the seller can recover the difference between the resale price and the contract price. N.Y U.C.C. § 2-706(1); *see Apex Oil*

---

[19] Because the Court has found A Base IX liable for breach of contract, and Plaintiff's account stated and unjust enrichment claims are duplicative of its breach-of-contract claim, the Court need not reach the merits of the alternative claims. The Court therefore dismisses Plaintiff's claims for account stated and unjust enrichment *sua sponte*. *See Pro. Merch. Advance Cap., LLC v. C Care Servs., LLC*, No. 13 Civ. 6562, 2015 WL 4392081, at *6 (S.D.N.Y. July 15, 2015).

*Co. v. Belcher Co. of N.Y.*, 855 F.2d 997, 1001 (2d Cir. 1988). "Commercially reasonable" is not defined in the UCC, but it applies to "every aspect of the sale including the method, manner, time, place and terms." N.Y. U.C.C. § 2-706(2). If the resale is through a private sale, "the seller must give the buyer reasonable notification of his intention to resell." *Id.* § 2-706(3). Failure to satisfy the requirements of § 2-706 relegates the seller to the measure of damages provided in § 2-708—that is, the difference between the market price at the time and place for tender and the contract price. *Id.* cmt. 2; *id.* § 2-708. These "damages provisions are designed to put the seller in the same position he would have enjoyed had the buyer not breached the contract." *N. Am. Foreign Trading Corp. v. Direct Mail Specialist*, 697 F. Supp. 163, 166 (S.D.N.Y. 1988).

The UCC does not specify who bears the burden of proof under § 2-706, and the parties cite virtually no authority on this point. Based on a review of the limited caselaw addressing this issue, the Court concludes that the initial burden of proof as to the reasonableness of the resale lies with the seller. *See BAII Banking Corp. v. Atl. Richfield Co.*, No. 86 Civ. 6651, 1993 WL 403963, at *18 (S.D.N.Y. Oct. 7, 1993) (Sotomayor, J.) (finding that plaintiff had not "met its burden of proving" reasonableness of resale under § 2-706), *aff'd*, 28 F.3d 103 (2d Cir. 1994); *Fuji Photo Film USA, Inc. v. Zalmen Reiss & Assocs., Inc.*, 930 N.Y.S.2d 174 (App. Div. 2011) (holding that plaintiff who failed to give notice of private sale under § 2-706 "had the burden to prove that its resale to a third party represented a transaction made in good faith and in a commercially reasonable manner"). *But see Finnish Fur Sales Co. v. Juliette Shulof Furs, Inc.*, 770 F. Supp. 139, 148 (S.D.N.Y. 1991) (finding plaintiff's resale of furs commercially reasonable where "[d]efendants submit[ted] no evidence demonstrating that [plaintiff] disposed of their furs in any manner other than at regularly scheduled auctions, at the currently prevailing price").

Most treatises agree that the seller bears the initial burden. However,

59

> the burden here is slight.  About all a seller must do is introduce evidence of the
> resale price, allege that he acted reasonably and in good faith, and perhaps provide
> a brief scenario of the resale.  The burden of going forward with the evidence that
> the resale was commercially unreasonable then rests with the buyer.

Roy R. Anderson, Damages Under the Uniform Commercial Code § 4:24.  Shifting the burden to

the buyer upon an initial showing of reasonableness is consistent with the general principle that

the breaching party must prove a failure to mitigate by the wronged party.  *See Air Et Chaleur*,

757 F.2d at 494.  Because § 2-706's requirements of good faith and commercial reasonableness

invoke the seller's mitigation obligation, it makes sense to require some evidence from the buyer

that the seller failed to meet those requirements.

Here, the Court concludes that Plaintiff has met its burden under § 2-706 and Defendants

have failed to rebut Plaintiff's evidence that the resale was commercially reasonable.  The evidence

shows that in February and May 2021, LIC shipped A Base's final orders to Plaintiff's warehouses

in California.  (Sun Tie Decl. ¶¶ 15, 17).  The parties agreed that A Base would pick up the goods

after paying its outstanding balance.  (*Id.* ¶¶ 16, 18).  Then, on June 24, 2021, A Base authorized

Plaintiff "to sell off all remaining finished goods related to all A Base IX purchase orders" after A

Base paid for and collected a subset of 42,300 specific items.  (PX-56).  The Release covered "all

A Base IX trademarked goods" and was to be "effective on 07/01/2021." (*Id.*).  On June 25, 2021,

Defendants picked up 27,072 items of clothing that they had paid for.  (Sun Tie Decl. ¶ 21).  On

November 8, 2021, LIC sold the remaining inventory for a total of $465,102.89 to private buyers

in the United States and China.  (*Id.* ¶¶ 23-24; PX-7).  Sun Tie swore in his declaration that this

was a "commercially reasonable, market rate." (Sun Tie Decl. ¶ 24).  When asked on cross-

examination why the resale was commercially reasonable, neither Sun Tie nor Jason Jiang

provided additional detail, and both appeared confused by the question.  (Trial. Tr. 53:2-5, 87:22-

88:3).

Plaintiff's evidence of commercial reasonableness is not extensive, but it is sufficient to meet its initial burden.  Plaintiff provided evidence of the resale price of $465,102.89 and the declaration of Sun Tie that this was a reasonable market rate.  Although the resale price was only a quarter of the contract price, that is not surprising given that the garments were manufactured specifically for A Base and bore A Base's brand names.  (PX-56).  It is hard to imagine that other buyers would value the garments anywhere near as highly as A Base had.  The burden therefore falls on Defendants to put forth some evidence of unreasonableness.  Defendants seem to suggest that a resale price significantly lower than the contract price is evidence of unreasonableness (Defs.' PCOL ¶ 176), but the cases they cite involved goods far more fungible than garments manufactured to an importer's specifications.  *See Fuji Photo Film*, 930 N.Y.S. 2d at 174 (memory cards); *Apex Oil*, 855 F.2d at 1002 (heating oil).  Based on the limited evidence before the Court regarding the market for such garments, the Court cannot conclude that the resale price raises any inference of unreasonableness.

Defendants' arguments to the contrary have no basis in the record.  Defendants argue that Plaintiff "sold the goods [] to a single purchaser (who upon information and belief is not in the garment industry)."  Defs.' PCOL ¶ 177.  But Defendants cite no evidence from the bench trial or the many documents submitted by the parties to support this contention.  In any event, "the UCC does not obligate [the plaintiff] to resell the [goods] to the highest offeror under any and all conditions; it requires only that the resale was made in a commercially reasonable manner."  *Star Funding, Inc. v. Vault Mins., LLC*, No. 15 Civ. 03026, 2017 WL 7791558, at *3 (S.D.N.Y. Aug. 10, 2017), *report and recommendation adopted*, 2018 WL 1581685 (S.D.N.Y. Mar. 28, 2018).  Defendants also argue that the sale was unreasonable because it took place "almost a full year after A Base IX ordered the goods and six months after the goods were to be delivered."  Defs.' PCOL ¶ 177.  Most of that delay, however, was due to A Base's own failure to pay for its orders—while

LIC accommodated them for months awaiting payment. It was not until the end of June 2021 that Defendants finally released the items, effective July 1, 2021. Plaintiff resold the goods just over four months later. To be sure, that is longer than courts have found reasonable in the context of highly fungible goods for which there is a ready but volatile market. *See BAII Banking*, 1993 WL 403963, at *18 (explaining that the Second Circuit in *Apex Oil* "rejected the use for measuring damages of a resale that occurred six weeks after a breach, where the market [for oil] was volatile," and where the oil originally identified to the contract was sold the day after the breach, providing a better measure of damages). Here, however, there is no evidence that a ready buyer for Plaintiff's goods existed at the time of Defendant's breach, or that the market was so volatile as to render a four-month delay unreasonable. *See* N.Y. U.C.C. § 2-706 cmt. 5 ("What is such a reasonable time depends upon the nature of the goods, the condition of the market and the other circumstances of the case; its length cannot be measured by any legal yardstick or divided into degrees."). Defendants have therefore failed to rebut Plaintiff's showing of commercial reasonableness.

Finally, as to notice, Defendants' release authorizing the resale of "all A Base IX trademarked goods" suffices to establish reasonable notification under UCC § 2-706(3). (PX-56). A buyer's consent to resale is not required under the UCC, but it certainly is evidence of notice. And while Defendants argue that the resale was unreasonable because Defendants never took possession of *all* 42,300 items of clothing mentioned in the Release, it is clear from the record that Defendants knew they had until July 1, 2021 to pay for and pick up their final items, after which all remaining goods would be released for resale. (PX-56). That they failed to do so does not nullify the notification or render the sale unreasonable.

Thus, due to A Base IX's inability to pay for goods manufactured and shipped, Plaintiff's remedy is measured by "the difference between the resale price and the contract price together with any incidental damages." N.Y. U.C.C. § 2-706(1). Plaintiff was damaged in the amount of

$1,495,766.98, representing the difference between $1,960,869.87 and the resale price of $465,102.89.

Plaintiff is entitled to 9% interest ($368.81 per diem) on that amount running from November 8, 2021 through July 21, 2025, which totals $498,262.31 ($368.81 x 1,351 days). Plaintiff, therefore, is entitled to recover $1,994,029.29 on its fourth cause of action.

## II.    Piercing the Corporate Veil

### A.    Legal Principles

"The concept of piercing the corporate veil is a limitation on the accepted principles that a corporation exists independently of its owners, as a separate legal entity, that the owners are normally not liable for the debts of the corporation, and that it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners." *Morris v. N.Y. State Dep't of Tax'n and Fin.*, 623 N.E.2d 1157, 1160 (N.Y. 1993). This "privilege is not without its limits," however, and "courts will disregard the corporate form . . . whenever necessary to prevent fraud or to achieve equity." *Walkovszky v. Carlton*, 223 N.E.2d 6, 7 (N.Y. 1966). An attempt "to pierce the corporate veil does not constitute a cause of action independent of that against the corporation; rather it is an assertion of facts and circumstances which will persuade the court to impose the corporate obligation on its owners," which in turn "presupposes that the corporation is liable." *Morris*, 623 N.E.2d at 1160, 62.

"Under New York law, a party seeking to pierce the corporate veil must generally show that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *EED Holdings v. Palmer Johnson Acquisition Corp.*, 228 F.R.D. 508, 512 (S.D.N.Y. 2005).

To determine the first element, whether the owners exercised complete domination of the corporation with respect to the transaction attacked, courts "consider factors that would tend to show that defendant was a dominated corporation, such as:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own."

*Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991). The *Passalacqua* factors most relevant to determining wither an individual (as opposed to another corporation) should be held liable are the first, second, and third. *See Push, Inc. v. Prod. Advisors, Inc.*, No. 09 Civ. 4722, 2010 WL 1837776, at *3 (S.D.N.Y. Apr. 15, 2010); *One Step Up Ltd. v. Empire Apparel LLC*, No. 21 Civ. 5392, 2022 WL 1446553, at *8 (S.D.N.Y. Apr. 13, 2022), *report and recommendation adopted*, 2022 WL 4124943 (S.D.N.Y. Sept. 9, 2022). A court is "not required to find that every factor is present, and no one factor is dispositive." *Shantou Real Lingerie Mfg. Co. v. Native Grp. Int'l, Ltd.*, 401 F. Supp. 3d 433, 440 (S.D.N.Y. 2018) (citing *N.Y. State Elec. and Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 225 (2d Cir. 2014)). "The ultimate question is whether the policy behind the presumption of corporate independence and limited shareholder liability—encouragement of business development—is outweighed by the policy justifying disregarding the corporate form—the need to protect those who deal with the corporation." *N.Y. State Elec. and Gas Corp.*, 766 F.3d at 224.

To satisfy the second element, whether such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury, the party seeking to pierce the corporate veil must demonstrate "1) the existence of a wrongful or unjust act toward that party, and 2) that the act caused that party's harm." *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 386 F. Supp. 2d 461, 465 (S.D.N.Y. 2005) (citing *Morris*, 623 N.E.2d at 1161). Notably, a "plaintiff is not required to demonstrate fraud for the Court to pierce the corporate veil." *Id.* at 476. "Under New York law, the diversion of funds to make a corporation judgment-proof constitutes a wrong for the purposes of determining whether the corporate veil should be pierced." *Id.* (citing *Godwin Realty Assocs. v. CATV Enters., Inc.*, 712 N.Y.S.2d 39, 41 (App. Div. 2000).[20]

### B.    Discussion

As set forth below, the evidence demonstrates that Apperman and Gammal exercised complete domination and control over A Base IX and used that domination and control to commit a fraud or wrong against Plaintiff which caused Plaintiff's injury. The Court therefore pierces the corporate veil to impose A Base IX's liability on its members.

### 1.    Domination and Control

The evidence supports a finding that Apperman and Gammal exercised domination and control over A Base IX in all relevant respects. The first, second, third, sixth, and ninth *Passalacqua* factors are all clearly present here. The fourth, fifth, and tenth factors, though less relevant in this context, also support the piercing of the corporate veil.

---

[20] The parties disagree as to whether the standard applicable to veil-piercing claims is the preponderance of the evidence or clear and convincing evidence. Although the caselaw indicates that the standard is a preponderance of the evidence, *see Rotella v. Derner*, 723 N.Y.S.2d 801, 802 (App. Div. 2001) (holding the lower court erred when applying the clear and convincing standard to a veil piercing claim), the Court need not resolve this dispute because Plaintiff has made out a strong case that would satisfy even the clear-and-convincing standard.

### a.    Absence of Corporate Formalities

The first factor weighs in favor of piercing the corporate veil because A Base IX failed to maintain corporate formalities.  A Base IX did not hold formal corporate meetings, maintain a Board of Directors, or prepare meeting minutes.  (Trial Tr. 165:16-22; *see also* Gammal Tr. 38:3-9, 40:19-21; Apperman Tr. 37:22-38:7, 46:21-22).  *See Shantou Real Lingerie Mfg. Co.*, 401 F. Supp. 3d at 440 (noting the absence of corporate records, such as "resolutions, minutes, or the like . . . weighs in favor of a finding that a corporation failed to maintain corporate formalities.").  To be sure, the Second Circuit has cautioned that in cases of "small privately held corporations where the trappings of sophisticated corporate life are rarely present," "preoccupation with questions of structure, financial and accounting sophistication or dividend policy or history would inevitably beckon the end of limited liability for small business owners, many, if not most, of whom have chosen the corporate form to shield themselves from unlimited liability and potential financial ruin." *Wm. Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 601 (2d Cir. 1989).  Nevertheless, veil piercing is warranted where there is "an abuse of that form either through on-going fraudulent activities of a principal, or a pronounced and intimate commingling of identities of the corporation and its principal or principals.'" *Id.*  Here, the Court does not rely exclusively on the absence of corporate formalities; rather, it finds that the absence of corporate formalities, combined with the remaining factors, demonstrate clear abuse of the corporate form.

### b.    Inadequate Capitalization

The second factor weighs in favor of piercing the corporate veil because A Base IX was not adequately capitalized.  The Court's conclusion is supported by at least five categories of evidence.

First, the evidence shows that Defendants allowed deficits in A Base IX's banking accounts on multiple occasions: A Base IX's BHI Account Number XX0878 had a balance of -$11,857.89

on September 30, 2019 (PX-29 at Bates BHI2022D_000608); A Base IX's TD Bank Account Number XX6051 had a balance of -$8,320.20 on July 31, 2019 (PX-32 at Bates TD00658); A Base IX's TD Bank Account Number XX6051 had a balance of -$9,223.04 on January 29, 2021 (*id.* at Bates TD00693); and A Base IX's TD Bank Account Number XX6051 had a balance of -$11,225.35 on January 31, 2022 (*id.* at Bates TD00763). Apperman acknowledged during his redirect testimony that there may have been "dozens or hundreds" of instances where at least one of A Base IX's bank accounts had a deficit. (Trial Tr. 242:23-243:3). Apperman also testified that A Base IX frequently lacked sufficient funds to cover its expenses, including twenty such instances in 2019, a year that Defendants claimed was profitable for the business. (*Id.* at 181:1-21; Apperman Decl. ¶ 64).

Second, Merchant Factors Corp. identified A Base IX's inadequate capitalization in November 2019 when it notified A Base IX of a default under the Discount Factoring Agreement for failing to maintain a tangible net worth of at least $400,000. (DX-2 at 24, 27).

Third, A Base IX's 2019 and 2020 independently audited financial statements confirm that Apperman and Gammal inadequately capitalized A Base IX. (DX-23). According to these statements, Apperman and Gammal had $613,633 in negative equity in A Base IX at the beginning of 2019. (*Id.* at 7). By the end of the year, Apperman and Gammal had distributed $945,291 to themselves but still had $202,568 in outstanding loans and/or advances owed to A Base IX. (DX-23, at 7, 12). In 2020, Apperman and Gammal distributed $1,108,250 to themselves while also taking substantial loans or advances from A Base IX, increasing the amounts they owed to $618,967. (*Id.* at 7, 12). According to the auditor, Apperman and Gammal did not intend to pay A Base IX back within the next twelve months. (*Id.* at 12).

Fourth, A Base IX was unable to pay its creditors, as evidenced by the unpaid balance owed to Plaintiff, which grew from $600,912.15 in August 2019 to $4,195,434 in July 2021 (Stipulated

Facts ¶¶ 16-26); the default under Merchant's Discount Factoring Agreement as of February 2022 (Apperman Decl. ¶ 80); and the multiple non-payment actions commenced against A Base IX, Apperman, Gammal, and/or CSCO, LLC (PX-25; PX-26; PX-27; PX-28).[21]

Fifth, Susanne Apperman personally guaranteed A Base IX's debt with Merchant on April 12, 2019, even though she was neither an employee nor member of A Base IX and was not otherwise affiliated with A Base IX.  (PX-67; PX-54; S. Apperman Tr. 8:11-13).  This personal guarantee was in addition to the personal guarantees David Apperman and Albert Gammal had already provided to Merchant on behalf of A Base IX.  (Apperman Tr. 208:18-209:21).  The Court infers that Merchant required personal guarantees from A Base IX's members and a member's spouse because of A Base IX's undercapitalization.

Taken together, these categories of evidence make clear that Apperman and Gammal undercapitalized A Base IX.

### c.  *Commingling of Assets*

The third factor weighs in favor of complete domination and control because Apperman and Gammal repeatedly used A Base IX's funds for their own personal use, most notably by charging personal expenses to their corporate credit cards and by paying their personal credit card bills with corporate funds.  Aside from their improper credit card use, there are multiple other examples of Apperman and Gammal's commingling of personal and corporate assets and liabilities.

---

[21] In addition to the non-payment actions discussed at trial, Plaintiff points to two additional actions against A Base IX stemming from nonpayment of purchase orders made in 2016 and 2020, respectively.  *See* Complaint, *Texport Industries PVt. Ltd. v. A Base IX Company LLC et al.*, No. 18 Civ. 10214 (S.D.N.Y. Nov. 2, 2018); *see also* Complaint, *Weihai Weibai Imp & Exp Co., Ltd. v. A Base IX Company LLC*, No. 21 Civ. 10398 (S.D.N.Y. Dec. 6, 2021).

From 2019 through 2021, Apperman used A Base IX's funds to pay approximately $117,000 toward his personal credit card bills, and Gammal used A Base IX's funds to pay more than $500 toward his personal credit card bills. *See supra* Findings of Fact Part II.B.1. There is no evidence that these payments were ever repaid or otherwise reconciled—but even if they were, the use of corporate funds to pay for personal expenses in the first instance is evidence that Apperman and Gammal dominated and controlled A Base IX.

Between 2019 and 2021, Apperman and Gammal repeatedly used their A Base IX corporate credit cards to pay for indisputably personal expenses. Gammal used his corporate credit card to pay for, among other personal expenses, more than $10,000 for tuition and tuition loan payments at CUNY Baruch and CUNY Brooklyn (PX-34 at Bates AMEX001056-99); $9,485.72 for his extended family's airfare to and from Israel (PX-34 at Bates AMEX001065-66); $2,109.34 for the Fashion Institute of Technology (*id.* at Bates AMEX001057, 1098); and $868.65 for flights to Aruba for him and two family members (*id.* at Bates AMEX001197-98). Meanwhile, Apperman used his A Base IX corporate credit card to pay for, among other personal expenses, $2,610 at a furniture store near his Long Island home (*id.* at Bates AMEX001086); $662.16 for a spa hotel for himself and Jeffrey Apperman (*id.*); $345 for a deluxe passport express service (*id.* at Bates AMEX001087*)*; $550 for airline fees to Israel (*id.* at Bates AMEX001099); $545.85 for a travel agency in Jerusalem (*id.*); and $296.58 for flights to Cancun for himself and his wife Susanne (*id.* at Bates AMEX001170). Additional examples of personal expenses charged to A Base IX's corporate credit cards are detailed in the Court's Findings of Fact, *supra*.

Alice Gammal, who is neither an employee nor owner of A Base IX, also had a corporate credit card. In February 2022, while Apperman and Gammal were closing A Base IX's business, Alice Gammal used A Base IX's American Express Business Gold credit card to pay for the Gammal family's membership at the DSN Community Center. (PX-76 at 3; Trial Tr. 275:17-24,

276:7-9, 331:4-18, 332:3-5). Albert Gammal and Apperman testified that they did not know that Alice Gammal had an A Base IX corporate credit card (Trial Tr. 187:10-20, 275:4-12), but the Court finds their testimony not credible. The fact that the spouse of one of A Base IX's members had her own corporate card and used it for personal expenses is strong evidence that Apperman and Gammal abused the corporate form.

Although Gammal testified that any personal charges on A Base IX's credit cards "were reconciled by the bookkeeper and taken off the membership distribution" (*id*. at 277:13-15), Defendants did not offer any evidence demonstrating such reconciliation, and as noted, the Court does not credit his testimony on this issue. And even if the charges were ultimately reconciled, Apperman and Gammal's pervasive use of A Base IX's corporate credit cards for personal expenses, by itself, weighs strongly in favor of a finding of complete domination.

Additionally, on several occasions Gammal used A Base IX's assets to cover deficits and/or low balances in his personal account. On October 11, 2019, Gammal wired $100,000 from A Base IX's TD Bank Account Number XX7304 to his personal Citibank Account Number XX6930 when the latter had a $65.13 balance. (PX-30 at Bates TD00005; PX-36 at Bates ABASEIX003227). The transaction was not labeled as a loan repayment, draw, or distribution. (PX-31 at 7). On February 12, 2021, Gammal wired $120,000 from A Base IX's TD Bank Account Number XX7304 to his personal HSBC Account Number XX0880 when the latter had a balance of -$271.05. (PX-30 at Bates TD00079; PX-35 at Bates ABASEIX004485). The transaction was not labeled as a loan repayment, draw, or distribution. (PX-31 at 325). On July 14, 2021, Gammal wired $15,000 from A Base IX's TD Bank Account Number XX7304 to his personal HSBC Account Number XX0880 when the latter had a -$432.77 balance. (PX-30 at Bates TD00099; PX-35 at Bates ABASEIX004458). The transaction was not labeled as a loan repayment, draw, or distribution. (PX-31 at 388).

Finally, A Base IX provided a guaranty for a $150,000 personal loan made by One Step Up, Ltd. to Gammal. (PX-51 at 10-11, 26). Gammal used the loan proceeds to pay his portion of A Base IX's debt owed to Merchant. (Trial Tr. 192:18-193:2). Thus, Gammal intertwined his personal financial obligations with A Base IX's financial obligations.

In sum, the evidence at trial amply demonstrates that Apperman and Gammal used corporate funds for personal use and otherwise intermingled corporate and personal assets and liabilities, strongly supporting a finding of domination and control.

> d. *Business Discretion*

The sixth factor weighs in favor of piercing the veil because Apperman and Gammal had complete business discretion over A Base IX. Apperman and Gammal were solely in charge of approving A Base IX expenses. (Apperman Tr. 213:19-214:4). Apperman and Gammal were authorized to make bank transactions on behalf of A Base IX. (*Id.* at 170:13-16). Apperman and Gammal both had the authority to approve petty cash. (*Id.* at 57:13-17). From 2019 through 2022, Apperman and Gammal would approve any invoices and then Apperman would make the payment through A Base IX's banking system to the factories. (*Id.* at 56:3-19). Apperman oversaw the finances of A Base IX from 2019 through 2022. (*Id.* at 56:3-9).

> e. *Personal Guaranties of Corporate Debt*

The ninth factor weighs in favor of piercing the veil because Apperman and Gammal were the personal guarantors of multiple A Base IX obligations. (PX-67; PX-54). Although *Passalacqua* speaks in terms of another corporation guaranteeing the debts of the dominated corporation, 933 F.2d at 139, an individual member's guarantee of corporate debt is also relevant to a finding of domination and control. *See Lakah v. UBS AG*, No. 07 Civ. 2799, 2017 WL 7245365, at *92 (S.D.N.Y. Feb. 14, 2017) ("A shareholder's payment of corporate debt or guarantee of corporate credit or transfer of assets to a corporation in other than an arm's-length

documented transaction clearly support veil-piercing."). Here, Apperman and Gammal were both personal guarantors of the lease at 525 Seventh Avenue. (Gammal Tr. 27:5-28:25). Apperman and Gammal were both personal guarantors on A Base IX's SBA loan. (*Id.* at 168:3-15). Apperman and Gammal were both personal guarantors on the Merchant obligation. (Apperman Tr. 208:18-209:21). Accordingly, this factor supports piercing the corporate veil.

*f.*    *The Related Companies*

The remaining *Passalacqua* factors are less relevant to whether an individual should be held liable for corporate obligations and more relevant "when a plaintiff seeks to pierce the corporate veil to reach another corporation's assets on an 'alter ego' theory." *Push, Inc.*, 2010 WL 1837776, at *3 n.4. However, to the extent A Base IX shared ownership, officers, personnel, office space, a telephone number, and funds with other corporations controlled by Apperman and/or Gammal, that is additional evidence to support a finding of complete domination and control over A Base IX. *See iPayment, Inc. v. 1st Americard, Inc.*, No. 15 Civ. 1904, 2017 WL 727538, at *4 (S.D.N.Y. Feb. 23, 2017).

The fourth, fifth, and tenth factors weigh in favor of piercing the veil because A Base IX operated from the same space as CSCO, a nearly identical garment company owned by Apperman and Gammal. (PX-23). Like A Base IX, CSCO was also a defendant in at least one non-payment action. (PX-25). These facts support a finding of domination and control over A Base IX.

*         *         *

In sum, eight of the ten *Passalacqua* factors are present here, and the Court concludes that A Base IX was completely dominated by Apperman and Gammal in all relevant respects.

2.    Use of Domination to Commit a Fraud or Wrong

There is no question that Apperman and Gammal used their domination of A Base IX to commit a fraud or wrong against Plaintiff, satisfying the second prong of the test. Between 2019

72

and 2022, Apperman and Gammal stripped A Base IX of its assets, leaving it undercapitalized and unable to pay its debts to Plaintiff and other creditors. Their actions, which were motivated by a desire to render A Base IX judgment-proof, are the wrongs that resulted in Plaintiff's injury.

Between 2019 and 2021, while the unpaid balance owed to Plaintiff was steadily rising, Apperman and Gammal paid themselves handsomely from A Base IX's corporate bank accounts and took out additional loans and advances. And there is no evidence that they ever repaid these amounts. In 2019, Apperman and Gammal took at least $906,500[22] and up to $945,291[23] in distributions and at least $17,000 and up to $202,568 in loans and/or advances from A Base IX. (DX-22; DX-23). Meanwhile, A Base IX's unpaid balance owed to Plaintiff grew from $2,246.40 in February 2019 to $600,912.15 in August 2019. It ballooned to $1,980,338.94 by March 2020. (Stipulated Facts ¶¶ 20-22).

In 2020, Apperman and Gammal took at least $1,108,250[24] and up to $1,317,049[25] in distributions and $416,399 in loans and/or advances from A Base IX. (DX-22; DX-23). There is no record that the loans or advances were ever paid back, and according to the independent auditor, Apperman and Gammal did not intend to repay the loans within the next twelve months. (DX-23). Thus, even as their business began to suffer the effects of COVID-19, Apperman and Gammal took significantly *more* of A Base IX's assets for themselves in 2020 than they did the year before. Meanwhile, the unpaid balance owed to Plaintiff grew from approximately $1,980,338.94 in March 2020 to approximately $3,295,989.88 by September 2020. (Stipulated Facts ¶ 24).

---

[22] This figure is taken from Defendants' distribution schedule (DX-22).

[23] This figure is taken from the audited financial statements (DX-23).

[24] This figure is taken from the audited financial statements and is slightly lower in Defendants' distribution schedule ($1,317,049). (DX-22; DX-23).

[25] This figure is taken from Defendants' distribution schedule (DX-22).

In January 2021, the relationship between Plaintiff and Defendants suffered a major breakdown and Plaintiff began to cancel orders. Defendants decided they "needed to do something to protect" themselves and began issuing debit notes seeking chargebacks to reduce the unpaid balance. (Trial Tr. 273:18-21). That same month, Apperman signed two promissory notes on behalf of A Base IX promising to pay back $300,000 and $500,000 loans that Gammal and Apperman, respectively, had purportedly made in 2019. These promissory notes were fabricated; there is no evidence of any loans payable to Apperman or Gammal in A Base IX's 2019 and 2020 financial statements. By July 2021, the unpaid balance owed to Plaintiff had increased to $4,195,434. (Stipulated Facts ¶ 16). At the end of 2021, Apperman and Gammal took $1,202,100 in total distributions and an additional $19,500 in loans and/or advances. (DX-22 at 3, 9). Their distributions to themselves in 2021 were substantially unchanged relative to 2020, even though they reported a $301,538 loss on A Base IX's 2021 tax return. (PX-74).

Apperman and Gammal funded these generous distributions to themselves in 2019, 2020, and 2021 in part with income from A Base IX's sales of Plaintiff's garments. (Trial Tr. 203:2-11). Indeed, A Base IX claimed to make a tidy 30% profit on its sales of Plaintiff's goods. (Apperman Tr. 134:2-135:25). But rather than paying Plaintiff for the garments and then rewarding themselves from the profits on their sales, Apperman and Gammal chose to pay themselves first.[26] From February 2019 to July 2021, the unpaid balance owed to Plaintiff increased by $4,193,187.60. (Stipulated Facts ¶¶ 16-26). Over roughly the same period, Apperman and Gammal received $3,425,649 in total disclosed compensation (*see supra* Findings of Fact Part

---

[26] The parties dispute whether Apperman and Gammal were permitted under the Operating Agreement to make distributions to themselves when they had outstanding payments due to Plaintiff. The Court need not resolve this dispute, because, as discussed below, the overall pattern of distributions in the face of large and growing outstanding debts is clearly wrongful regardless of whether the Operating Agreement technically permitted each individual distribution.

II.D) and had $618,967 in total outstanding loans and advances from A Base IX (DX-23 at 12), for a total of $4,044,616.[27]  It is therefore fair to say that Apperman and Gammal's excessive distributions to themselves were a cause of Plaintiff's injury.

They did not stop there.  After this lawsuit was filed, Apperman and Gammal paid themselves an additional $325,500 from A Base IX's account on February 23, 2022.  (PX-31).  They funded these payments using the proceeds from a $1,000,900 SBA loan issued to A Base IX that same day.  (DX-6).  The payments violated the terms of the SBA loan agreement because Defendants did not obtain SBA's prior written consent before making distributions to themselves.  (DX-6 at Bates ABASEIX004033; Trial Tr. 208:22-209:1).  Again, Apperman and Gammal could have used the loan proceeds to pay down the balance owed to Plaintiff, but they chose not to do so.  (Trial Tr. 207:2-8).  Apperman and Gammal made these transfers to themselves when they were winding down A Base IX's business.  (*Id.* at 213:19-21, 214:9-13; Apperman Decl. ¶ 80).  A Base had defaulted under the discount factoring agreement with Merchant (Trial Tr. 213:10-25), and there were at least four non-payment lawsuits pending, including this one (PX-25; PX-26; PX-27).  A Base IX owed more than $4 million to Plaintiff and owed significant debts to Merchant, SBA, A Base IX's landlord, and at least one other manufacturer.  This eleventh-hour transfer was clearly motivated by a desire to shield A Base IX's assets from the company's many creditors, including Plaintiff.

Defendants' primary argument is that they were entitled to *some* payment for their services, so at least some of the payments must not have been wrongful.  In their view, "Plaintiff must prove that *each and every* transaction to the Individual Defendants was fraudulent or wrongful" in order to pierce the corporate veil.  Defs.' PCOL ¶ 47 (emphasis in original).  Defendants rely primarily

---

[27] These figures likely do not include the use of corporate funds to pay for personal expenses such as family vacations, community centers, and dining out.

on *Mars Electronics of N.Y., Inc. v. U.S.A. Direct, Inc.*, in which the court held that it would be inequitable to hold the individual defendant liable for the full amount owed by the defendant corporation on a motion for summary judgment "absent conclusive evidence" that he used his domination of the corporation "to commit fraud with respect to each and every transaction at issue." 28 F. Supp. 2d 91, 99 (E.D.N.Y. 1998). The court pierced the corporate veil, but it held the defendant liable on summary judgment for only "the amount of money wrongfully withdrawn" in a specific transaction. *Id.* at 100. *Mars Electronics* is distinguishable in many respects, not least of which is that it was a decision on partial summary judgment, and the court did not have the benefit of trial testimony to assess the defendant's culpable intent. Here, Defendants' demeanor and testimony at trial support the conclusion that they acted culpably in draining A Base IX's assets and choosing to pay themselves instead of A Base IX's creditors from 2019 to 2022.

"Piercing the corporate veil is an equitable remedy, with some flexibility in its application, and it is true that, on occasion, courts have chosen not to hold a defendant liable for a corporation's full liabilities even after piercing the veil." *Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.*, 724 F. Supp. 2d 308, 320 (E.D.N.Y. 2010) (citing *Mars Electronics*, 28 F. Supp. 2d at 99-100). But it is "more common in such cases" to find that the equities favor holding the defendant liable for all of the corporation's liabilities in question once the veil has been pierced. *Id.* Indeed, in an unpublished opinion, the Second Circuit rejected an argument by defendants in a veil-piercing case that the liability imposed on them as alter egos was disproportionate to the specific fraudulent transfers they had engaged in. *Atateks Foreign Trade, Ltd. v. Priv. Label Sourcing, LLC*, 402 F. App'x 623, 627 (2d Cir. 2010). The Circuit explained that, unlike "the fraudulent transfer statute, which . . . generally limits recovery to the particular property that was fraudulently transferred, . . . piercing the corporate veil . . . permits plaintiffs to hold those behind the corporation liable 'for some underlying corporate obligation.'" *Id.* (quoting *Morris*, 623 N.E.2d at 1160). Here,

similarly, the weight of the evidence clearly indicates that Apperman and Gammal engaged in a brazen and widespread pattern of transfers that was motivated by a desire to shield A Base IX's assets from its creditors, and to extract these assets for themselves. Accordingly, it is not disproportionate to hold them liable for the entire underlying debt to Plaintiff.[28]

The evidence reveals a persistent pattern of excessive distributions to Apperman and Gammal as they drained A Base IX's assets and allowed its debts to mount. In January 2021, they issued fabricated promissory notes, apparently in an attempt to retroactively justify their exorbitant distributions to themselves. Their wrongful conduct culminated in a final series of fraudulent transfers in February 2022 as the walls were closing in on them. The evidence compels "only one conclusion: that [Apperman and Gammal] did not care whether [A Base IX] ever fulfilled any of the obligations it entered into, as long as [they] could continue to extract money and other benefits

---

[28] At trial, Defendants misstated the law regarding the second element of a veil-piercing claim. Specifically, Defendants represented that the Second Circuit, in *American Federated Title Corp. v. GFI Management Services*, held that "absent persuasive evidence of a culpable motive as to each transfer, a transfer of assets . . . is not sufficient to justify veil piercing." (Trial Tr. 366:1-6). The quote Defendants were referencing appears to be from the district court opinion, and it reads: "Absent persuasive evidence of a culpable motive, therefore, a claim that is successful under DCL §§ 273 or 273-a may not establish wrongdoing sufficient to justify veil-piercing." *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 126 F. Supp. 3d 388, 405 (S.D.N.Y. 2015), *aff'd*, 716 F. App'x 23 (2d Cir. 2017).

Defendants misrepresent the law in two respects. First, Defendants argue that culpable motive must be shown "as to each transfer" (Trial Tr. 366:3-4; Defs.' PCOL ¶ 48), but no such words appear in the district court or the Second Circuit opinion. Second, Defendants suggest that Plaintiff must show "fraudulent intent," but the motive referenced by the district court in *GFI* was not fraudulent intent; rather, it was "a deceitful or unjust purpose." *Id.* at 405. The district court confirmed this in the next sentence, stating: "By the same token, evidence that a controlling party executed a constructively [as opposed to actually] fraudulent transfer with a deceitful or unjust purpose can justify veil-piercing, even absent a successful claim under DCL § 276." *Id.*

Finally, in affirming the district court's decision in *GFI*, the Second Circuit did not hold that proof of culpable motive is *always* required to pierce the corporate veil. Rather, it explained that "analysis of defendants' intent here offered one method of assessing whether the corporate form was sufficiently abused to permit veil piercing." 716 F. App'x at 28. Here, the evidence in the record of Defendants' wrongful purpose is abundantly clear, such that the Court need not decide whether piercing the veil would be appropriate on some other basis.

from the company." *Fed. Nat. Mortg. Ass'n*, 724 F. Supp. 2d at 321.  Because the evidence as a whole establishes Apperman and Gammal's wrongful intent through a broad pattern of misconduct, Plaintiff need not prove that every single transfer was motivated by a desire to shield A Base IX's assets from its creditors.

In sum, by diverting over $4 million to themselves while allowing more than $4 million owed to Plaintiff to go unpaid, and then further dissipating A Base IX's assets while winding down the business after this suit was filed, Apperman and Gammal used their domination of A Base IX to commit a wrong against Plaintiff.  Apperman and Gammal are therefore jointly and severally liable for A Base IX's breach of the parties' contract and its liability under the first and fourth causes of action in the Amended Complaint.  *See Trs. of N.Y. City Dist. Council of Carpenters Pension Fund, Welfare Fund, Annuity Fund v. Vintage Tile & Flooring, Inc.*, No. 14 Civ. 06450, 2015 WL 3797273, at *5 (S.D.N.Y. June 18, 2015) (holding that the defendants were jointly and severally liable for a separate judgment against one of the defendants because they were alter egos of one another).

## III.    Fraudulent Transfers

In its fifth and sixth causes of action, Plaintiff alleges that the transfers of the Vacation Home and portions of the SBA Loan after the filing of this lawsuit are fraudulent under New York's Debtor and Creditor Law ("DCL") § 273.  The Court agrees that the transfers were fraudulent, but it appears any relief the Court can order will only partially remedy Plaintiff's injury.

### A.    Legal Principles

New York's DCL § 273 is based on the Uniform Voidable Transactions Act (UVTA), which "aim[s] to prevent debtors from hiding or shielding their assets from creditors." *United States v. Miller*, 145 S. Ct. 839, 847 (2025).  The UVTA "provide[s] creditors with a cause of action to invalidate any transfer that a debtor made with the intent to defraud creditors," as well as

"'constructive' fraudulent transfers . . . made without an actual intent to defraud." *Id.*  Under the UVTA, "defrauded creditors may have their debtor's fraudulent transactions voided to the extent necessary to satisfy the creditor's claim." 50 A.L.R. 7th Art. 5 (2020).

New York's DCL § 273 provides that "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation" either "(1) with actual intent to hinder, delay or defraud any creditor of the debtor" or "(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."  N.Y. Debt. & Cred. Law § 273(a) (McKinney).  In determining actual intent under DCL § 273(1), courts consider a number of factors, often called badges of fraud, including whether:

> (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

*Id.* § 273(b).

The DCL exempts certain categories of property from its reach.  As relevant here, the DCL defines a debtor's assets to exclude "an interest in property held in tenancy by the entirety to the

extent it is not subject to process by a creditor holding a claim against only one tenant." *Id.* § 270(b)(3).

The typical remedy for a creditor seeking relief against a fraudulent transfer is "avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim." *Id.* § 276(a)(1). But the DCL also provides for other remedies, including "any other relief the circumstances may require," "subject to applicable principles of equity and in accordance with applicable rules of civil procedure." *Id.* § 276(a)(3)(iii). Thus, "where the assets fraudulently transferred no longer exist[,] a money judgment may be entered in an amount up to the value of the fraudulently transferred assets." *Perrone v. Amato*, No. Civ. 09-316, 2017 WL 2881136, at *38 (E.D.N.Y. July 5, 2017) (quoting *Neshewat v. Salem*, 365 F. Supp. 2d 508, 521-522 (S.D.N.Y. 2005)). Such money judgment may be entered against either "the first transferee of the asset or the person for whose benefit the transfer was made," or a transferee of that person other than "a good-faith transferee that took for value." N.Y. Debt. & Cred. Law § 277(b)(1). If such money judgment is "based upon the value of the asset transferred, the judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require." *Id.* § 277(2)(c).

## B.  Discussion: The Vacation Home Transfer

Plaintiff originally sought to set aside Gammal's February 2022 transfer of his interest in the Vacation Home as a tenant by the entirety to his wife, Alice Gammal. (FAC ¶ 232). But on April 2, 2024, as the trial originally scheduled in this action approached, the Vacation Home was sold to a third party. (PX-47). Plaintiff now acknowledges that this second transfer renders a set-aside impossible and instead seeks a money judgment against Gammal up to the value of the Vacation Home. Pl.'s PCOL ¶¶ 143, 154.

Defendants argue that Albert Gammal's interest in the Vacation Home would not have been available to satisfy a judgment in the first place "because the tenancy by the entirety cannot be reached by creditors of one party to the joint tenancy." Defs.' PCOL ¶ 119. Defendants misstate New York law. Although in some states "property held by spouses as tenants by the entirety is exempt from the claims of creditors of one spouse," "this is not the case for property owned by married couples in New York." *In re Mirian*, 656 B.R. 314, 318 (Bankr. E.D.N.Y. 2023); *see In re Persky*, 893 F.2d 15, 19 (2d Cir. 1989) ("[I]t seems plain that the interest of a tenant by the entirety is not exempt from sale and enforcement by execution."); *In re Parameswaran*, 50 B.R. 780, 783 (S.D.N.Y. 1985) ("The interest of a tenant by the entirety in New York is subject to the lien of judgment and may be sold under execution.").[29] Thus, had the second transfer not taken place, the initial transfer of Albert Gammal's interest in the home would have been voidable under DCL § 273(a) so long as it was actually or constructively fraudulent.[30]

---

[29] DCL § 270(b)(3), which Defendant puzzlingly does not cite, excludes any interest in property held in tenancy by the entirety only "*to the extent it is not subject to process* by a creditor holding a claim against only one tenant." N.Y. Debt. & Cred. L. § 270(b)(3) (emphasis added). In *In re Persky*, the Second Circuit considered a similar provision under federal bankruptcy law, which permits a debtor to exempt "an interest as a tenant by the entirety . . . to the extent that such interest as a tenant by the entirety . . . is *exempt from process* under applicable nonbankruptcy law." 893 F.2d at 18 (quoting 11 U.S.C. § 522(b)(3)(B)). The Circuit held unequivocally that an interest as a tenant by the entirety is not exempt from process under any New York law. *Id.* at 19.

[30] Defendants cite *Deerbrook Ins. Co. v. Mirvis*, No. 20-1385, 2021 WL 4256845 (2d Cir. Sept. 20, 2021), for the proposition that an interest held as a tenant by the entirety cannot be reached by creditors of one party to the joint tenancy. That is a misreading of the case. In *Deerbrook*, the district court had set aside a husband and wife's fraudulent conveyance to their daughter of their interests as tenants by the entirety in property in New York. In addition to setting aside the conveyance, the district court had ordered that the wife's right of survivorship be extinguished. *Id.* at *1. The Second Circuit held that the termination of the wife's right of survivorship was not authorized by the version of the DCL in effect at the time the transfer, but no one disputed that the creditor was entitled to enforce a judgment against the husband's interest in the property by selling it subject to the wife's right of survivorship. *Id.* at *1 & n.1. Moreover, the Second Circuit based its holding on the conclusion that the addition of the statutory language "any other relief the circumstances require" to the newer version of the DCL (the version applicable here) "strongly suggests that broad-based equitable relief was not available to those

The Court agrees with Plaintiff that Gammal's February 2022 transfer of his interest in the Vacation Home to Alice Gammal was actually fraudulent under DCL § 273(a)(1). Several of the classic badges of fraud are clearly present here: Alice Gammal, as Gammal's wife, is definitionally an insider under the DCL, *see* N.Y. Debt. & Cred. Law § 270(h)(1)(i), and she received no consideration for the transfer. That alone is sufficient to find the transfer presumptively fraudulent, and Gammal's explanation for the transfer—that it was made for unexplained "estate planning" purposes—fails to rebut that presumption. *See Cheek v. Brooks*, 135 N.Y.S.3d 478, 480 (App. Div. 2020) ("[W]hen a transfer is made without fair consideration, a presumption of insolvency and fraudulent transfer arises, and the burden shifts to the transferee to rebut that presumption."). Moreover, Albert Gammal retained possession and control over the Vacation Home after the transfer and orchestrated the subsequent sale of the home in 2024. (Trial Tr. 293:6-19, 302:1-11; Alice Gammal Tr. 63:16-18, 65:23-68:2). The transfer occurred just months after this action was commenced—and although Defendants argue that Gammal was not yet named as a Defendant, the notion that he was unaware of his potential liability is implausible. Moreover, on the same day Gammal transferred his interest in the Vacation Home, he also transferred his interest in the Brooklyn Property, evincing an intent to hide his assets. (PX-49). It is beyond dispute that Gammal transferred the Vacation Home with the intent to hinder, delay, or defraud Plaintiff and other creditors.

Gammal then sought to further obstruct Plaintiff's recovery when he orchestrated the sale of the Vacation Home to a third-party buyer in April 2024. Unfortunately, he may have been successful. It is unclear to the Court how Plaintiff's proposed remedy of a money judgment against

---

creditors under the pre-2020 DCL . . . ." *Id.* at *5. Here, the Court need not decide whether such relief would have been available upon a set-aside of the 2022 conveyance because Alice Gammal's right of survivorship has now been extinguished by the 2024 sale of the property.

Albert Gammal provides any real relief beyond that already afforded by the piercing of the corporate veil. The Court has held that Gammal is jointly and severally liable for the more than $4 million debt owed to Plaintiff by A Base IX, and the purpose of DCL § 273(a) is to help Plaintiff recover that amount, and no more. *See* N.Y. Debt. & Cred. L. § 277(b)(1) (providing that "the creditor may recover judgment for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim, whichever is less"); *Perrone*, 2017 WL 2881136, at *39 (noting that "when a plaintiff seeks compensation for the same damages under different legal theories of wrongdoing, the plaintiff should receive compensation for an item of damages only once"). But Gammal transferred the Vacation Home to his wife for no consideration specifically to shield the value of his interest in the home from a money judgment against him.

Now that the Vacation Home has been sold, the only way to reach the fraudulently transferred assets—to the extent they have not already been dissipated—would appear to be through Alice Gammal. The DCL provides that a money judgment may be entered against the transferee, and Plaintiff cites cases saying the same. *See Perrone*, 2017 WL 2881136, at *39; *Consumer Fin. Prot. Bureau v. MacKinnon*, No. 21 Civ. 537, 2024 WL 4277042, at *5 (W.D.N.Y. Sept. 24, 2024), *appeal dismissed* (Dec. 2, 2024). But Alice Gammal is not a party to this action, nor does Plaintiff seek a judgment against her. In both *Perrone* and *MacKinnon*, the recipients of the fraudulent transfers were named defendants, and the courts could therefore could enter money judgments against them to help satisfy the debt owed by the fraudulent transferor. *See Perrone*, 2017 WL 2881136, at *1 (naming Jack Amato as a defendant); *MacKinnon*, 2024 WL 4277042, at *1 (naming Mary-Kate as a defendant). That remedy is not available here.[31]

---

[31] The Court recognizes that Plaintiff may seek "any other relief the circumstances may require," "subject to applicable principles of equity and in accordance with applicable rules of civil procedure." N.Y. Debt. & Cred. L. § 276(a)(3)(iii). At the moment, the Court is unaware of any

In any event, a judgment against Albert Gammal is appropriate, even if duplicative of the veil-piercing claim, in the amount of $1.42 million,[32] for the fraudulent transfer of the Vacation Home under DCL § 273(a)(1). Plaintiff is also entitled to pre-judgment interest at the 9% rate ($350.13 per diem) on that amount running from February 3, 2022 until July 21, 2025 (1,264 days), which totals $442,564.32. This sum is coextensive with, and not in addition to, Gammal's liability for A Base IX's underlying debt after piercing the corporate veil. Gammal is also liable to Plaintiff for its reasonable attorney's fees under DCL § 276-a.

### C.    Discussion: The SBA Loan Transfers

Plaintiff's sixth cause of action alleges fraudulent transfer pursuant to DCL §§ 273, 276, and 276-a based on Defendants' transfer of $325,500 of the $1,000,900 SBA Loan from A Base IX's business checking account to Apperman and Gammal. FAC ¶¶ 234-239.[33]

This claim is also coextensive with the veil-piercing claim, under which Apperman and Gammal are jointly and severally liable for the entire debt owed by A Base IX. Nevertheless, the Court concludes that the transfers were actually fraudulent under DCL § 273(a)(1). A Base IX did

---

other relief that would be appropriate here, but it will permit post-judgment briefing from the parties on this issue.

[32] Because Gammal transferred the Vacation Home to Alice Gammal for no consideration, the 2022 value is not readily discernable through the transfer records. To determine the value as of the date of the transfer in February 2022, the Court considers the April 2024 sale records (PX-47, PX-50 through PX-51, PX-68) together with Alice Gammal's testimony, which demonstrate that an arm's length purchaser paid $4.3 million for the Vacation Home, and the 2022 and 2024 Monmouth County property tax assessments for the Vacation Home (PX-75), which show that the Vacation Home's assessed value was $1.9 million in 2022 and $2.9 million in 2024. Comparing the 2024 assessed value of $2.9 million and the 2024 purchase price of $4.3 million, the Court concludes that the assessed value is approximately 67% of the market value. Using that same 67% figure and reasoning backwards from the assessed value of $1.9 million in 2022, the market value of the home in 2022 would have been approximately $2.84 million ($1.9/.67). Gammal's one-half share would have been $1.42 million.

[33] Plaintiff originally alleged that the entire $1,000,900 was transferred to Gammal's personal checking account, but they have since revised their claim. *See* FAC ¶ 234; Pl.'s PCOL ¶¶ 164-65.

not receive any consideration for the $325,500 and the transfers were to corporate insiders (Apperman and Gammal). Thus, they are presumptively fraudulent. *Cheek*, 135 N.Y.S.3d at 480; *see also Mega Pers. Lines, Inc. v. Halton*, 780 N.Y.S.2d 409, 411 (App. Div. 2004) ("When the insider is the transferee or controls the transferee, there can be no factual dispute that the purpose of the transfer was to confer on the insider a preference over other creditors."). Defendants failed to rebut that presumption. They argue that "[c]ompensation for services to a corporate officer are not presumed to be made in bad faith and thus are not lacking in fair consideration." Defs.' PCOL ¶ 100.[34]   "Unlike payments for antecedent debts, transfers to corporate insiders for contemporaneous value are not presumed to have been made in bad faith." *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, No. 13 Civ. 6437, 2016 WL 4290525, at *4 (S.D.N.Y. Aug. 11, 2016). Here, however, Defendants offer no evidence that the payments were for contemporaneous value (and indeed argue that the $85,500 transfer was for antecedent debt).   Moreover, other badges of fraud are present here: the transfers were made when A Base IX was a party to three non-payment actions, Apperman was a defendant in two non-payment actions, and Gammal was a party to one non-payment action; and Defendants did not disclose the transfers. (PX-25-PX-28; Stipulated Facts ¶ 39). Thus, the evidence demonstrates that Defendants transferred a significant portion of the SBA Loan Proceeds with actual intent to hinder, delay, or defraud Plaintiff.

Accordingly, the transfer of $325,500 from the SBA Loan to Apperman and Gammal is voidable under DCL § 273 (a)(2). The per diem interest on the $325,500 is $80.26. Multiplying the per diem by 1,244, the number of days between the fraudulent transfers (February 23, 2022) and July 21, 2025, results in $99,843.44 in total interest. Accordingly, Plaintiff is entitled to

---

[34] Defendants once again cite the Second Circuit's decision in *American Federated Title Corp.*, 716 F. App'x at 27, when the language they quote is actually from the district court opinion, 2016 WL 4290525, at *4. (Defs.' PCOL ¶ 100).

judgment against Apperman and Gammal in the amount of $425,343.44 (which is coextensive with their joint and several liability for A Base IX's debt) plus its reasonable attorneys' fees on this claim pursuant to DCL § 276-a.

## IV.    Defendants' Counterclaims

As explained above, Defendants have abandoned their counterclaim for breach of contract and failed to prove their counterclaims for breach of the implied warranty of merchantability. *See supra* Conclusions of Law Part I.C. Defendants have also abandoned their counterclaim for damage to trade reputation, which they did not attempt to prove at trial. *See generally* Defs.' PCOL. Accordingly, Defendants' counterclaims are all dismissed.

## CONCLUSION

It is HEREBY ORDERED that:

On Plaintiff's first cause of action (breach of contract), A Base IX, David Apperman, and Albert Gammal are jointly and severally liable to LIC in the amount of **$4,189,136**, plus **$1,517,374.17** in pre-judgment interest, for a total of **$5,706,510.17**.

Plaintiff's second and third causes of action (account stated and unjust enrichment) are **DISMISSED** as duplicative of the breach-of-contract claim.

On Plaintiff's fourth cause of action (resale of goods under N.Y. U.C.C. § 2-706(1)), A Base IX, David Apperman, and Albert Gammal are jointly and severally liable to LIC in the amount of **$1,495,766.98**, plus **$498,262.31** in prejudgment interest, for a total of **$1,994,029.29**.

On Plaintiff's fifth cause of action (avoidance of fraudulent transfer as to the Vacation Home), Albert Gammal is liable to LIC in the amount of **$1,420,000**, plus **$442,564.32** in pre-judgment interest, for a total of **1,862,564.32**. This sum is coextensive with Gammal's joint and several liability on Plaintiff's first and fourth causes of action. Plaintiff may also seek reasonable attorney's fees on this claim under N.Y. D.C.L. § 276-a.

On Plaintiff's sixth cause of action (avoidance of fraudulent transfer as to the SBA Loan Transfers), David Apperman and Albert Gammal are jointly and severally liable to LIC in the amount of **$325,500**, plus **$99,843.44** in pre-judgment interest, for a total of **$425,343.44.** This sum is coextensive with Apperman and Gammal's joint and several liability on Plaintiff's first and fourth causes of action. Plaintiff may also seek reasonable attorney's fees on this claim under N.Y. D.C.L. § 276-a.

Defendants' counterclaims are **DISMISSED**.

Within **two weeks of the date of this Opinion**, the parties shall submit a joint letter, not to exceed two pages, identifying any remaining issues in this case. The letter shall state whether Plaintiff intends to file a motion for attorney's fees and, if so, shall include a proposed briefing schedule (or competing schedules) on that motion. The letter may also briefly address the issues the Court raised with respect to equitable relief on Plaintiff's sixth cause of action (*see supra* at 83 n.34) and indicate whether further briefing is necessary.

The Clerk of Court is respectfully directed to enter judgment in favor of Plaintiff in the amounts listed above.

SO ORDERED.

Dated: July 21, 2025

New York, New York

DALE E. HO
United States District Judge